Jeffrey L. Kradel, Esq.
jeff@kradeldefense.com
www.kradeldefense.com



KRADEL DEFENSE PLLC
YOUR CRIMINAL DEFENSE

February 10, 2025

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States v. Anthony Curcio & Iosif Bondarchuk*, 24 Cr. 312 (RA)
           **Defendant Curcio Motion for Franks Hearing**

Dear Judge Abrams:

Attached for the Court's consideration is Anthony Curcio's Motion for Hearing pursuant to *Franks v. Delaware*.

                              Respectfully submitted,

                              Jeffrey L. Kradel
                              Attorney at Law
                              WSBA #26767

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>ANTHONY CURCIO<br><br>      Defendant. | No. 24-CR-312<br><br>MOTION FOR HEARING PURSUANT TO *FRANKS V. DELAWARE*<br><br>[CLERK'S ACTION REQUIRED] |

### I. MOTION

Comes now the defendant, Anthony Curcio, through counsel, and moves this court for an order setting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The motion is supported by the Memorandum of Fact and Law below.

### II. DECLARATION OF COUNSEL

1. I am counsel for the defendant Anthony Curcio;

2. I have reviewed the discovery provided by the Government in this case;

3. Anthony Curcio has been an active collector of trading cards since 2000;

4. On December 5, 2023, in Cause No. 23-2-24037-5, Anthony Curcio filed a lawsuit in King County Superior Court in Seattle, Washington, against Jeffrey Johnson, aka "Captain Ticket." The suit alleged Mr. Johnson had taken Mr. Curcio's

property – trading cards- and either destroyed it or converted to his own use. The suit alleged breach of contract, unlawful conversion, defamation and libel. The Summons and Complaint for that case are attached as Appendix A.

On March 11, 2024, the court entered a default judgment in Mr. Curcio's favor, awarding a monetary judgment against Mr. Johnson for $123, 267.68, as well as ordering Mr. Johnson to retract defamatory statements he previously made against Mr. Curcio regarding allegations of trading card fraud. The judgment is also attached in Appendix A;

5. Jeffrey Johnson, throughout the period when he retained Mr. Curcio's property unlawfully, was acting in coordination with both Special Agent Chris Campbell (SA Campbell) of the Federal Bureau of Investigation (FBI) and employees and agents of Professional Sports Authenticator (PSA);

6. SA Campbell was aware of the lawsuit filed by Curcio against Jeffrey Johnson and the allegations within that lawsuit at least as early as November 23, 2023. Attached as Appendix C is an FBI memo drafted by SA Campbell reflecting that knowledge.

7. In September 2023, Jeffrey Johnson, representing himself as the owner of Captain Ticket, Inc. and Upland Sports, induced Mr. Curcio into consigning high-value collectible cards under false pretenses. Johnson claimed to have a robust network of buyers and a sophisticated consignment process, which he fraudulently used to gain Anthony's trust. Anthony, seeking to expand his professional dealings, agreed to consign several cards, including two highly valuable PSA-graded cards, with an

MOTION FOR HEARING PURSUANT TO  
*FRANKS V. DELAWARE*  
- 2

KRADEL DEFENSE PLLC  
1455 NW Leary Way, Suite 400  
Seattle, Washington 98107  
jeff@kradeldefense.com

agreement that the cards would either sell for a minimum of $80,000 or be returned immediately.

8. Upon receipt of the cards, Johnson falsely claimed the cards were counterfeit, refused to return them, and turned them over to PSA. Evidence indicates Johnson was coordinating with PSA throughout the transaction, acting as their proxy to confiscate Anthony's property under the guise of counterfeiting allegations. PSA collaborated with Johnson to obtain Anthony's cards unlawfully

9. SA Campbell, at the time he applied for the search warrant for Mr. Curcio's residence on May 22, 2024, knew that some portion of information he included in the affidavit in support of his application, had come from Jeffrey Johnson and employees and agents of PSA who had been acting in concert with Jeffrey Johnson;

