UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 24 Cr. 312 (RA) |
| ANTHONY CURCIO,<br>a/k/a "Brendan Wooley," and | |
| IOSIF BONDARCHUK,<br>a/k/a "Joe Bondarchuk," | |
| Defendants. | |

**THE GOVERNMENT'S OPPOSITION TO DEFENDANT ANTHONY CURCIO'S
PRETRIAL MOTIONS**

MATTHEW PODOLSKY
Acting United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

David R. Felton
Kingdar Prussien
Assistant United States Attorneys
- Of Counsel –

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.   Overview of Alleged Offense Conduct ................................................................ 2

    B.   The Challenged Premises Search Warrant ........................................................... 6

        1.   The Search Warrant ................................................................................. 6

        2.   Statements in the Campbell Affidavit ..................................................... 7

        3.   The May 23, 2024 Search ...................................................................... 11

ARGUMENT ................................................................................................................... 14

I.      The Motions Should Be Denied for Lack of Standing ........................................ 15

    A.   Legal Standard ................................................................................................... 15

    B.   Curcio Has Not Established Standing ................................................................ 17

II.     The Motions Should Be Denied without a *Franks* Hearing ............................. 18

    A.   Legal Standard ................................................................................................... 19

        1.   The Magistrate Judge's Probable Cause Determination ........................... 19

        2.   The *Franks* Doctrine ............................................................................. 20

        3.   Proof of Intentional or Reckless Conduct ............................................. 21

        4.   Materiality ............................................................................................. 23

    B.   The Campbell Affidavit is Detailed and Provides Timely Evidence Establishing Probable Cause ................................................................................................................. 24

    C.   There is No Basis for a *Franks* Hearing ......................................................... 27

        1.   The Campbell Affidavit Did Not Omit Material Information or Contain a False Statement ............................................................................................. 28

        2.   The Alleged Omissions Were Not Made Deliberately or Recklessly ......... 29

        3.   The Alleged Omissions Were Not Material to the Probable Cause Determination ... 31

CONCLUSION ................................................................................................................ 32

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Pages**

*Franks v. Delaware*,
    438 U.S. 154 (1978)...................................................................................... 1, 14, 19

*Gerstein* v. *Pugh*,
 420 U.S. 103 (1975)............................................................................................ 19

*Illinois* v. *Gates*,
    462 U.S. 213, 238 (1983)............................................................................ 19, 25, 32

*Kentucky v. King*,
563 U.S. 452, 459 (2011)...................................................................................... 15

*Panetta v. Crowley*,
460 F.3d 388, 395 (2d Cir. 2006)......................................................................... 22

*Rawlings v. Kentucky*,
    448 U.S. 98, 104 (1980)................................................................................... 16

*Rivera v. United States*,
    928 F.2d 592, 602 (2d Cir. 1991)................................................................ 22, 27

*Texas* v. *Brown*,
460 U.S. 730 (1983)............................................................................................. 19

*United States v. Aulicino*,
44 F.3d 1102 (2d Cir. 1995)................................................................................. 16

*United States v. Awadallah*,
349 F.3d 42, 64 (2d Cir. 2003)................................................................... 20, 21, 22

*United States v. Beltempo*,
675 F.2d 472, 476-79 (2d Cir.1982) ..................................................................... 27

*United States v. Calk*,
2020 WL 3577903 (S.D.N.Y. Jul. 1, 2020) .......................................................... 22

*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000)........................................................... 20, 21, 23, 24, 29

*United States v. Cromitie*,
2010 WL 3025670 (S.D.N.Y. July 28, 2010) ....................................................... 23

*United States v. Damian Campagna*,
No. 16 CR. 78 (LGS), 2016 WL 4367992 (S.D.N.Y. Aug. 11, 2016) ....................... 27

*United States v. Dore*,
586 F. App'x 42, 46 (2d Cir. 2014) ................................................................. 16, 17

*United States v. Falso*,
    544 F.3d 110, 125-26 (2d Cir. 2008) ................................................... 20, 21, 29

*United States v. Fama*,
758 F.2d 834, 838 (2d Cir. 1985)..................................................................... 27, 28

*United States* v. *Feola,*
651 F. Supp. 1068, 1109 (S.D.N.Y. 1987).................................................................... 22

*United States v. Fields,*
113 F.3d 313, 322 (2d Cir.1997)................................................................................. 15

*United States v. Galpin,*
720 F.3d 436, 445 (2d Cir. 2013)............................................................................... 15

*United States v. Gotti,*
399 F. Supp. 2d 214, 221 (S.D.N.Y. 2005)................................................................. 31

*United States v. Haqq,*
278 F.3d 44, 47 (2d Cir. 2002).................................................................................. 15

*United States v. Lahey,*
967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013)....................................................... 23, 29, 30

*United States v. Levasseur,*
816 F.2d 37, 43 (2d Cir. 1987).................................................................................. 24

*United States v. Maisonet,*
2013 WL 12204909 (S.D.N.Y. Mar. 22, 2013) .......................................................... 22

*United States v. Mathieu,*
No. 16 Cr. 763 (LGS), 2018 WL 5869642 (S.D.N.Y. Nov. 9, 2018)........................... 16

*United States v. Melissas,*
No. 05 CR. 107 (GEL), 2005 WL 2414550 (S.D.N.Y. Sept. 21, 2005)....................... 27

*United States v. Montoya-Eschevarria,*
892 F. Supp. 104, 106 (S.D.N.Y. 1995)................................................................. 16, 17

*United States v. Nejad,*
436 F. Supp. 3d 707, 720 (S.D.N.Y. 2020)................................................................ 31

*United States v. Payner,*
447 U.S. 727, 731 (1980)........................................................................................ 15

*United States v. Pena,*
961 F.2d 333, 336 (2d Cir. 1992).............................................................................. 16

*United States v. Rajaratnam,*
719 F.3d 139, 146 (2d Cir. 2013)....................................................... 20-23, 28-30

*United States v. Ray,*
541 F. Supp. 3d 355 (S.D.N.Y. 2021)........................................................................ 30

*United States v. Reilly,*
76 F.3d 1271, 1280 (2d Cir. 1996)............................................................................ 23

*United States v. Rivera,*
750 F. Supp. 614 (S.D.N.Y. 1990) ....................................................................... 22, 27

*United States v. Rowell,*
903 F.2d 899, 903 (2d Cir. 1990).............................................................................. 27

*United States v. Ruggiero*,
824 F. Supp. 379, 391 (S.D.N.Y. 1993) ........................................................................ 16

*United States v. Singh*,
390 F.3d 168 (2d Cir. 2004) ............................................................................... 19, 26

*United States v. Vilar*,
No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ....................... 22, 23

*United States v. Watson*,
404 F.3d 163, 166-67 (2d Cir. 2005) ...................................................................... 17, 18

*United States v. Wilbert*,
818 F. App'x 113, 115 (2d Cir. 2020) ........................................................................... 27

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Anthony Curcio's motion to suppress evidence obtained through a premises search warrant and motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (ECF Nos. 32 (the "Suppression Motion") & 33 (the "*Franks* Hearing Motion") (collectively, the "Motions")). The Motions do not meet the demanding standard for suppression or for a hearing, and accordingly they should be denied.

