UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 24-cr-312 (RA) |
| ANTHONY CURCIO, | OPINION & ORDER |
| Defendant. | |

RONNIE ABRAMS, United States District Judge:

Defendant Anthony Curcio was indicted in May 2024 for wire fraud, conspiracy and aiding and abetting the same in violation of 18 U.S.C. §§ 1349, 1343 and 2. According to the indictment, Curcio and his co-defendant, Iosif Bondarchuk, defrauded trading card collectors across the country by repackaging low-grade cards as high-grade ones and selling them for outsized profits. Curcio now moves to suppress the evidence seized during a search of his home in Washington state on the grounds that the warrant affidavit failed to establish probable cause. Dkt. No. 32 ("Suppression Mot."). He also moves for a *Franks* hearing, asserting that the officer who prepared the affidavit omitted important background information. Dkt. No. 33 ("Franks Mot."). For the reasons that follow, both motions are denied.

## BACKGROUND

The following facts are primarily drawn from the indictment, Dkt. No. 3 ("Indictment"), and the search warrant affidavit, Dkt. No. 32-1 at 3 ("Affidavit"). As alleged in the Indictment, Curcio and Bondarchuk ("Defendants") ran a fraudulent trading card scheme between 2022 and 2024. Indictment ¶ 1. Their modus operandi was to relabel cheaper cards to make them appear more expensive and then re-sell the repackaged cards at inflated prices. According to the Indictment, Curcio and Bondarchuk falsely replicated the card grading and packaging system used

by Professional Sports Authenticator ("PSA"), a leading card authenticator that grades trading cards and places them in a distinctive, tamper-proof case. *Id.* ¶ 2. To make it seem like PSA had authenticated and graded the cards they sold, Curcio and Bondarchuk would place ungraded or lower-grade cards in plastic cases that resembled the PSA cases, and then affix a fake label stating that the cards had received high or even perfect grades from PSA. Curcio and Bondarchuk would then sell the repackaged cards to unsuspecting customers for thousands of dollars more than their fair-market value.

One of the cards that Curcio advertised for sale, for instance, was a Michael Jordan rookie card from 1986. *Id.* ¶ 3. When the card is graded an "8" (out of 10) by PSA, it will sell for around $6,000 to $7,000. *Id.* But when the same card receives a perfect "10" rating, it can fetch anywhere from $185,000 to $203,000. *Id.* According to the Indictment, Curcio took an ungraded or low-graded version of this card, placed it in a plastic case with a fake "10" label and advertised it for sale on an online marketplace in Manhattan for $171,700. He used similar tactics to sell two Pokémon cards, including one that he sold in July 2023 for $10,5000 to an undercover law enforcement purchaser. *Id.* ¶ 8. Curcio and Bondarchuk allegedly also sold fake cards depicting various other famous athletes such as Tom Brady, John Elway and Nolan Ryan. *Id.* ¶ 10. In total, Curcio and Bondarchuk are alleged to have attempted to defraud victims out of over $2 million. *Id.* ¶ 1.

On several occasions, victims complained to Curcio and Bondarchuk about the fraudulently graded cards they had been sold. The pair allegedly often feigned ignorance and refunded the victims before attempting to re-sell the same cards—still with the fake PSA grading labels attached—to others. *Id.* ¶ 6. At several points Curcio instructed the complaining victims to send the cards back to his residential address in Redmond, Washington. Affidavit ¶ 7. Curcio also

2

placed online orders to the same address for various materials that could be used to create forged card cases and labels, including plastic cases, barcode labels, printers and drill bits designed for engraving. *Id.* ¶ 11.

