UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- v. -<br><br>ANTHONY CURCIO,<br><br>Defendant. | 24-cr-312-RA |

# DEFENDANT ANTHONY CURCIO'S
## MEMORANDUM OF LAW IN SUPPORT OF HIS OMNIBUS MOTION IN LIMINE

By this motion, Defendant Anthony Curcio seeks to ensure a fair trial, free from speculative, inflammatory, or improperly prejudicial material that does not meet the standards of admissibility or could mislead or improperly influence the jury's deliberations.

Specifically, Mr. Curcio respectfully seeks an order barring the admission of (i) expert testimony; (ii) DNA evidence; (iii) evidence of prior bad acts, including a book excerpt; and (iv) testimony tending to imply or concluding that certain of Mr. Curcio's cards were counterfeit or his dealings were otherwise illicit in a fashion inconsistent with the charged conduct in this case, and to admit testimony of evidence regarding good faith or purpose on Mr. Curcio's part. Mr. Curcio also seeks an order permitting certain evidence relating to his state of mind and good purpose.

## BACKGROUND

The Government alleges that Mr. Curcio and Iosif Bondarchuk engaged in a scheme to defraud buyers of sports and Pokémon trading cards. To understand those charges, some background on the trading card industry is necessary. One company with near-monopolistic power authenticates and grades the physical condition of trading cards based on several subjective factors.

That company then encases the card in a protective plastic case bearing, among other things, the grade corresponding to its physical condition. This plastic encasement has a host of security features, both subtle and pronounced, that vary depending on the generation of the encasement.

According to the Government's narrative, Mr. Curcio misrepresented the grades of his personal cards to buyers, thereby inflating their value and causing buyers to pay excessive prices. That is not true. For these alleged acts, the Government charges Mr. Curcio with conspiracy to commit wire fraud (18 U.S.C. § 1349) and wire fraud (18 U.S.C. § 1343).

## ARGUMENT

1. <u>The Court Should Bar the Government from Introducing Expert Testimony</u>

Mr. Curcio respectfully moves the Court to exclude or preclude the Government from introducing expert opinion evidence, whether documentary or testimonial, at trial.

The Government has not disclosed any expert witnesses in accordance with the Court's order, which required such disclosures on or before May 1, 2025. "A failure to provide timely disclosure can result in preclusion [of expert testimony]." *United States v. Ulbricht*, 2015 WL 413318, at *5 (S.D.N.Y. Feb. 1, 2015) (collecting cases). Accordingly, Mr. Curcio respectfully submits that the Government should be barred from introducing expert testimony at trial.

For avoidance of doubt, Mr. Curcio intends to object to any expert opinion evidence offered at trial, including expert testimony delivered through a fact witness. Federal Rule of Evidence 701 was amended to "eliminate the risk" that a party would evade the court's gatekeeping function and "proffer[] an expert in lay witness clothing." Rule 701 explicitly bars lay witnesses from offering testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." And, relevant to this case, courts consider product authenticity to be within the scope of Federal Rule of Evidence 702. *See, e.g.*, *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp.

2

2d 284, 285, 288 (S.D.N.Y. 2003) (accepting expert testimony from quality control manager that luxury goods were counterfeit); *Michael Kors, LLC v. Hernandez Int'l Inc.*, 2016 WL 6306129, at *14 (S.D. Tex. Oct. 27, 2016) (holding undisclosed experts could not give expert opinions that goods, tags and labels were counterfeit); *cf. Nussberg v. Tatintsian*, 2013 NY Slip Op 7415, 1 (N.Y. App. Div. 1st Dep't.) ("[E]xpert testimony is required to identify and authenticate the works of art[.]").

While employees may testify to facts "that the witness has by virtue of his or her position in the business," that exception does not permit them to, e.g., testify about whether a particular card or encasement shows signs of tampering based on their specialized knowledge, training, forensic techniques, or detailed knowledge of anti-counterfeiting devices. Fed. R. Evid. 701 Committee Note (2000); *United States v. Afriyie*, 929 F.3d 63, 69 (2d Cir. 2019) (holding employee's testimony based on an investigation in their role as an employee was inadmissible if it reflected specialized knowledge from extensive experience); *see also United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997) (testifying about manufacturing methods or the intricacies of distribution require qualifying the witness as an expert).