10. The "reputable card authenticating company" described in SA Campbell's affidavit and referred to as "COMPANY-1" in that affidavit was in fact PSA;

11. As of May 22, 2024, SA Campbell knew that PSA was involved in an ongoing dispute with Mr. Curcio related, in part, to the role PSA played in retaining Mr. Curcio's property in concert with Jeffrey Johnson. He also knew that Curcio had repeatedly contacted PSA for clarification and resolution regarding his cards, only to be ignored. Despite Curcio's multiple attempts to obtain guidance from PSA—including emails, phone calls, and formal complaints filed with the Better Business Bureau (BBB) and the Federal Trade Commission (FTC) against PSA and PWCC—PSA remained silent. When PSA finally responded, it did so with an

MOTION FOR HEARING PURSUANT TO
*FRANKS V. DELAWARE*
- 3

KRADEL DEFENSE PLLC
1455 NW Leary Way, Suite 400
Seattle, Washington 98107
jeff@kradeldefense.com

undated letter that provided no clear resolution. SA Campbell, who was fully aware of these facts, excluded them from the warrant affidavit;

12. As of May 22, 2024, SA Campbell was aware Mr. Curcio had threatened to take legal action against PSA;

13. As of May 22, 2024, SA Campbell knew the criminal investigation targeting Anthony Curcio had come at the request of PSA, and that PSA had continued to act as a de facto investigator on behalf of the FBI;

14. As of May 22, 2024, SA Campbell knew that prior to PSA contacting his agency, no complaints of fraud related to trading cards and Anthony Curcio had been received by the FBI;

15. As of May 22, 2024, SA Campbell and the FBI had not utilized any investigative tools or techniques to determine of PSA's allegations against Curcio were true, but had instead allowed PSA to direct the investigation and provide all information related to determining if any item was "counterfeit" or was representing a card quality rating that PSA had never given the card;

The foregoing is true and correct to the best of my knowledge.

Jeffrey L. Kradel

### III. MEMORANDUM

#### A. Background Facts

On May 23, 2024, agents with the Federal Bureau of Investigation (FBI), in conjunction with other law enforcement agencies, served a search warrant at Anthony

MOTION FOR HEARING PURSUANT TO
*FRANKS V. DELAWARE*
- 4

KRADEL DEFENSE PLLC
1455 NW Leary Way, Suite 400
Seattle, Washington 98107
jeff@kradeldefense.com

Curcio's residence in Redmond, Washington. The warrant had been issued by Magistrate Michelle Peterson in the Western District of Washington upon an application made by Special Agent Chris Campbell (SA Campbell) of the Joint Major Theft Task Force in New York City.

The Declaration of Counsel above provides specific information that SA Campbell omitted from his affidavit in support of a search warrant application. To understand how important those omissions are to probable cause, it is helpful to understand other background information that is nowhere to be found SA Campbell's affidavit.

The affidavit, search warrant, and log of the items seized are attached as Appendix A.

**1.    The Trading Card Industry and PSA Background**

The trading card industry has undergone a significant transformation over the years, evolving from a nostalgic hobby into a high-value asset class. Once primarily seen as collectibles for enthusiasts, trading cards have become lucrative investments, with the IRS reclassifying them as "alternate assets" for tax purposes. However, as the value of these assets increased, so too did concerns over authenticity, fuelled by the rise of counterfeiting in the 1980s and 1990s. This uncertainty created a demand for third-party grading companies to authenticate cards and assess their condition, giving collectors and investors confidence in their purchases.

Professional Sports Authenticator (PSA), founded in 1991 by David Hall, quickly emerged as the dominant player in this growing industry. PSA provided a grading service that combined authentication with subjective evaluations of a card's quality, assigning grades based on factors like centering, surface condition, and corner wear. Once graded, cards were encapsulated in tamper-proof holders with certification numbers and labels, and PSA offered

MOTION FOR HEARING PURSUANT TO
*FRANKS V. DELAWARE*
- 5

KRADEL DEFENSE PLLC
1455 NW Leary Way, Suite 400
Seattle, Washington 98107
jeff@kradeldefense.com

a "Financial Guarantee" to reassure consumers of the card's authenticity and grade. This guarantee and the associated security features became a cornerstone of PSA's brand, propelling the company to market dominance.