In the Suppression Motion, Curcio argues that broad suppression is required because, in his view, the affidavit in support of the search warrant does not provide a basis for the assertions made therein or the sources of those assertions, and the assertions themselves are nevertheless stale. In the *Franks* Hearing Motion, Curcio argues that a hearing is appropriate because FBI Special Agent Christopher Campbell ("SA Campbell")—who submitted the affidavit in support of the warrant—purportedly deliberately lied to or recklessly misled the approving magistrate judge concerning material facts. The Court should reject Curcio's meritless contentions.

First, Curcio has failed to establish standing to challenge the warrant through sufficient evidence. Second, even if Curcio had established standing, the Suppression Motion fails because SA Campbell clearly stated the sources he relied upon, provided detailed explanations of what he learned from those sources, and provided timely evidence supporting probable cause to believe that evidence and instrumentalities of Curcio's crimes would be found in Curcio's residence. Finally, the *Franks* Hearing Motion fails to make the threshold showing that SA Campbell's affidavit intentionally or recklessly contained any material misrepresentations or omissions of fact, as required to warrant a hearing. Instead, Curcio apparently relies on his anticipated (and likely impermissible) trial defense that the FBI investigation that led to the charges was not only a sham, but was a conspiracy between the FBI and private parties to steal Curcio's property and attack his

reputation. Curcio's speculative and far-fetched claims provide no basis for a *Franks* hearing. For the reasons stated herein, the Motions should be denied in their entirety.

## BACKGROUND

### A.  Overview of Alleged Offense Conduct

Indictment 24 Cr. 312 (RA) charges Anthony Curcio and coconspirator Iosif "Joe" Bondarchuk with violations of Title 18, United States Code, Sections 1349 (wire fraud conspiracy), 1343 (wire fraud), and 2 (aiding and abetting the same) (collectively, the "Subject Offenses"). (ECF No. 3, the "Indictment" or "Ind.") The charges arise from an FBI investigation that uncovered Curcio's and Bondarchuk's fraudulent scheme to defraud buyers and marketplaces to purchase sports and Pokémon trading cards at false and inflated prices by misrepresenting that low-to-mid grade cards had received high-grade ratings from a reputable card authentication company ("Company-1"), thereby causing victims to pay more money for the cards than they otherwise would have. (Ind. ¶ 1.)

Specifically, from at least 2022 to May 2024, Curcio and Bondarchuk sold and attempted to sell fraudulent sports and Pokémon trading cards to victims across the country. (*Id.*) In total, Curcio and Bondarchuk attempted to defraud victims of over $2 million through their sales and attempted sales by misrepresenting the grades of numerous trading cards. (*Id.*)

Sports and Pokémon trading cards can have considerable resale value depending on, among other things, their condition and authenticity. (*Id.* ¶ 2.) Company-1 is a prominent card authenticator and grader. (*Id.*) For a fee, Company-1 verifies a card's authenticity, assesses its condition, and assigns it a numerical grade from 1 to 10, with 1 being the lowest grade and 10 being the highest grade. (*Id.*) The grade assigned is reflective of the card's market value. (*Id.*) After grading a card, Company-1 seals the card in a distinctive, tamper-resistant plastic case that encloses the card to preserve its condition and indicates its grade on an affixed label. (*Id.*)

2

The card grade assigned by Company-1 significantly impacts the market value of the card. (*Id.* ¶ 3.) For example, one of the cards that Curcio and Bondarchuk sold in connection with the scheme was a misrepresented 1986 Fleer Michael Jordan #57 rookie card ("1986 MJ Card"). (*Id.*) A 1986 MJ Card graded as an 8 has an estimated market value of between $6,000 and $7,000. (*Id.*) But this same card, when graded as a 10 by Company-1, has had an estimated market value of between approximately $185,000 and $203,000. (*Id.*) In short, representations about Company-1's grade of a card go directly to the value of the card itself and the price at which the card can be bought and sold. (*Id.*) In May 2022, Curcio advertised the sale of a 1986 MJ Card on an online marketplace based in Manhattan (the "Manhattan Marketplace") for $171,700, as pictured below:



(*Id.* ¶ 5.) Curcio advertised the 1986 MJ Card as having a purported grade of 10 assigned by Company-1, despite knowing that Company-1 had not assigned this grade to the card. (*Id.*) To make it appear as though the 1986 MJ Card had received a rating of 10 from Company-1, Curcio caused a purported Company-1 label to be included in the plastic case, along with a fraudulent bar code and certification number. (*Id.*)

Through the Manhattan Marketplace, Curcio and Bondarchuk sold various cards at inflated prices by falsely claiming the cards had been assigned higher ratings by Company-1 than was true. (*Id.* ¶ 4.) Curcio and Bondarchuk also sold and attempted to sell fraudulent cards at in-person card shops, auctions, and card shows. (*Id.* ¶ 7.) Curcio further sold and attempted to sell fraudulent cards through other online platforms using third-party sellers. (*Id.*)

When victims demanded refunds and confronted Curcio and Bondarchuk, including by showing them confirmations from Company-1 that they had misrepresented the grade of the cards they were selling, Curcio and Bondarchuk feigned ignorance and often refunded the victims. (*Id.* ¶ 6.) Yet, after being put on notice that the cards' grades and labels were fraudulent, Curcio and Bondarchuk repeatedly attempted to, and did, sell these very same cards to subsequent victims, again with fraudulent labels showing an inflated grade from Company-1. (*Id.*)

Among the fraudulent cards that Curcio and Bondarchuk sold and attempted to sell are a 1999 Pokémon Venusaur card and a 1999 Pokémon Charizard card, as pictured below:

 

(*Id.* ¶ 8.) In July 2023, as part of a law enforcement undercover purchase of the above fraudulently misrepresented 1999 Pokémon Venusaur card for $10,500—a card which Bondarchuk had previously attempted to sell on an online marketplace—Curcio mailed the card to the undercover law enforcement purchaser in Manhattan after the undercover purchaser wired the money to a Curcio-controlled bank account. (*Id.*)

Knowing that they were committing fraud, Curcio and Bondarchuk repeatedly used fake names and identities to conceal their involvement in the fraudulent scheme. (*Id.* ¶ 10.) For example, in March 2023, after a victim complained to Bondarchuk about his sales of fraudulent cards, including a Tom Brady rookie card, a John Elway rookie card, and various Michael Jordan cards, Bondarchuk gave the victim Curcio's phone number but falsely told the victim that the phone

number belonged to another individual who, in reality, was a leader of the Hells Angels motorcycle ring. (*Id.* ¶ 10(a).) A couple month later, in May 2023, after another victim complained to Bondarchuk about his sales of fraudulent cards, including a 1968 Topps Nolan Ryan/Jerry Koosman rookie card, Bondarchuk gave the victim Curcio's phone number but this time falsely told the victim that the phone number belonged to someone named "John Steel." (*Id.* ¶ 10(b).)

About a month before the grand jury returned the Indictment, in April 2024, at a card show in New Jersey, Curcio gave a business card to a potential victim buyer, falsely claiming to be "Brendan Wooley" and listing, among other identifiers, a phone number and LinkedIn page purportedly belonging to "Brendan Wooley." (*Id.* ¶ 10(c).) However, Curcio—and not "Brendan Wooley"—created and operated the LinkedIn page and controlled the phone number. (*Id.*)

Importantly, in furtherance of the fraud, Curcio ordered from an online marketplace various items needed to create forged card cases and labels, and had them shipped to his residence. (*Id.* ¶ 11.) The items included various card grading cases, thermal transfer barcode labels, a magnifier loupe optical glass, a handheld inkjet printer, a lock-cutting kit, an electric grinding pen, an abrasive buffer and polishing wheel, an abrasive and bristle brushes, and drill bits designed for engraving. (*Id.*)

## B. The Challenged Premises Search Warrant

### 1. The Search Warrant

The Indictment was returned on May 20, 2024. After the grand jury in the Southern District of New York returned the Indictment, multiple federal magistrate judges in different federal districts issued search warrants based upon their findings of probable cause.[1] As relevant here, Curcio challenges only the premises search warrant designated No. 24 Mag. 309 (W.D.W.A.) (the

---

[1] The Government produced the search warrants and their respective affidavits in support thereof to the defendants on or about September 19, 2024.

"Search Warrant"), issued on May 22, 2024, by the Honorable Michelle Peterson, United States Magistrate Judge for the Western District of Washington, which authorized the search of Curcio's residence in Redmond, Washington (the "Premises"), and any digital devices or other electronic storage media located therein. (ECF No. 32-1, Appendix A to the Suppression Motion.)

The Search Warrant was issued upon an application made by Special Agent Christopher Campbell of the FBI's Major Theft Task Force in New York City (the "Campbell Affidavit" or "Affidavit"). Consistent with the Indictment, the Affidavit listed the following Subject Offenses: 18 U.S.C. §§ 1349 (wire fraud conspiracy), 1343 (wire fraud), and 2 (aiding and abetting the same).

### 2. Statements in the Campbell Affidavit

At the beginning of the Campbell Affidavit, SA Campbell generally described the sources he relied upon for the factual assertions he made in the Search Warrant application:

> The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of cooperating witnesses; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.

(Campbell Aff. ¶ 3.) SA Campbell later provided specific sourcing when making particular factual claims. (*See id.* ¶¶ 7-12.)

SA Campbell made clear that "[b]ecause this Affidavit [was] submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it [did] not set forth each and every fact that [he] and others have learned during the course of this investigation." (*Id.* ¶ 4.) Indeed, the Affidavit was explicit that SA Campbell "set forth only the facts that [he] believe[d] [were] necessary to establish probable cause to believe that evidence, fruits and instrumentalities of" the Subject Offenses would be found at the Premises. (*Id.*)

The Campbell Affidavit not only referenced the Indictment, but it made clear that the grand jury in the Southern District of New York returned the Indictment just two days earlier, and it incorporated the Indictment by reference therein. (*See id.* ¶ 5.) The Affidavit then briefly summarized the allegations set forth in the Indictment. (*See id.* ¶ 6.)

The factual summary supporting probable cause to believe Curcio had engaged in the Subject Offenses (*i.e.*, 18 U.S.C. §§ 1349, 1343, and 2) was accompanied by facts supporting probable cause to believe that evidence, fruits and instrumentalities of that criminal activity would be found in Curcio's residence, the Premises. For example, SA Campbell explained that, based on: (1) information provided to him and other law enforcement agents by certain victims of the fraudulent trading card scheme, (2) his training and experience, (3) his discussions with other law enforcement agents, and (4) his own participation in this investigation, SA Campbell learned that:

> [Curcio] repeatedly provided the [Premises] as his shipping address to victims. Specifically, when victims learned that the trading cards were fraudulent and demanded refunds and/or otherwise confronted [Curcio] about the fraudulent trading cards, among other things, [Curcio] asked the victims to return the fraudulent trading cards to him by mailing the cards to the [Premises]. A victim returned a fraudulent card to [Curcio] at the [Premises] as recently as September 2023.

(*Id.* ¶ 7.)

The Affidavit explained that, based on: (1) purchase records produced to law enforcement pursuant to a grand jury subpoena served upon an online marketplace, (2) SA Campbell's discussions with other law enforcement agents, (3) his training and experience, and (4) his own participation in this investigation, SA Campbell learned that during the fraudulent trading card scheme:

> [Curcio] ordered various items needed to create forged card cases and labels to be delivered to his listed residence, the [Premises]. Specifically, between in or about June 2022 and in or about February

2024, [Curcio] purchased various card grading cases, thermal transfer barcode labels, a magnifier loupe optical glass, a handheld inkjet printer, a lock-cutting kit, an electric grinding pen, an abrasive buffer and polishing wheel, an abrasive and bristle brushes, and drill bits designed for engraving. The most recent purchase, in February 2024, was for drill bits designed for engraving.