Curcio and Bondarchuk were indicted by a grand jury in this district on May 20, 2024. Several federal magistrate judges in different districts subsequently issued search warrants, including the search warrant authorizing the search of his home (the "Premises") that Curcio challenges here (the "Search Warrant"). *See* Case. No. 24 Mag. 309 (W.D. Wash.). This Search Warrant was issued on May 22, 2024 by Magistrate Judge Michelle Peterson of the Western District of Washington upon an application by Special Agent Christopher Campbell of the Federal Bureau of Investigation's ("FBI") Major Theft Task Force. Dkt. No. 32-1 at 2. In the Affidavit, Agent Campbell detailed how Curcio had advertised various cards for sale under false descriptions and had completed at least eight fraudulent sales for $225,000 total. Affidavit ¶ 6(d)–(g). The Affidavit also explained how Curcio's alleged fraud was connected to the Premises, recounting how Curcio had instructed complaining victims to ship fake cards back there as recently as September 2023. *Id.* ¶ 7. The Affidavit further alleged that Curcio had ordered several tools that could be used to forge card cases to the Premises, including a set of engraving drill bits that Curcio had ordered in February 2024. *Id.* ¶ 8. It also asserted that Curcio had flown from nearby Seattle to attend a card show in New Jersey in April 2024, from which he was expelled for having fraudulent cards. *Id.* ¶ 9.

Agents executed the Search Warrant on the Premises on May 23, 2024. *Id.* at 38. They recovered tools and equipment that can be used to forge trading cards and cases, including sets of trading cards, a tackle-box of tools, trading card cases and packaging materials, a 3D printer, a label printer, labels, a drill and a soldering iron, much of which was found in a workshop room on

a desk scattered with cards and tools. *Id.* at 39–45; *see also* Dkt. 35 ("Gov't Opp.") at 12–13 (depicting pictures of workshop room). Agents also seized various computers and hard drives, which are not at issue here. Curcio was arrested the same day. Dkt. No. 23.

On February 10, 2025, Curcio filed the two motions presently before the Court: the motion to suppress the physical evidence seized from the Premises during the May 2024 search, and the motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## LEGAL STANDARD

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "[P]robable cause to search a place exists if the issuing judge finds a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[P]robable cause is a flexible, common[]sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). It "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 183 (2d Cir. 2004). "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000).

Although search warrant affidavits are presumed reliable, defendants may challenge their veracity at a *Franks* hearing. To trigger the right to a hearing, a defendant must make a "substantial preliminary showing" that (1) the affidavit contains a false statement or omission, (2) the false statement or omission was made deliberately or recklessly, and (3) the false statement or omission was material. *United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021) (quoting *Franks*, 438

4

U.S. at 155); *see also United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (discussing omissions). This preliminary showing "must be more than conclusory" and "must be accompanied by an offer of proof." *United States v. Flaso*, 544 F.3d 110, 125–26 (2d Cir. 2008). "The burden to obtain . . . a hearing is a heavy one, and such hearings are exceedingly rare." *United States v. Melendez*, No. 16-cr-33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016).

## DISCUSSION

### I.    Motion to Suppress

Curcio's suppression motion seeks to exclude the physical evidence seized during the search of the Premises on May 23, 2024. He makes two arguments in favor of suppression: first, that the Affidavit was deficient because it failed to identify the specific sources of the information, and second, that the information in the Affidavit was stale.[1] Neither argument is persuasive.

### A.    Probable Cause

Curcio first disputes whether the Affidavit prepared by Agent Campbell established probable cause. As a threshold matter, Curcio has little room to dispute the existence of probable cause that he had committed a crime. As multiple judges in this district have recognized, the fact that a defendant was indicted prior to issuance of the warrant provides substantial support that he had "engaged in criminal activity." *United States v. Mouzon*, No. 16-cr-284 (CM), 2016 WL 7188150, at *4 (S.D.N.Y. Dec. 2, 2016); *United States v. Kostin*, No. 24-cr-91 (GHW), 2025 WL 1504409, at *24 (S.D.N.Y. May 27, 2025) ("The existence of the indictment supports a finding of