Mr. Curcio likewise moves to preclude admission of any documents or testimony that are (or were) aided by specialized knowledge, training, forensic techniques, or detailed knowledge of anti-counterfeiting devices.

2. The Court Should Bar the Government from Introducing DNA Evidence

Relatedly, Mr. Curcio moves to preclude admission of any and all DNA evidence that might be introduced by the Government because it has not disclosed any expert witness qualified to testify regarding DNA evidence, nor has it provided any reports.

3

The introduction of DNA evidence without the proper foundation and expert testimony would violate the Court's gatekeeping role under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "DNA evidence, with all of its scientific complexities and nuances, simply is not the type of evidence that lay witnesses can competently testify about." *McCree v. City of Chester*, 2023 WL 1814175, at *10 (D.S.C. Feb. 8, 2023) (citing *United States v. Davis*, 602 F. Supp. 2d 658, 661-63 (D. Md. 2009) (applying Rule 702 to a motion in limine to suppress DNA evidence)). Absent a properly qualified expert and a complete report, the Court should exclude such evidence under Federal Rules of Evidence 702 and 403 as not reliable or prejudicial in nature.

3. <u>The Court Should Bar the Government from Introducing Certain Evidence Relating to Mr. Curcio's Prior Conviction or Other Irrelevant Bad Acts</u>

Mr. Curcio further moves the Court to limit the introduction of evidence regarding his prior conviction to avoid undue prejudice under the Federal Rules of Evidence 403 and 404(b)(1).

In 2008, Mr. Curcio committed an elaborate robbery of an armored car in his native Washington State. The details of that offense are almost inherently sensationalistic, as evidenced by the substantial media coverage they have garnered in the years since, including a detailed half-hour long exploration on the ABC network's news show, "20/20." Among other things, on September 30, 2008, Mr. Curcio overwhelmed an armored car driver with mace, utilized unwitting hired actors wearing work uniforms matching his own so as to disappear into a crowd while escaping, and managed to float away from the scene of the robbery down a nearby creek using an inner tube. He was convicted in 2009 and sentenced to 72 months' incarceration.

Evidence of prior convictions must be carefully scrutinized and limited because "[s]uch evidence easily lends itself to generalized reasoning about a defendant's criminal propensity and thereby undermines the presumption of innocence." *United States v. McCallum*, 584 F.3d 471, 476 (2d Cir. 2009). Mr. Curcio's prior conviction occurred over a decade and a half ago; is not

4

for fraud or dishonesty and so it has little, if any, probative value; and is highly prejudicial. The defense may, however, need to reference certain limited aspects of his prior conviction in the context of Mr. Curcio's state of mind during the instant charged conduct or his communications with the purported victims. The defense therefore requests that the Court restrict the introduction of evidence relating to Mr. Curcio's prior conviction to the following: (i) that Mr. Curcio was previously convicted in 2009; (ii) that the prior conviction was not for fraud or dishonesty; and (iii) that the prior conviction may have generated public notoriety for Mr. Curcio.

References to or introduction of other prior alleged bad acts unrelated to the prior conviction—such as Mr. Curcio's coursework in college, alleged forgery of prescription slips, alleged theft of furniture, and alleged creation of a fake escrow company—are irrelevant and should be excluded under the Federal Rules of Evidence 402 and 403 as well. These acts bear no probative value on any issue in this case and would serve only to unfairly prejudice Mr. Curcio. We understand that the Government does not seek to introduce these acts unless Mr. Curcio testifies. Should Mr. Curcio assert his right to testify, the defense recognizes that the evidentiary implications may shift and reserves the right to raise additional objections at that time.

4. <u>The Court Should Bar the Government from Referencing Card Counterfeiting and Other Card-Related Schemes</u>

The Government should be barred under Federal Rules of Evidence 401 and 403 from referencing the creation, receipt, or sale of counterfeit cards for which Mr. Curcio has not been charged. This alleged conduct has not been charged in this case and is therefore irrelevant, and referencing it would unduly prejudice Mr. Curcio's right to fair trial as to the conduct for which he is actually charged.