Despite its outward success, PSA's internal operations were plagued by a lack of robust documentation. From its inception until 2021, PSA did not systematically photograph cards submitted for grading or maintain comprehensive records of their authenticated cards or processes. Details such as specific case types, manufacturing batches, or the labels used during encapsulation were inconsistently tracked, if at all. Changes to grading standards, labels, and cases were undocumented, creating an environment where it was difficult to establish the provenance or authenticity of a card once graded.

PSA also did not track ownership transfers, leaving them unable to accurately trace the ownership and history of the 75 million cards they had graded, despite offering a transferrable Financial Guarantee to owners of their Graded Card. While they offered an optional "Set Registry" for collectors to declare ownership for their own personal records, it relied on self-reporting and required no proof of possession or purchase of the originally Graded Card. This lack of documentation extended to grading policies and procedures, which PSA intentionally kept private. The company has been accused of inconsistencies in grading practices, including artificially suppressing high grades for certain eras of cards to inflate market values. PSA also benefited from collectors frequently resubmitting cards for regrading in hopes of receiving higher scores, a process that generated additional revenue for PSA.

In early 2021, Collectors Universe, Inc., the parent company of Professional Sports Authenticator (PSA), transitioned from a publicly traded company to private ownership. The acquisition was spearheaded by Steven A. Cohen, a billionaire hedge fund manager, through Cohen Private Ventures, alongside investments from D1 Capital Partners, founded by

MOTION FOR HEARING PURSUANT TO
*FRANKS V. DELAWARE*
- 6

KRADEL DEFENSE PLLC
1455 NW Leary Way, Suite 400
Seattle, Washington 98107
jeff@kradeldefense.com

billionaire Daniel Sundheim, and billionaire Nat Turner, who holds a 10% minority stake. While Turner has been publicly portrayed as the face of the acquisition, the controlling interest remains with Cohen's private equity group—a detail that has been carefully obscured from the public and collector community. Following the acquisition, the company's valuation skyrocketed from $700 million to $4.3 billion by March 2022, driven by aggressive revenue-focused strategies.

PSA's longstanding decision to forgo comprehensive record-keeping, despite available technological advancements, created systemic vulnerabilities in its operations—vulnerabilities the new ownership team viewed as opportunities to exploit for financial gain. Rather than addressing these gaps, PSA and its parent company, Collectors Universe, turned them into strategic advantages, prioritizing profit over transparency and accountability. This shift was exemplified in the company's revised corporate strategy, which included quietly removing the original terms of the financial guarantee and eliminating the insurance expenses associated with the cards they graded.

In September 2022, PSA established its Brand Protection Department, ostensibly to safeguard its intellectual property (IP) and brand integrity. However, the department's structure and actions fell short of ordinary intellectual property and brand protection. The department was staffed with individuals who had no specialized knowledge in IP law or brand protection. Crucially, there was no attorney oversight to ensure the actions taken complied with consumer protection and other relevant laws.

### 2. PSA and Anthony Curcio

*The Captain Ticket Operation*

MOTION FOR HEARING PURSUANT TO
*FRANKS V. DELAWARE*
- 7

KRADEL DEFENSE PLLC
1455 NW Leary Way, Suite 400
Seattle, Washington 98107
jeff@kradeldefense.com

In September 2023, Jeffrey Johnson, representing himself as the owner of Captain Ticket, Inc. and Upland Sports, induced Mr. Curcio into consigning high-value collectible cards under false pretenses. Johnson claimed to have a robust network of buyers and a sophisticated consignment process, which he fraudulently used to gain Anthony's trust. Curcio agreed to consign several cards, including two highly valuable PSA-graded cards, with an agreement that the cards would either sell for a minimum of $80,000 or be returned immediately.