(*Id.* ¶ 8.)

The Affidavit further explained that, based on: (1) flight records obtained by law enforcement pursuant to a database search, (2) SA Campbell's discussions with other law enforcement agents, (3) his training and experience, and (4) his own participation in this investigation, SA Campbell learned that Curcio "attended a card show" in April 2024, in New Jersey, where Curcio "was identified and removed from the show for having fraudulent cards," and that Curcio "flew directly from Seattle to Newark" to attend this card show. (*Id.* ¶ 9.)

Additionally, the Affidavit made clear that, based on: (1) records produced to law enforcement pursuant to grand jury subpoenas served upon phone companies and financial institutions, (2) SA Campbell's discussions with other law enforcement agents, (3) his training and experience, and (4) his own participation in this investigation, SA Campbell learned that the Premises was listed as Curcio's address on Curcio's "driver's license and bank records." (*Id.* ¶ 10.) SA Campbell further stated that surveillance was conducted on the Premises on multiple days in May 2024 and, as recently as May 21, 2024—the day before the warrant application was submitted to the magistrate judge—Curcio was seen at the Premises. (*Id.*)

The Affidavit explained that, based on the information set forth therein and in the Indictment, it appeared that Curcio "used the [Premises] to further the fraudulent trading card scheme." (*Id.* ¶ 11.) Accordingly, based on SA Campbell's training and experience and his participation in the investigation, including SA Campbell's review of Curcio's communications with victims, there was probable cause to believe that the Premises contained, among other things,

"fraudulent trading cards and certain tools and equipment needed to create forged card cases and labels in connection with the commission of the Subject Offenses." (*Id.*)

In addition, the Campbell Affidavit detailed the use of electronic devices in furtherance of the scheme. In particular, the Affidavit set forth that, based on: (1) information provided to SA Campbell and other law enforcement agents by certain victims of the fraudulent trading card scheme, (2) his discussions with other law enforcement agents, (3) his training and experience, and (4) his own participation in this in this investigation, SA Campbell learned that Curcio "use[d] electronic devices to communicate with victims" and that Curcio "communicated with victims via emails, phone calls, and text messages." (*Id.* ¶ 15.) SA Campbell further detailed that he had "reviewed electronic communications of [Curcio] with certain victims of the Subject Offenses that occurred by email and text message." (*Id.* ¶ 16.)

Furthermore, regarding electronically stored evidence, the Affidavit stated that, based on SA Campbell's knowledge, training, and experience, he knew that certain files can be preserved "for months or even years." (*Id.* ¶ 18(a).) Indeed, such files "can be stored for years at little or no cost." (*Id.*) The Affidavit further explained that "deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device or other electronic storage medium that is not currently being used by an active file—for long periods of time before they are overwritten." (*Id.* ¶ 18(b).)

Moreover, the Affidavit described the probable cause that electronic devices were used as instrumentalities of the Subject Offenses. In particular, the Affidavit stated that SA Campbell had learned that Curcio "use[d] electronic devices to communicate with victims of the Subject Offenses," and in particular that Curcio "communicated with victims via emails, phone calls, and text messages." (*Id.* ¶ 20.) The Affidavit then provided detailed examples of Curcio using

electronic communications to interact with victims. (*Id.*) For instance, in April 2024, a victim exchanged emails with Curcio about the exchange of trading cards for money or other trading cards. (*Id.* ¶ 20(a).) And victims exchanged text messages with Curcio about the return and refund of certain fraudulent trading cards, including messages that show Curcio directing the victims to return the fraudulent trading cards to him by mailing the cards to the Premises to be searched. (*Id.* ¶ 20(c).)

### 3. The May 23, 2024 Search

On May 23, 2024, agents with the FBI, in conjunction with other law enforcement agencies, served and executed the Search Warrant at Curcio's residence in Redmond, Washington. As explained in the inventory of items seized, which is included in Appendix A to Curcio's Suppression Motion (ECF No. 32-1), law enforcement recovered what are clearly tools and equipment needed to create fraudulent trading cards and forged card cases and labels—including, but not limited to, binders of trading cards and loose trading cards, trading cards placed in cases, a tackle-box of tools, trading card packaging material, a box of packaging and tools, trading card cases, a 3D printer, a label printer, labels, a buffing drill, a soldering iron, a Dremel tool, a portable label maker and accessories, and liquid resin components. A few pictures of Curcio's forgery workshop taken during the May 23, 2024 search, are included below:



[USAO_017864]



[USAO_017945]



[USAO_017938]



[USAO_017997]

## **ARGUMENT**

Curcio advances superficial and illogical theories, and attempts to use his apparent trial defense—that the charges are a byproduct of a conspiracy between and among law enforcement and private parties to steal Curcio's property and attack his reputation—as arguments for suppression under *Franks v. Delaware*, 438 U.S. 154 (1978). The Court should reject these meritless arguments.

In the Suppression Motion, Curcio argues that the Campbell Affidavit does not provide a basis for the assertions made therein or provide the sources of those assertions, and argues that the assertions are stale. In the *Franks* Hearing Motion, Curcio argues that a hearing is appropriate because SA Campbell purportedly deliberately lied to or recklessly misled Judge Peterson. These arguments fail because, as a threshold legal matter, Curcio does not provide competent evidence to establish he has a reasonable expectation of privacy in the Premises and, therefore, standing to challenge the Search Warrant. Even if Curcio had established standing, the Suppression Motion fails because SA Campbell expressly stated the sources he relied upon, gave detailed explanations of what he learned from those sources, and provided timely evidence supporting probable cause to believe evidence and instrumentalities of the Subject Offenses would be found in Curcio's residence. Furthermore, the *Franks* Hearing Motion fails because Curcio has not met his burden of establishing through a "substantial" showing that any (let alone all) of the requirements necessary for *Franks* relief are present—*i.e.*, that SA Campbell made false factual statements or omissions; that he did so intentionally or recklessly; or that his statements or omissions were material.

## I.    The Motions Should Be Denied for Lack of Standing

The Motions should be denied because Curcio has not established standing to challenge the Search Warrant.