---

[1] The Government initially argued that Curcio lacked standing to make these arguments because he failed to submit an affidavit establishing that he "owned or had a subjective expectation of privacy" in the Premises. Gov't Opp. at 17. Curcio, however, submitted an affidavit attesting to his ownership of the premises with his reply brief, Dkt. No. 37 Decl. at 1–2, which "moot[s]" the Government's argument, *United States v. Barrett*, No. 23-cr-623 (JLR), 2025 WL 371084, at *16 (S.D.N.Y. Feb. 3, 2025).

probable cause to believe a crime was committed.")[2]; *see also United States v. Feng Ling Liu*, No. 12-cr-934 (RA), 2014 WL 101672, at *5 (S.D.N.Y. Jan. 10, 2014) (same, though noting that Second Circuit has yet to address issue). Here, a grand jury indicted Curcio for carrying out a fraudulent trading card scheme, and the Affidavit recited verbatim the bulk of the allegations from the indictment that the grand jury found persuasive. *See* Affidavit ¶ 6(a)–(g). The magistrate judge thus "would have been all but justified in concluding, based solely on the facts alleged in the [i]ndictment, that . . . probable cause existed to believe that" Curcio had engaged in trading card fraud. *Mouzon*, 2016 WL 7188150, at *4.

Even if the case had not been indicted, however, the Affidavit would still have established probable cause that a crime was committed and that evidence of that crime could be found at the Premises. For starters, Campbell stated in the Affidavit that victims had told him and other law enforcement agents that Curcio had instructed them to send fraudulent cards to him at the Premises. Affidavit ¶ 7. Those allegations alone indicated that evidence of the fake card scheme may well be found there. And even though victim allegations need not be corroborated, *see United States v. Harding*, 273 F. Supp. 2d 411, 418–19 (S.D.N.Y. 2003), other information in the Affidavit backed up their assertions that Curcio was selling fraudulent cards made in the Premises. For instance, Campbell cited to "purchase records" obtained pursuant to a grand jury subpoena that revealed Curcio had been ordering tools and materials required to forge card cases for almost two years and had listed the Premises as the shipping address. Affidavit ¶ 8. These tools included plastic cases like those used by PSA, barcode labels, label printers, lock-cutting kits, polishing wheels and drill bits designed for engraving. *See id.* Campbell also stated that he had learned,

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt all alterations.

based on "flight records" from a "database search" and discussions with other agents, that Curcio had flown from Seattle to an April 2024 card show in New Jersey, where he was removed for having fake cards. *See id.* ¶ 9. The Affidavit further asserted that Curcio had sold and mailed a fraudulent Pokémon card to an undercover law enforcement purchaser. *See id.* ¶ 6(g) (quoting the Indictment). Although Campbell did not specifically say where he learned this information, it is apparent that it originated from the undercover purchaser, as Campbell included pictures of the allegedly fraudulent card (in the PSA-style case in which Curcio sold it) in the Affidavit itself. *See id.* These allegations are more than sufficient to establish probable cause—a "fair probability"— that Curcio committed a crime using the Premises and that evidence of such crime could be found there. *Gates*, 462 U.S. at 238.

The Court is not persuaded by Curcio's tenuous arguments to the contrary. He first tries to fault the Affidavit for failing to identify Campbell's sources "by name." Suppression Mot. at 4. But there is no requirement that search warrants disclose the names or identities of sources, and indeed it is "common practice" for the Government to decline to do so. *United States v. Franzone*, No. 21-cr-446 (VSB), 2025 WL 993112, at *11 (S.D.N.Y. Apr. 2, 2025). The absence of that information in the Affidavit does nothing to defeat probable cause here.