The Indictment charges Mr. Curcio with engaging "in a fraudulent scheme to defraud buyers and marketplaces to purchase sports and Pokémon trading cards at false and inflated prices

5

by misrepresenting that low-to-mid grade cards had received high-grade ratings from a reputable card authentication company." Indictment (ECF No. 3) ¶ 1.  Mr. Curcio is alleged to have done this by selling sports and Pokémon trading cards with fraudulent grading labels showing inflated grades from Company-1.  *Id.* ¶¶ 6, 8.  What is charged is therefore an "upcoding" scheme, in which the alleged fraud took place via manipulation of the grade shown on a card case.  The alleged scheme does not include allegations of counterfeiting cards—that is, the fabrication or falsification of the trading cards themselves.

Because of this, any evidence of separate conduct involving the purported falsification of the trading cards themselves would be irrelevant under Rules 401.  Any evidence that Mr. Curcio falsified trading cards would have no bearing on the scheme actually alleged in the Indictment.  Proof that such conduct took place would not only fail to make the scheme alleged more likely to have taken place, but it would tend strongly to confuse the jurors, forcing them to juggle notions of two different card-related schemes, only one of which—involving the labels and purported grades of cards—is actually charged.  This presentation would be both irrelevant and confusing.

Allowing this evidence in would also be deeply prejudicial: mentions of separate, irrelevant bad conduct would do little but signal to the jury that Mr. Curcio is a "bad person" in the card industry, separate and apart from the core question for the jury of whether Mr. Curcio is guilty of the actual wrongdoing for which he is charged.  *See United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (reasoning that unfair prejudice under Rule 403 "may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant").

Moreover, statements that Mr. Curcio was involved in counterfeiting cards should also be barred because such statements would be improper expert opinion.  Entire industries predicated on

determining whether particular cards are authentic or counterfeit have emerged in recent years, and their trade involves deeply technical analysis that (short of testimony from counterfeiters themselves) only experts are in a position to explain. Mr. Curcio denies that he was involved in the production or sale of any counterfeit cards. Glib pronouncements from lay, percipient witnesses that Mr. Curcio was responsible for counterfeit cards would therefore not only be prejudicial but would also run afoul of the framework established by Rules 701 and 702 regarding expert testimony. *See United States v. Garcia*, 413 F.3d 201, 216–17 (2d Cir. 2005) (finding testimony should have come from an expert witness because the witness's "reasoning process was not that of an average person in everyday life").

Likewise, evidence that Mr. Curcio engaged in counterfeiting cards years earlier should be excluded. As set forth below, the Government has declared its intention to offer into evidence excerpts of a memoir co-written by Mr. Curcio in 2013—more than a dozen years ago. Among other things, the Government intends to include references therein to Mr. Curcio's having, well prior to his conviction, "bought insurance for $20,000 on a shitty baseball card worth fifty cents and put the card in the mail;" "receipt and sale of counterfeit [Mickey] Mantle and Michael Jordan cards;" and modification of actual cards in order to manipulate their grades as part of his *own* card-grading business. Not one of these modes of behavior is the type of behavior alleged in the Indictment in this case, and each of them would, in addition to being susceptible to overly conclusory modes of proof given the absence of experts in this case, be both irrelevant and overly prejudicial.

Counterfeiting and other behaviors involving trading cards, while fascinating, are not the behavior charged in this case. They do not have a place in Mr. Curcio's upcoming trial. Their mention and proof should be precluded.

7

5. <u>The Court Should Bar the Government from Introducing Excerpts From Mr. Curcio's Memoir</u>

The Government intends to introduce Rule 404(b) evidence consisting of excerpts of the book <u>Heist and High</u>, a memoir (hereinafter the "Memoir") Mr. Curcio published with the assistance of a ghostwriter, Dane Batty, approximately a dozen years ago and about a decade before the scheme alleged in the Indictment began.

As the title bluntly suggests, the Memoir recounts Mr. Curcio's descent into addiction to prescription painkillers, leading to a life of crime to afford a widening array of drugs and culminating in his sensational and ill-fated armored car robbery in 2008. The book was marked on online marketplaces in the "self-help" and "true crime" genres.