Upon receipt of the cards, Johnson falsely claimed the cards were counterfeit, refused to return them, and turned them over to PSA. Evidence indicates Johnson was coordinating with PSA throughout the transaction, acting as their proxy to confiscate Anthony's property under the guise of counterfeiting allegations. PSA collaborated with Johnson to obtain Curcio's cards unlawfully.

PSA's involvement went beyond passive receipt of the stolen cards. Johnson's communications with PSA reference PSA's requests for additional cards and their purported "examination" of items. The coordination between PSA and Johnson extended to misinformation and public disparagement of Curcio. All of this was known to SA Campbell when he applied for the search warrant for Mr. Curcio's residence

### *PSA, Curcio and a Jordan Card*

On September 18, 2022, Anthony Curcio agreed to sell a 1986 Fleer Michael Jordan Sticker #8, PSA Certificate #03085869 ("Jordan Card"), to Brian Oleska. The terms of the agreement required PSA to authenticate and reholder the card, after which PSA would ship the card directly to Oleska. Oleska agreed to release payment to Anthony upon receiving the

authenticated and reholdered card. Oleska completed the required PSA reholdering form to facilitate the process.

PSA physically inspected the Jordan Card and its case during the reholdering process. The card and case were authenticated, updated into a new case and label, bearing PSA Certificate #03085869, and photos of the card were entered into PSA's Cert Verification system. PSA's database included detailed photos of the Jordan Card in its reholdered state, with all features matching the card Oleska purchased from Curcio.

On or about October 12, 2022, PSA shipped the Graded Card #03085869 directly to Oleska, fulfilling the terms of the agreement. PSA's authentication occurred without their knowledge of Anthony Curcio's association with the card, and no concerns were raised about the card's authenticity or the integrity of the PSA holder while in their possession.

In July 2023, Jackie Curiel, an employee of PSA, became aware of Anthony Curcio's role as the seller of the Jordan Card. Curiel contacted Oleska via phone, informing him that he was a "victim" of Anthony Curcio and alleged that Anthony was a counterfeiter. Curiel specifically claimed that the Jordan Card's PSA holder were counterfeit, basing her allegations solely on Anthony's involvement as the seller. Curiel disregarded PSA's prior authentication of the PSA case and card, which had occurred months earlier when Anthony was not associated with it.

Curiel then introduced Oleska to Christopher Campbell of the FBI via email, facilitating communication between them. SA Campbell's affidavit failed to disclose that the Jordan card in question had been authenticated and graded by PSA and then only later declared "fraudulent" with no basis for that claim.

MOTION FOR HEARING PURSUANT TO
*FRANKS V. DELAWARE*
- 9

KRADEL DEFENSE PLLC
1455 NW Leary Way, Suite 400
Seattle, Washington 98107
jeff@kradeldefense.com

**B.     Legal Standard**

*Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), requires the court to determine whether the defendant has made "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155-56, 98 S.Ct. at 2676.  To be entitled to a hearing under *Franks*, a defendant must make a "substantial preliminary showing" that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding. See *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir.1987). If, after setting aside the allegedly misleading statements or including the omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a Franks hearing. See *id.*

**C.     Material Facts Were Intentionally or Recklessly Omitted from the Search Warrant Affidavit.**

The affidavit in support of the search warrant in this case failed to disclose material information related to probable cause.   Those omissions are described in the Declaration of Counsel above, and center around the failure to disclose information relevant to the credibility of the sources of information that SA Campbell relied upon in his affidavit in support of the application for a search warrant.

In a separate motion Mr. Curcio has raised the fundamental problem with this search warrant application – the affidavit lacks any facts to support the broad allegations it lodges against Mr. Curcio, provides no information about the sources used by investigators, and fails to even disclose which source of information – even if unnamed – provided the factual allegation. *See Defendant's Motion to Suppress and Memorandum in Support of Suppression*.

1  This motion suggests a possible explanation for that lack of information – the FBI had not
2  been investigating this case independently but rather acting as a proxy for PSA in its dispute
3  with Mr. Curcio.