### A.  Legal Standard

The Fourth Amendment to the U.S. Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (citing *Kentucky v. King*, 563 U.S. 452, 459 (2011)).[2]

It is well established that "Fourth Amendment rights are personal rights that may not be vicariously asserted." *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (quoting *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)). "The cornerstone of the modern law of searches is the principle that, to mount a successful Fourth Amendment challenge, a defendant must demonstrate that he personally has an expectation of privacy in the place searched." *Haqq*, 278 F.3d at 47; *see also United States v. Fields*, 113 F.3d 313, 322 (2d Cir.1997) ("The ultimate focus of Fourth Amendment analysis remains whether the defendant had a reasonable expectation of privacy in the place searched."). A defendant's Fourth Amendment rights are violated "only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." *United States v. Payner*, 447 U.S. 727, 731 (1980) (emphasis in original). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth

---

[2] Unless otherwise indicated, case citations omit internal quotation marks, citations, footnotes, and previous alterations.

Amendment rights infringed." *Rakas*, 439 U.S. at 134. "And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Id.*

A defendant seeking suppression bears "the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas*, 439 U.S. at 130 n.1; *see also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992). "[T]he burden on the defendant to establish [Fourth Amendment] standing is met *only* by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge." *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (emphasis added); *see also United States v. Ruggiero*, 824 F. Supp. 379, 391 (S.D.N.Y. 1993) ("It is well established that in order to challenge a search, a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search"), *aff'd sub nom. United States v. Aulicino*, 44 F.3d 1102 (2d Cir. 1995); *United States v. Dore*, 586 F. App'x 42, 46 (2d Cir. 2014) (holding that the defendant lacked standing to challenge a search of cellphone information where "he did not submit an affidavit establishing that the cell phones in question belonged to him or that he had a subjective expectation of privacy in them" or that he had "a privacy interest in the cell phones in some other manner"); *United States v. Mathieu*, No. 16 Cr. 763 (LGS), 2018 WL 5869642, at *2 (S.D.N.Y. Nov. 9, 2018) ("Absent any showing that the email accounts belong to [defendant], Defendant has no basis for challenging the warrant on Fourth Amendment grounds.").

An attorney's declaration is insufficient to make the requisite showing. *See Montoya-Eschevarria*, 892 F. Supp. at 106. And a defendant does not have standing to challenge a search "merely because he anticipate[s] that the Government will link the objects recovered in that search" to him "at trial." *United States v. Watson*, 404 F.3d 163, 166-67 (2d Cir. 2005).

### B.  Curcio Has Not Established Standing

Curcio did not submit any evidence establishing that he owned or had a subjective expectation of privacy in the materials that he seeks to suppress. Thus, Curcio has not established standing because he has not stated, under oath, a possessory and privacy interest—that is, a Fourth Amendment right—in the Premises. This glaring error in the Motions is fatal. *See Watson*, 404 F.3d at 166 (explaining that one of the many ways in which a defendant failed to establish standing was a failure to "state the time period when the defendant allegedly resided at" the location searched); *see also Dore*, 586 F. App'x at 46 (holding that the defendant lacked standing to assert Fourth Amendment rights in phone records because he "did not submit an affidavit establishing that the cell phones in question belonged to him or that he had a subjective expectation of privacy in them").

"The defendant may demonstrate the infringement of his own legitimate expectation of privacy by showing that he owned the premises or that he occupied them and had dominion and control over them by leave of the owner." *United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990). "A defendant who, at the time of the search, neither owned nor occupied the premises nor had any dominion or control over them has no standing to contest a search of the premises." *Id.*

To prevent gamesmanship, a defendant may not assert standing merely by relying on the Government's arguments and assertions that he resided at the relevant premises. *See Watson*, 404 F.3d at 166-67. This requirement prevents a defendant from asserting a possessory interest at the motions stage, and then affirmatively denying that interest (and disclaiming it as simply a lawyer's

argument) at a later stage of the proceedings. For example, if Curcio were to testify at trial that he moved his belongings out of the Premises shortly before the Search Warrant was served and executed, or that the recovered items belonged to others, and so it was someone else's forgery workshop identified by law enforcement, it would put this Court in an untenable position: allowing testimony under oath disclaiming a Fourth Amendment interest in a premises which interest Curcio previously insisted this Court entertain.

Here, Curcio has not established standing to suppress evidence seized pursuant to the Search Warrant because he has failed—through a sworn affirmation—to meet his burden of proving he had a legitimate expectation of privacy in the Premises. *See Watson*, 404 F.3d at 166 ("The defendant bears the burden of proving that he had a legitimate expectation of privacy, which he may do by showing that he owned the premises or that he occupied them and had dominion and control over them by leave of the owner."). Accordingly, the Motions must be denied on this basis alone.

## II.    The Motions Should Be Denied without a *Franks* Hearing

Even if Curcio had established standing to challenge the Search Warrant—which he does not, for the reasons stated above—Curcio falls short of establishing a basis for relief.

*First*, the Suppression Motion fails because SA Campbell expressly stated the sources he relied upon, gave detailed explanations of what he learned from those sources, and provided timely evidence supporting probable cause to believe evidence and instrumentalities of the Subject Offenses would be found in the places to be searched.

*Second*, the *Franks* Hearing Motion fails because Curcio has not met his burden of establishing that SA Campbell made false factual statements or omissions; that he did so intentionally or recklessly; or that his statements or omissions were material. Indeed, Curcio identifies no factual statement that was false or misleading; instead, he contends that SA Campbell

omitted a separate and distinct theory – namely, that the charges are not the result of a legitimate government investigation but are instead the byproduct of the FBI being used as a proxy for Company-1 to attack and discredit Curcio for undefined reasons. Curcio makes no showing, much less the necessary *substantial* showing, that the claimed omissions were the result of SA Campbell's deliberate falsehood or reckless disregard for the truth. Furthermore, even if Curcio's allegations had merit, he makes no showing that any omissions were material, as the Campbell Affidavit contains ample other unchallenged evidence supporting the probable cause findings. In short, Curcio's *Franks* Hearing Motion fails every aspect of the *Franks* standard to obtain a hearing, and it should be denied as well.

### A.  Legal Standard

#### 1.  The Magistrate Judge's Probable Cause Determination

In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Such determinations must be approached in a practical way, *id.* at 231-32, because "probable cause is a flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983). Probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004). Probable cause also "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975). Instead, probable cause requires "only the probability, and not a *prima facie* showing, of criminal activity." *Gates*, 462 U.S. at 235. "Courts have repeatedly been warned not to interpret the affidavit in a

hypertechnical, rather than a commonsense, manner." *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000).