Curcio likewise seeks to impugn the Affidavit for failing to provide more details about the "victims" so the magistrate judge could assess their "reliability." Suppression Mot. at 5. This argument, however, confuses the framework for witnesses and confidential informants. While information from confidential *informants* must be heavily scrutinized, "information by a crime victim or other citizen witness may be accepted even absent a proven track record of reliability or corroboration." *Harding*, 273 F. Supp. 2d at 418–19; *see also United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) ("A witness to a crime need not be shown to have been previously reliable

7

before the authorities may rely on his statements."); *see also United States v. Burke*, 517 F.2d 377, 380 (2d Cir. 1975) (explaining that *Spinelli-Aguilar* analysis does not apply to victims). Along similar lines, Curcio insists that the Affidavit should have given more detail about which "database" Campbell used to obtain the flight records, since there is no way of knowing whether it was a "reliable" database or rather a "set of 'flight records' promulgated by a Reddit user." Suppression Mot. at 6. But affidavits need not provide gratuitous detail about sourcing in order to rule out fanciful speculation of that sort. The only "commonsense" reading of the Affidavit was that Campbell referenced government or airline flight records, not a crowdsourced collection found on social media. *Canfield*, 212 F.3d at 719.

Finally, Curcio faults the Affidavit for citing multiple sources behind certain allegations, claiming this prevented the magistrate judge from gauging source reliability. Suppression Mot. at 5–6. For instance, the Affidavit states that Campbell learned that that Curcio was using the Premises as his shipping address from four sources: "information provided to [him] and other law enforcement agents by certain victims of the fraudulent trading card scheme, [his] discussions with other law enforcement agents, [his] training and experience, and [his] participation in this investigation." *Id.* ¶ 7. According to Curcio, it is "impossible" to tell whether Campbell learned this information from "personal knowledge" or "an online rumo[]r." Suppression Mot. at 4. But that is not a fair, and certainly not a "commonsense," reading of the Affidavit. *Canfield*, 212 F.3d at 719. If Campbell "learned" about what Curcio told the victims, then logic dictates that he heard it either from the victims directly or through fellow law agents who interviewed them—just as the Affidavit plainly states. *Id.* ¶ 7 ("[b]ased on information provided to me and other law enforcement agents by certain victims of the fraudulent trading card scheme"). This is not an affidavit that hides the ball by listing competing sources to confuse the magistrate judge; it is one that states

8

outright that the affiant learned the information from victims, whether firsthand or secondhand. The Court thus declines Curcio's invitation to read the Affidavit in an illogical and "hypertechnical" way. *Canfield*, 212 F.3d at 79.

### B. Staleness

Curcio fares no better with his argument that the assertions in the Affidavit were stale by May 23, 2024, the date of the search. "In determining whether probable cause exists, the magistrate judge is required to assess whether the information in the application appears to be current, i.e. true at the time of the application, or whether instead it has become stale." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991). "[I]ntervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale." *Id.* This is especially true when the "affidavit presents a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts." *Mouzon*, 2016 WL 7188150, at *3. Indeed, even dated information of past criminal activity "can be sufficient if the affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993); *see also United States v. Feola*, 651 F. Supp. 1068, 1091 (S.D.N.Y. 1987) ("[I]f a criminal enterprise is appropriately extended, information can remain fresh for probable cause for years.").

Multiple allegations in the Affidavit indicated that evidence of trading card fraud would be found at the Premises on May 23, 2024. First off, the Affidavit stated that Curcio flew from Seattle—the area where the Premises was located—to a card show just a month prior, in April 2024. *See* Affidavit ¶ 9. It further alleged that Curcio was removed from that show after being caught with fraudulent cards, *see id.*, which suggested that he may have brought those cards from

9

(and back to) the Seattle area. The Affidavit also alleged that Curcio had "repeatedly" told complaining victims to ship fraudulent cards back to the Premises, the latest of which was in September 2023. *Id.* ¶ 7. Finally, it detailed that, between June 2022 and February 2024, Curcio ordered tools useful for forging card cases—cases, labels, printers, brushes, lock cutting kits—to the Premises, his listed home address. *See id.* ¶ 8. The most recent purchase was an order for engraving drill bits in February 2024, an indication that Curcio may have been forging cases at the Premises just three months before the search.

In short, this is not an instance where evidence of criminal activity was linked to the Premises on a single fleeting occasion years before the search. Rather, the Affidavit detailed multiple occasions connecting fraudulent trading cards to the Premises, and as recently as February and April 2024. And beyond that, it documented a longrunning "pattern" of suspected criminality at the Premises—including several years of suspicious tool orders—that indicated that Curcio's criminal conduct there "was probably not a one-time occurrence." *Wagner*, 989 F.2d at 75. The allegations in the Affidavit were thus far from stale when the search was executed.