Prior to that point, as explained in the Memoir, Mr. Curcio's addiction reduced him to other mostly illicit behaviors. The Government has signaled its intention to offer the excerpts to establish a number of these in Court. Certain of these, which go to his knowledge of the card market, card grading system, and similarly uncontested matters, appear less objectionable provided that they are otherwise admissible (and Mr. Curcio does not know *how* the Government intends to get the excerpts admitted). Others are cause for substantial concern. Among this latter category are:

- As set forth above, descriptions of uncharged fraud committed before 2008, including but not limited to Mr. Curcio's "[buying] insurance for $20,000 on a shitty baseball card worth fifty cents and put the card in the mail;" Mr. Curcio's "receipt and sale of counterfeit [Mickey] Mantle and Michael Jordan cards;" and instances of Mr. Curcio modifying cards to manipulate their grades as part of his *own* card-grading business, none of which are even the same kind of conduct alleged in the instant Indictment;

- Mr. Curcio's "discover[ing] how to open sealed card cases and reseal them without any outward appearance of tampering. That allowed him to change the grade of other, well-known, companies' cards. He could re-grade a PSA-4 Mantle to a PSA-7. He would make the barcode reflect the change while trimming[;]" and

8

- Mr. Curcio's convincing a police officer who had investigated his sales in counterfeit goods that he was a legitimate businessman and his subsequent determination to "never do anything in his own name again."

As an initial matter applicable to all three of these categories, the events described are stale. To be admissible pursuant to Rule 404(b), a prior bad act must not be too remote in time. *United States v. Figueroa*, 618 F.2d 934, 942 (2d Cir. 1980); *see United States v. Plancarte-Alvarez*, 366 F.3d 1058, 1062 (9th Cir. 2004). The excerpts recount events from nearly 20 years ago and include events wholly unrelated to the allegations in this case, including Mr. Curcio's historical battle with drug addiction, which could taint the jury's perception of Mr. Curcio. The probative value of such evidence is lessened by its remoteness in time. *See United States v. Harvey*, 845 F.2d 760, 763 (8th Cir. 1988) (holding it was an error to admit evidence of prior bad act occurring more than ten years before the case). A jury should not be tempted to convict Mr. Curcio because he engaged in somewhat similar acts nearly two decades ago, under vastly different personal circumstances, and on the other side of a criminal conviction and half-decade stint in federal prison. At best, the passage of time alone erodes the Rule 404(b) purposes ostensibly being invoked—knowledge, intent, absence of mistake, modus operandi, and the like. Unfortunately, time does not necessarily dull the prejudice of introducing these prior bad actions. By any Rule 403 analysis, each year that separates the crime alleged from this conduct should push it toward being more unduly prejudicial than probative. Here, we have two decades' worth of time.

Further, and as set forth in the previous section, certain of these events are immaterial and irrelevant. In its Rule 404(b) notice to Mr. Curcio, the Government suggested that each of the above acts are "virtually identical" to the crime currently charged. Not so. Even though the Government is quite capable of creatively casting each of them as "wire fraud conduct involving the trading card industry," there are substantial differences between the conduct alleged in the

Indictment—fraudulently upcoding grades by grading companies to sell cards at inflated values—and either receiving or selling wholly fraudulent cards, insurance fraud, or altering cards so that he can change the grades in his own card-grading business. The differences between the conduct alleged and each of these behaviors sap their value under the Rule 404(b) rationales the Government tries to rely on. *See United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002) ("If the government cannot identify a similarity or some connection between the prior and current acts, then evidence of the prior act is not relevant to show knowledge and intent.").

Even with respect to instances in which the memoir describes regrading PSA's cards, the scheme was different. Although Mr. Curcio describes discovering how to manipulate the grading, the Memoir describes his doing this but once, and it does not describe any instance of his selling upcoded cards in this manner. Instead, the narrative skips right to his scamming money and a counterfeit card from a counterfeiter that had scammed him earlier. The difference here is clear—in the pre-2008 equivalent of Mr. Curcio's regrading manipulation, it was not attached to an actual scam. There is not established bad conduct, and the Government should not be allowed to introduce this stray, ancient anecdote under the ill-fitting clothing of Rule 404(b) evidence. It is a purported prior bad act that is not even demonstrably part of a completed bad act.