4  In *United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003), the Second Circuit
5  addressed the validity of a warrant affidavit where law enforcement misrepresented the extent
6  of their investigation, misleading the magistrate into making a probable cause determination
7  based on an inflated impression of the evidence. The court ruled that a misrepresentation
8  about investigative steps taken—even if not outright false—can invalidate a warrant if it
9  creates a misleading picture for the issuing magistrate. . *See United States v. Awadallah*, 349
10 F.3d 42, 68 (2d Cir. 2003) ("*Franks* protects against omissions that are *designed to mislead*,
11 or that are made in *reckless disregard of whether* they *would mislead*, the magistrate.")
12 (quoting *United States v. Coakley*, 899 F.2d 297, 300-01 (4th Cir. 1990)) (emphasis in
13 original).

14 The way SA Campbell drafted the search warrant affidavit – identifying multiple
15 possible sources of information yet never indicating which source gave information, nor why
16 that source should be believed – is understandable when the omissions are revealed.  If those
17 material facts are included in the affidavit, then probable cause would be lacking.

18 The affidavit failed to tell the magistrate that "COMPANY-1" was not a passive figure
19 in the claims against Mr. Curcio, but instead the engineers of those claims.  The interests and
20 bias of PSA and Jeffrey Johnson were not disclosed – specifically the ongoing civil lawsuit
21 and PSA and Johnson's unlawful conversion of Curcio's property.  It is hard to point to *which*
22 facts in the affidavit would have been impacted by the veracity of the source because it is
23 impossible to identify the source.

24
25

MOTION FOR HEARING PURSUANT TO
*FRANKS V. DELAWARE*
- 11

KRADEL DEFENSE PLLC
1455 NW Leary Way, Suite 400
Seattle, Washington 98107
jeff@kradeldefense.com

Attached as Appendix D is an email exchange between Roxanne Ghezzi, an employee of PSA, and SA Campbell and other members of the FBI/NYPD Task Force. The exchange demonstrates how the FBI and PSA worked in conjunction – with Ghezzi asking for guidance on how to deal with an ongoing request by Curcio for the return of his property, and SA Campbell providing them with direction. SA Campbell's affidavit leaves out completely the role PSA was playing, and the complete absence of any independent investigation by the FBI.

The affidavit creates an impression there had been objection determination that Curcio was involved in creating fraudulently rated cards. That was not the case. The FBI was not examining evidence – they were receiving emails from PSA. The FBI was not investigating – they were parroting claims from PSA and inserting them into the affidavit as if they were their own. The FBI was essentially an agent of PSA, and PSA of the FBI. The "Joint Task Force" did not just include the FBI and NYPD – it had a third, non-governmental party who had specific monetary and legal interests in causing the prosecution of Mr. Curcio. And none of that was communicated to the magistrate in the affidavit.

### E. When All Material Information is Included the Affidavit Fails to Establish Probable Cause to search Curcio's Residence.

The search warrant application in this case would have been denied had all material information been included in the affidavit submitted in support of that application. That omitted information would have allowed the magistrate to evaluate the bias of the individuals and companies feeding the FBI allegations against Curcio, and the complete absence of any independent investigation by the FBI.

### F. Conclusion

The defense has met the threshold requirements for the Court to grant the request for a Franks hearing.

MOTION FOR HEARING PURSUANT TO
*FRANKS V. DELAWARE*
- 12

KRADEL DEFENSE PLLC
1455 NW Leary Way, Suite 400
Seattle, Washington 98107
jeff@kradeldefense.com

*I certify that this memorandum contains 3211 words in compliance with local criminal rules.*

Dated this 10th day of February 2025.

Respectfully submitted,

s/Jeffrey L. Kradel
WSBA No. 26767
1455 NW Leary Way, Suite 400
Seattle WA 98107
206/397-3102 voice
206/922-5547 facsimile
jeff@kradeldefense.com

CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

AUSA Kingdar Prussein and AUSA David Felton.

U.S. Attorney's Office for Southern District of New York

/s Jeffrey Kradel