### 2. The *Franks* Doctrine

"A search warrant affidavit is presumed reliable." *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008) (citing *Franks*, 438 U.S. at 171). "In certain circumstances, however, a defendant may challenge the truthfulness of *factual* statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (citing *Franks*, 438 U.S. at 164-72) (emphasis added). But these circumstances are limited. *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000).

To invoke the *Franks* doctrine and meet the standard for obtaining an evidentiary hearing, a defendant must "make a substantial preliminary showing" that (i) the warrant affidavit contains a false statement or omission, (ii) the false statement or omission was included or made deliberately or recklessly, and (iii) the false statement or omission was material. *See United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021); *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013).

"To avoid fishing expeditions into affidavits that are otherwise presumed truthful, . . . to mandate an evidentiary hearing" under *Franks*,

> [t]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*United States v. Falso*, 544 F.3d 110, 125-26 (2d Cir. 2008).

As a result, "[t]he burden to obtain . . . a [*Franks*] hearing is a heavy one, and such hearings are exceedingly rare." *United States v. Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016); *see also United States v. Mandell*, 710 F. Supp. 2d 368, 372 (S.D.N.Y. 2010) ("Hearings under Franks are not freely granted."); *United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a Franks hearing bears a substantial burden.").

### 3.  Proof of Intentional or Reckless Conduct

A defendant seeking to make the required showing of an intentional or reckless misstatement or omission must show more than inadvertent error. "[E]very statement in a warrant affidavit does not have to be true," *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005), and "the mere intent to exclude information is insufficient . . . [because] every decision not to include certain information in the affidavit is intentional insofar as it is made knowingly. . . . An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Awadallah*, 349 F.3d at 67-68.

To find that an affiant intentionally made misstatements or omissions in the search warrant affidavit, the "reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (quoting *Awadallah*, 349 F.3d at 68). The test is subjective, measuring the affiant's state of mind. *Id.*

A misstatement or omission is intentional only when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield*, 212 F.3d at 717-18. "To prove reckless disregard for the truth, the defendant[] must prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154. *See also Falso*, 544 F.3d at 126 ("Allegations of negligence or

innocent mistake are insufficient." (quoting *Franks*, 438 U.S. at 171)). Although reckless disregard "can sometimes be *inferred* from the omission of critical information[,] . . . such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information, and the inference is particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence, or that the omission was the result of a considered and reasonable judgment that the information was not necessary." *Rajaratnam*, 719 F.3d at 154 (emphasis in original).

"Omissions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007); *see also Awadallah*, 349 F.3d at 67; *United States v. Feola*, 651 F. Supp. 1068, 1109 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989). Thus, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Mandell*, 710 F. Supp. 2d at 376. This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id*.

As a result, the law recognizes that while "an officer may not disregard plainly exculpatory evidence," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), an affiant is "not required to include all potentially exculpatory information" in seeking the search warrant, *United States v. Maisonet*, 2013 WL 12204909, at *1 (S.D.N.Y. Mar. 22, 2013); *see also United States v. Calk*, 2020 WL 3577903, at *5 (S.D.N.Y. Jul. 1, 2020). Indeed, "[a] requirement that all potentially

exculpatory evidence be included in an affidavit would severely disrupt the warrant process and place an extraordinary burden on law enforcement officers, and is not the law." *United States v. Cromitie*, 2010 WL 3025670 at *6 (S.D.N.Y. July 28, 2010). Accordingly, "[o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Mandell*, 710 F. Supp. 2d at 374.

To permit the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). It is not sufficient for the movant to simply show that a reasonable person would have included the omitted information, *Rajaratnam*, 719 F.3d at 154.

### 4. Materiality

Under *Franks*, a misstatement or omission is only material if it is "necessary to the [issuing] judge's probable cause finding." *Canfield*, 212 F.3d at 718. "To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves *de novo* whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In assessing whether an alleged omission was material, courts look to "whether the omitted information was 'necessary to the finding of probable cause,' and not just what might have been relevant to that finding, let alone of interest to a magistrate judge." *United States v. Vilar*, No. S3 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. 2007) (quoting *Franks*, 438 U.S. at 156). "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner." *Canfield*, 212 F.3d at 719.

In the end, "the defense motion must be denied without a hearing if, after setting aside the allegedly misleading statements or omissions, there remains a residue of independent and lawful

information sufficient to support probable cause." *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987).

### B.  The Campbell Affidavit is Detailed and Provides Timely Evidence Establishing Probable Cause

In his Suppression Motion, contrary to Second Circuit law, Curcio interprets the Campbell Affidavit "in a hypertechnical, rather than a commonsense, manner." *Canfield*, 212 F.3d at 719. Even a cursory review of the Affidavit shows that it overwhelmingly sets forth timely probable cause, and Curcio's motion should be denied.

Before turning to certain of Curcio's specific arguments, it bears noting that the Campbell Affidavit contained significant evidence providing more than an ample basis to find probable cause to search the Premises. The Affidavit describes, among other things:

- When victims confronted Curcio about his sale of fraudulent cards to them, Curcio instructed them to mail the cards back to him at the Premises (Affidavit ¶ 7); and

- Purchase records show that during the relevant time period Curcio ordered materials needed to create forged card cases and labels to be delivered to the Premises, including various card grading cases, thermal transfer barcode labels, a magnifier a magnifier loupe optical glass, a handheld inkjet printer, a lock-cutting kit, an electric grinding pen, an abrasive buffer and polishing wheel, an abrasive and bristle brushes, and drill bits designed for engraving (Affidavit at ¶8).

Curcio argues that the Campbell Affidavit "has no information about the 'basis of knowledge' or 'veracity' for any sources of information" and that it "is an affidavit full of conclusory allegations, and devoid of any description of the underlying reliability of the sources of those claims." (ECF No. 32 at 4.) However, after incorporating the Indictment and providing a factual summary thereof supporting probable cause to believe Curcio had engaged in the Subject

Offenses, SA Campbell explicitly cited his basis of knowledge at the beginning of each paragraph setting forth probable cause to believe that Curcio's residence contained evidence, fruits and instrumentalities of that criminal activity. For example, in Paragraph 8 of the Campbell Affidavit, he explained that he learned that Curcio ordered various items needed to create forged card cases and labels to be delivered to the Premises, specifically based on purchase records produced to him pursuant to a grand jury subpoena served upon an online marketplace, his discussions with other law enforcement agents and his own participation in the investigation. Paragraph 8 then described in further detail that the forgery tools included card grading cases, thermal transfer barcode labels, a magnifier loupe optical glass, a handheld inkjet printer, a lock-cutting kit, an electric grinding pen, an abrasive buffer and polishing wheel, an abrasive and bristle brushes, and drill bits designed for engraving. The Suppression Motion is simply not credible when it argues that "it is impossible to determine if SA Campbell is relating something from personal knowledge, repeating an online rumour [sic], or parroting the claims of what he has deemed a 'reputable card authentication company.'" (ECF No. 32 at 4.)