**II.     Motion for a *Franks* Hearing**

Curcio also moves for a *Franks* hearing to challenge the warrant's validity based on omissions from the affidavit. *See Franks*, 438 U.S. at 154. Such hearings permit defendants to attack a warrant by introducing evidence that officers either made false statements in or omitted key facts from their affidavits. *See United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). Defendants are not entitled to a *Franks* hearing by right, however, and must first make a "substantial preliminary showing." *Rajaratnam*, 719 F.3d at 146. When, as here, a defendant moves for a hearing based on purported omissions, he must show that (1) the affidavit omitted information, (2) the omission was done deliberately or recklessly, and (3) the omission was

necessary to the finding of probable cause. *McColley v. County of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014). In determining the third element—whether the omission was "necessary" to probable cause—courts consider a hypothetical "corrected affidavit" that includes the allegedly "omitted facts" and assess whether it "would still have been sufficient to support . . . probable cause." *Id.* at 823–24. "While the law does not demand that an officer applying for a warrant volunteer every fact that arguably cuts against the existence of probable cause, he must not omit circumstances that are critical to its evaluation." *Id.* at 824.

Here, Curcio does not appear to challenge whether probable cause existed to search the Premises so much as dispute whether there was probable cause to believe he had committed a crime to begin with. On this front, Curcio argues that officers omitted several key facts from the Affidavit that, had they been included, would have extinguished any probable cause that he had committed a crime. In particular, he asserts that the Affidavit failed to disclose: (1) that PSA was working with Campbell and other agents to investigate Curcio, such as by exchanging emails with the FBI and asking it to help investigate his allegedly fraudulent sales, *see* Franks Mot. at 11–12; *see also* Dkt. No. 38 ("Franks Reply") at 4–13; (2) that PSA had at one point verified several of his cards, including the 1986 Michael Jordan, as authentic, *see* Franks Mot. at 8; and (3) that one of the alleged victims who complained to PSA was engaged in litigation with Curcio over a trading card deal gone wrong, *see id.*

None of these facts would have altered the probable cause determination. To make that assessment, the Court considers a hypothetical affidavit that includes all of these additional facts and asks whether it would still establish probable cause to search the Premises. *See McColley*, 740 F.3d at 823–24. That standard is met here, as the Affidavit made multiple other convincing and corroborated allegations that Curcio was involved in trading card forgery. It detailed, for instance,

that Curcio had sold and mailed a fraudulent card to an undercover law enforcement purchaser in July 2023, and that he had completed another eight fraudulent sales totaling over $200,000 in one marketplace. *See* Affidavit ¶ 6(e)–(g). It included pictures of multiple faked cards and explained in detail how Curcio had manipulated them. *Id.* It further discussed how Curcio unsuccessfully attempted to sell numerous cards to other victims, and then tried re-selling them to other victims after his initial targets complained and sent the cards the back. *Id.* ¶ 7. And it went on to explain how Curcio had continuously ordered tools and supplies uniquely suited to card forgery over nearly a two-year span, and how he had just recently been ejected from a card show for peddling fake cards. *Id.* ¶¶ 8–9.

These allegations more than establish probable cause that Curcio had committed a crime, and would still do so even if the Affidavit had also included Curcio's proposed additions. For instance, Curcio insists that probable cause would have been negated if the Affidavit had revealed that PSA was "work[ing] in conjunction" with the FBI. Franks Mot. at 12. According to Curcio, the FBI was not performing any investigations itself and was merely "parroting" allegations by PSA, which was involved in an authenticity dispute with Curcio, that he was dealing fake cards. *Id.*; *see also* Franks Reply at 4–12 (providing narrative of PSA's involvement). But disclosing that PSA was the source of some information would do little to alter the analysis here. PSA was not alleged to be the origin for other key allegations, such as the assertion that Curcio sold a fake Pokémon card to an undercover purchaser in June 2023. *See* Affidavit ¶¶ 6(g); *see also id.* ¶¶ 7–9 (attributing other allegations to discussions with victims who purchased cards from him, as well as purchase and flight records). Because those allegations came from elsewhere, the Affidavit independently established a "fair probability" that Curcio had committed a crime, no matter whether and to what extent PSA was assisting the FBI's investigation. *Gates*, 462 U.S. at 238.