Additionally, there is no clarification for why the purported deactivation of Mr. Curcio's eBay and PayPal accounts twenty years ago is germane to these proceedings. But even if those accounts were deactivated for similar conduct, admitting that evidence would ultimately remove the ultimate question from the finders of fact and devolve the diligent and measured deliberations of a jury to faceless corporate actors.

Further, each of these purported bad acts is unduly prejudicial and should be excluded under Rule 403. The Government ostensibly seeks to show that Mr. Curcio has been engaging in

the same bad conduct alleged in the Indictment (it is not) for decades, demonstrating a modus operandi, the absence of mistake, or other permissible factors (although they do not).  But the natural consequence will be that, regardless of any jury instruction to the contrary, jurors will see Mr. Curcio as a bad actor who has done it before and conclude that, because he has done it before, he must have done it this time too.  If allowed to introduce such inflammatory (and immaterial) evidence, the Government may tap into the instinctual prejudices of the jury, depriving Mr. Curcio of a fair trial.  *See Figueroa*, 618 F.2d at 943.

Finally, utilizing the Memoir excerpts opens the door to a trial-within-a-trial concerning the context of these statements and the circumstances under which they were written. As mentioned, the book is a self-help memoir about a dark chapter in Mr. Curcio's life over a decade and a half before the alleged scheme commenced. Far from the standard, straightforward admissions that tend to characterize motion practice of this sort, it was co-authored and written about Mr. Curcio *in the third person*. Most of the excerpts that the Government seeks to admit purport to represent Mr. Curcio's innermost thoughts, but they cannot attribute any specific statement in the book to him as authorship of any particular section remains ambiguous in light of the fact that there was a co-author. At a minimum, Mr. Curcio would need to be able to explore how the book was written, and the circumstances that distinguish Mr. Curcio's actions then from those at the time of the instant offense. The weight of all of this would threaten to overwhelm the trial—all for evidence that, as set forth above, is minimally probative and deeply prejudicial in any event.

The Government should not be permitted to use these book excerpts at trial.

6. <u>The Court Should Admit Evidence Pertaining to Mr. Curcio's State of Mind and Good Purpose</u>

Mr. Curcio anticipates a defense that focuses, in large part, on his having engaged in certain of the conduct alleged in the Indictment not for the purposes of executing the fraud charged, but for other, innocent purposes. Further, Mr. Curcio anticipates a related defense showing that he acted in response to unusual developments precipitated by the Government's involvement with a third party actor in the sequence of transactions listed in the Indictment.

The defense cannot elaborate further without prematurely revealing aspects of defense strategy to which the Government is not entitled. Nevertheless, the defense notes for the time being its understanding that, barring other issues, state of mind evidence and contextual evidence that explains the defendant's actions is generally probative of the mens rea element of the offense and is thus admissible. *See United States v. Graham*, 2019 WL 2366724, at **2, 5 (S.D.N.Y. May 31, 2019) ("Extrinsic acts evidence has been deemed admissible . . . especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." "Proof of state of mind, such as intent, has been deemed to be a proper purpose.").

## CONCLUSION

For the foregoing reasons, Mr. Curcio respectfully requests that the Court enter an order:

i. precluding any expert witness testimony;

ii. precluding any DNA evidence;

iii. precluding the Government from introducing certain evidence relating to Mr. Curcio's prior conviction or other irrelevant bad acts;

iv. precluding references to counterfeit cards and other card-related schemes not charged in the Indictment;

v. precluding the Government from introducing excerpts from Mr. Curcio's memoir; and

vi.    allowing evidence relating to Mr. Curcio's state of mind and good purpose.

Dated: New York, New York
       December 11, 2025                               Respectfully submitted,

                                                          **Simpson Thacher & Bartlett LLP**

                                                          By: */s/ Martin S. Bell*
                                                          Martin S. Bell
                                                          Meredith Karp
                                                         Patrick K. Barry
                                                          425 Lexington Avenue
                                                          New York, New York 10017
                                                          (212) 455-2000
                                                          martin.bell@stblaw.com
                                                          meredith.karp@stblaw.com
                                                          patrick.barry@stblaw.com

                                                          *Attorneys for Defendant Anthony Curcio*

## Certificate of Service

I hereby certify that I filed the foregoing through the Court's CM/ECF system which will provide notice of filing to all counsel of record.

By: /s/ Martin S. Bell
Martin S. Bell