Similarly, the Suppression Motion argues that the Campbell Affidavit "provides no specific fraudulent transactions, no victim statements confirming deception, and no authentication findings verifying fraudulent items" when criticizing the paragraph that incorporates the Indictment and summarizes why it established probable cause to believe Curcio had engaged in the charged offenses. (ECF No. 32 at 4.) Curcio cites no authority supporting his contention that such information would be required, particularly in a summary of the Indictment reflecting the grand jury's finding of probable cause. That is because such granular detail was not necessary for Judge Peterson to determine that there "is to a *fair probability* that contraband or evidence of a crime will be found in a particular place," which is all that is required. *Gates*, 462 U.S. at 238. Contrary to

Curcio's view, the Second Circuit has explicitly stated that probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *Singh*, 390 F.3d at 182.

The Suppression Motion also misses the mark when contending that the Campbell Affidavit "provided the magistrate with no information from which an analysis of the 'totality of the circumstances' could be evaluated" because, for example, the "database from which 'flight records' were taken" might not be one "relied upon by law enforcement that draws from reliable source" and might instead be "a set of 'flight records' promulgated by a Redditt user who has created a 'database' full of data provided by other users." (ECF No. 32 at 4.) This is not the reasonable, "common sense" reading of the Campbell Affidavit required by law; it is a "hypertechnical" analysis that is unsupported by law and reason.

Furthermore, the Suppression Motion fares no better when arguing that the claims in the Campbell Affidavit were "stale by May 23, 2024." (ECF No. 32 at 6-7.) SA Campbell made clear that: (i) a victim returned a fraudulent card to Curcio at his residence as recently as September 2023 (Ind. ¶ 7); (ii) Curcio purchased various forgery tools and had them shipped to his residence between June 2022 and as recently as February 2024, including drill bits designed for engraving in February 2024 (*id.* ¶ 8); (iii) Curcio took a plane and attended a card show in New Jersey in April 2024, where he was identified and removed from the show for having fraudulent cards (*id.* ¶ 9); (iv) after returning to Washington from the card show, Curcio was observed at his residence on multiple days in May 2024, including as recently as May 21, 2024 (*id.* ¶ 10); and certain evidence sought by the Search Warrant could be preserved "for months or even years" and "can be stored for years at little or no cost." (*id.* ¶ 18(a)). That Curcio had ordered tools that could be used to further the fraudulent scheme to the Premises as recently as February 2024—a mere three

months prior to the May 2024 search warrant—undercuts Curcio's claims of staleness. And the fact that Curcio had been identified as trying to sell fraudulent cards at a card show as recently as April 2024 and then had traveled back to the Premises thereafter further undermines any claims that the evidence relied upon was stale. To the contrary, the Campbell Affidavit provided recent evidence supporting probable cause to search the Premises.

Courts have regularly recognized that evidence far older than that relied upon in the Campbell Affidavit is not stale. *See, e.g.*, *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991) ("[I]ntervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale"); *United States v. Melissas*, No. 05 CR. 107 (GEL), 2005 WL 2414550, at *2 (S.D.N.Y. Sept. 21, 2005) ("The age of the information has to be assessed in light of the nature of the criminal activity suspected."); *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) (18-month period did not render the warrant stale); *United States v. Wilbert*, 818 F. App'x 113, 115 (2d Cir. 2020) (4-month period did not render the warrant stale); *United States v. Beltempo*, 675 F.2d 472, 476-79 (2d Cir.1982) (2 months); *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (5 weeks); *United States v. Damian Campagna*, No. 16 CR. 78 (LGS), 2016 WL 4367992, at *6 (S.D.N.Y. Aug. 11, 2016) (7 months)

### C.  There is No Basis for a *Franks* Hearing

In the *Franks* Hearing Motion, Curcio challenges the Campbell Affidavit for allegedly omitting facts about a lawsuit Curcio filed and his belief that Company-1 and other third parties are out to get him. Specifically, the *Franks* Hearing Motion avers that SA Campbell knew that Company-1 "was involved in an ongoing dispute" with Curcio regarding the role Company-1 "played in retaining" Curcio's trading cards after a victim of Curcio's fraud was made aware by Company-1 that Curcio provided counterfeit trading cards to the victim to sell on consignment. (ECF No. 33 ¶¶ 5-11.) Curcio filed a lawsuit against the victim, alleging that the victim engaged

in breach of contract, unlawful conversion, defamation, and libel. (*Id.* ¶ 4.) Curcio alleges that, when the Affidavit was submitted, SA Campbell "knew the criminal investigation targeting [Curcio] had come at the request of [Company-1], and that [Company-1] has continued to act as a de factor investigator on behalf of the FBI." (*Id.* ¶ 13.) Furthermore, the *Franks* Hearing Motion alleges that "SA Campbell and the FBI had not utilized any investigative tools or techniques to determine" if Company-1's "allegations against Curcio were true, but had instead allowed [Company-1] to direct the investigation and provide all information related to determining if any item was 'counterfeit' or was representing a card quality rating that [Company-1] had never given the card." (*Id.* ¶ 15.)

Curcio has not made "a substantial preliminary showing" that (i) the Campbell Affidavit contains a false statement or omission, (ii) the false statement or omission was included or made deliberately or recklessly, and (iii) the false statement or omission was material. *See McKenzie*, 13 F.4th at 236. Accordingly, the Court should deny the *Franks* Hearing Motion.

### 1. The Campbell Affidavit Did Not Omit Material Information or Contain a False Statement

The *Franks* Hearing Motion argues that SA Campbell intentionally or recklessly omitted Curcio's narrative about how "the FBI had not been investigating this case independently but rather acting as a proxy" for Company-1 in its dispute with Curcio. (ECF No. 33 at 11.) This separate and unsupported theory is not material information and, therefore, the alleged omissions do not warrant a hearing.