12

And in any event, even if Affidavit had identified PSA as the source of some allegations, that would not be out of the ordinary or a red flag that those accusations were untrue. PSA was an indirect victim of Curcio's fraud—he was allegedly forging its proprietary card labels—and victims routinely work with law enforcement to investigate the wrongdoers that harmed then, including by making allegations about the perpetrator's crimes. *See Harding*, 273 F. Supp. 2d at 418–19. The fact that the Affidavit did not mention PSA's involvement thus does not defeat probable cause here.[3]

Curcio's second omission—that PSA initially validated some of his cards as authentic—fares no better. He points out, for instance, that PSA at one point authenticated the 1986 Michael Jordan card that it later declared fraudulent, which was not mentioned in the Affidavit. But this proves little. Affidavits are "not required to include all potentially exculpatory information," *United States v. Maisonet*, No. 12-cr-489 (AKH), 2013 WL 12204909, at *1 (S.D.N.Y. Mar. 22, 2013), and imposing such an "extraordinary burden on law enforcement officers" "would severely disrupt the warrant process," *United States v. Cromitie*, No. 09-cr-558 (CM), 2010 WL 3025670, at *6 (S.D.N.Y. July 28, 2010). And at any rate, "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Even if some of Curcio's sales were legitimate, that hardly negates the other allegations that he "repeatedly" peddled counterfeits to others, including an undercover law enforcement purchaser who bought a forged Pokémon card from him. Affidavit ¶ 7.

---

[3] Curcio's reply brief also raises, for the first time, various other facts related to PSA and the FBI's investigation that he believes should have been included in the Affidavit. *See* Franks Reply at 4–14 (detailing how PSA intercepted and inspected several of Curcio's sold cards and challenging Campbell's characterization of Curcio's tool purchases). But when, as here, such arguments are raised for the first time on reply, the Court need not consider them. *See United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003). And even if it did, these arguments would still fail, because the numerous other allegations of criminal conduct in the Affidavit would still amount to probable cause.

Finally, Curcio argues that the Affidavit should have mentioned that one of Curcio's alleged victims, a collector named Jeffrey Johnson, was engaged in litigation with him over a card deal and had also been assisting PSA and Campbell. *See* Franks Mot. at 1–3. That argument is rejected as well. While it may have been better practice to include such information about potential bias in the Affidavit, it does not make a legal difference here. As a threshold matter, the mere fact that Johnson and Curcio were engaged in litigation does not automatically discredit Johnson's value as a source. Affidavits frequently rely on information from those who may be "biased" against defendants, due to their alleged victimization, and courts have explicitly confirmed that such statements may be accepted without inquiring into the victim's "reliability." *Harding*, 273 F. Supp. 2d at 418–19. And even if Johnson could somehow be cast aside as wholly unreliable, he was only one of the several "victims" who sourced the allegations Campbell included in the Affidavit. Affidavit ¶ 7. Those other victim allegations were also corroborated from sources beyond Johnson, including the purchase and flight records.

In sum, even if the Affidavit had included all of the facts about PSA and Johnson that Curcio says were omitted, it would still establish a fair possibility that Curcio had committed a crime. Because none of these alleged omissions were material, Curcio is not entitled to a *Franks* hearing here.

## CONCLUSION

For these reasons, the motions are DENIED. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 32 and 33.

SO ORDERED.

Dated:   August 21, 2025
        New York, New York

                                          Ronnie Abrams
                                          United States District Judge