As an initial matter, Curcio offers no "credible and probative evidence," *Rajaratnam*, 719 F.3d at 154, to support his allegations, let alone that the omissions in question were deliberate or reckless. Instead, Curcio relies solely on unsupported conclusory assertions about the FBI abdicating its role to investigate federal crimes and allowing Company-1 to direct the

investigation. As a matter of law, Curcio's motion is plainly insufficient. *See Falso*, 544 F.3d at 125-26.

In addition, an examination of what Curcio intends to prove at a *Franks* hearing establishes that the Campbell Affidavit's statements were fair and accurate characterizations of facts establishing probable cause based on information available to law enforcement at the time, and thus the allegedly omitted material would not have rendered those statements false had the material been included. As noted, the *Franks* inquiry is *not* whether certain information that was omitted "in retrospect seem[s] significant." *Lahey*, 967 F. Supp. 2d at 708. Rather, the inquiry is whether SA Campbell intentionally omitted or recklessly disregarded material information that was known to him. Because Curcio relies entirely on a separate and distinct set of omitted "facts," he has not cleared the hurdle of establishing that SA Campbell's statements were false to begin with.

### 2. The Alleged Omissions Were Not Made Deliberately or Recklessly

Even if any of the alleged omissions could have "corrected" the statements in the Campbell Affidavit at the time they were made, Curcio has not met his burden of showing that SA Campbell omitted information knowingly or recklessly. Curcio has failed to make any showing, let alone a substantial preliminary showing, that "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield*, 212 F.3d at 717-18.

As to the purported omissions Curcio asserts, the defendant bears a heavy burden under *Franks* and must show that the "the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (quoting *Awadallah*, 349 F.3d at 68). A misstatement or omission is intentional only when "the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth." *Canfield*, 212 F.3d at 717-18. The defendant cannot come close to making this showing with respect to the purported omissions in the Campbell Affidavit.

Without any "credible and probative evidence" of impropriety, *Rajaratnam*, 719 F.3d at 154, Curcio is left with only the speculative and conclusory argument that SA Campbell must have intended to mislead Judge Peterson because he omitted information that Curcio believes was critical to any assessment of probable cause. (ECF No. 33 at 10-11.) But that argument conflates two separate *Franks* prongs—materiality and intent—in a manner the Second Circuit has rejected. *See Rajaratnam*, 719 F.3d at 154 (an affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical,'" and "an inference [of reckless disregard for the truth] is not to be automatically drawn simply because a reasonable person would have included the omitted information.").

In effect, Curcio is arguing that the *relevant facts* (*i.e.*, Company-1 being out to get him) are completely different from *the facts stated* in the Campbell Affidavit (*i.e.*, the probable cause that Curcio committed the charged offenses and that evidence of those crimes would be found in his residence). As a result, in Curcio's view, the Search Warrant "would have been denied had all material information been included in" the Affidavit. (ECF No. 33 at 12.) But as noted above, that the Affidavit included information that is different than what Curcio considers to be "critical" does not establish any malintent by SA Campbell at the time the Affidavit was prepared. *See, e.g.*, *Lahey*, 967 F. Supp. 2d at 716 ("[T]he Government's selective storytelling does not call into question the validity of either affidavit."). This is especially so when Curcio has offered no evidence to suggest that his theory is correct.

Ultimately, aside from his conclusory assertions, Curcio has offered no credible proof to establish that SA Campbell acted with the requisite intent to merit a hearing. *See, e.g.*, *United States v. Ray*, 541 F. Supp. 3d 355 (S.D.N.Y. 2021) (denying *Franks* hearing where there was no

evidence of subjective malintent by the affiant with respect to allegedly omitted information); *United States v. Nejad*, 436 F. Supp. 3d 707, 720 (S.D.N.Y. 2020) (denying *Franks* hearing where defendant "fail[ed] to make the requisite *substantial* showing of credible and probative evidence demonstrating that any of these alleged misstatements, omissions, or 'misleading claims' were deliberately false or made with reckless disregard for the truth" (emphasis in original)); *Mandell*, 710 F. Supp. 2d at 375-77 (denying *Franks* hearing where defendant failed to show that affiant's alleged omissions, including defendants engagement in lawful trading activities, was done with reckless disregard for the truth); *United States v. Gotti*, 399 F. Supp. 2d 214, 221 (S.D.N.Y. 2005) (denying *Franks* hearing where "affidavit presents ample evidence to support a probable cause determination even if *all* of the five statements or omissions are purged from" the affidavit (emphasis in original)).

### 3. The Alleged Omissions Were Not Material to the Probable Cause Determination

Even assuming the Campbell Affidavit intentionally or recklessly omitted relevant facts (which it did not, for the reasons stated above), the *Franks* Hearing Motion would still fail to make a substantial showing as to the third requirement—materiality—because the alleged omissions were not necessary to the findings of probable cause.

Critically, Curcio does not challenge the core facts set forth in the Campbell Affidavit that there was probable cause to believe: (1) Curcio committed the charged offenses (Ind. ¶ 6); and (2) evidence and instrumentalities of the charged offenses would be found in Curcio's residence because (i) a victim had recently returned a fraudulent card to Curcio at his residence (*id.* ¶ 7), (ii) Curcio had recently purchased forgery tools and had them shipped to his residence (*id.* ¶ 8), (iii) Curcio had recently attended a trading card show and was kicked out for having fraudulent cards (*id.* ¶ 9), and (iv) Curcio had recently been observed at his residence (*id.* ¶ 10). These facts

easily create a "fair probability" that evidence of criminal activity will be found as a result of the requested search, *Gates*, 462 U.S. at 238, under the probable cause requirement's "flexible, common-sense standard," *Brown*, 460 U.S. at 742; *see Gates*, 462 U.S. at 235 (probable cause requires "only the probability, and not a prima facie showing, of criminal activity").

In sum, the alleged omissions regarding Curcio's theory that there was a "complete absence of any independent investigation by the FBI" are immaterial and, accordingly, do not justify a *Franks* hearing.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court deny Curcio's Motions without an evidentiary hearing.

Dated:       New York, New York
             March 10, 2025

                                        Respectfully submitted,

                                        MATTHEW PODOLSKY
                                        Acting United States Attorney
                                        Southern District of New York

                              By:       ____/s/_____
                                        David R. Felton
                                        Kingdar Prussien
                                        Assistant United States Attorneys
                                        (212) 637-2299 / 2223