UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ANTHONY CURCIO,
    a/k/a "Brendan Wooley,"

        Defendant.

24 Cr. 312 (RA)

# THE GOVERNMENT'S MOTIONS *IN LIMINE*

JAY CLAYTON
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

David R. Felton
Kingdar Prussien
Cecilia Vogel
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 1

PRELIMINARY STATEMENT ................................................................................... 2

RELEVANT BACKGROUND .................................................................................... 2

ARGUMENT ................................................................................................................. 4

I.   THE COURT SHOULD ALLOW THE ADMISSION OF CERTAIN EVIDENCE ........ 4

   A.   The Court Should Admit Curcio's Admissions in His Autobiography Regarding His Nearly Identical Prior Trading Card Fraud Scheme as Direct Evidence or Pursuant to Rule 404(b) ................................................................................................................ 4

   B.   The Court Should Admit Lay Opinion Testimony from PSA Representatives ............ 16

   C.   Statements of the Defendant's Co-Conspirator are Admissible at Trial ...................... 24

II.   THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENTS THAT ARE IRRELEVANT AND UNFAIRLY PREJUDICIAL ............................................................ 29

   A.   The Court Should Exclude Evidence and Argument that Curcio's Victims Were Negligent or Failed to Conduct Adequate Due Diligence ................................................... 30

   B.   The Court Should Exclude Evidence and Argument that PSA Has Engaged in Misconduct or Is Otherwise to Blame for the Defendant's Conduct ................................... 31

   C.   The Court Should Preclude the Defense that the Defendant Did Not Intend to Defraud Because He Refunded Certain Victims ................................................................................ 34

   D.   The Court Should Exclude Evidence and Argument About the Government's Investigation ........................................................................................................................ 35

   E.   The Court Should Preclude Evidence and Argument Concerning the Defendant's Purported Good Acts ............................................................................................................ 38

   F.   The Court Should Exclude Evidence and Argument About the Defendant's Personal Circumstances and Potential Punishment ........................................................................... 42

III.   THE COURT SHOULD PRECLUDE CROSS-EXAMINATION ON IRRELEVANT ISSUES THAT ARE UNRELATED TO WITNESS CREDIBILITY ..................................... 43

   A.   Factual Background ................................................................................................. 44

   B.   Applicable Law ....................................................................................................... 47

   C.   Discussion ............................................................................................................... 51

CONCLUSION ............................................................................................................. 56

## PRELIMINARY STATEMENT

In advance of the January 12, 2026, trial of defendant Anthony Curcio, on Indictment 24 Cr. 312 (RA) (ECF No. 3, the "Indictment" or "Ind."), the Government respectfully moves *in limine* for orders: (1) admitting (a) the defendant's statements in his autobiography regarding his nearly identical prior trading card fraud scheme as direct evidence or, alternatively, pursuant to Rule 404(b) of the Federal Rules of Evidence, (b) lay opinion testimony by witnesses from Professional Sports Authenticator ("PSA"), and (c) statements of the defendant's co-conspirator in furtherance of the conspiracy; (2) precluding the defendant from offering or eliciting evidence or making argument (a) that the defendant's victims were negligent or failed to conduct adequate due diligence, (b) that PSA engaged in purported misconduct or is otherwise to blame for the defendant's conduct, (c) that the defendant did not have intent to defraud because he refunded certain victims, (d) regarding the Government's investigatory or charging decisions and the Government's motives, (e) regarding the defendant's purported good acts, and (f) regarding the defendant's personal circumstances, potential punishments, or consequences of conviction; and (3) precluding certain irrelevant evidence, argument, and cross-examination with respect to four anticipated witnesses.

## RELEVANT BACKGROUND

The two-count Indictment charges Curcio and co-conspirator Iosif Bondarchuk with violations of Title 18, United States Code, Sections 1349 (wire fraud conspiracy), 1343 (wire fraud), and 2 (aiding and abetting the same). At trial, the Government expects to prove that, from at least 2022 to May 2024, Curcio agreed to carry out, and did carry out, a fraudulent scheme to induce victims to pay more money for sports and Pokémon trading cards than they otherwise would have paid by agreeing to make, making, and causing to be made, false statements regarding the

grade ratings assigned to the cards by one of the industry's largest card authentication companies, PSA, knowing that PSA had not in fact assigned those grades to the cards.[1]

To further his fraud, Curcio repeatedly used fake names and identities to conceal his involvement in the fraudulent scheme. (Ind. ¶ 10). For example, in May 2023, after a victim complained about fraudulent cards, Curcio pretended to be someone named "John Steel." As another example, about a month before the grand jury returned the Indictment, in April 2024, at a card show in New Jersey, Curcio gave a business card to a potential victim buyer, falsely claiming to be "Brendan Wooley" and listing, among other identifiers, a phone number and LinkedIn page purportedly belonging to "Brendan Wooley." (*Id.* ¶ 10(c)). However, Curcio—and not "Brendan Wooley"—created and operated the LinkedIn page and controlled the phone number. (*Id.*).

Among other evidence, the Government expects to offer the testimony of victims whom Curcio defrauded, witnesses from PSA and marketplaces where Curcio sold cards, a cooperating witness, and members of law enforcement. The Government also expects to offer evidence in the form of, among other things: (1) items Curcio used to create forged card holders and labels recovered from a search of Curcio's home; (2) altered PSA holders and labels, as well as cards, recovered from Curcio's home; (3) counterfeit PSA-graded cards Curcio sold to victims; (4) inculpatory communications, templates, web searches, images, and videos recovered from Curcio's digital devices and storage media; and (5) third-party business records.

---

[1] The cards are counterfeit, fake, or inauthentic in the sense that Curcio represented that they had received certain grades from PSA or been certified as authentic by PSA when they had not.

**ARGUMENT**

**I.  THE COURT SHOULD ALLOW THE ADMISSION OF CERTAIN EVIDENCE**

> **A.  The Court Should Admit Curcio's Admissions in His Autobiography Regarding His Nearly Identical Prior Trading Card Fraud Scheme as Direct Evidence or Pursuant to Rule 404(b)**

The Government seeks to introduce portions of nine pages excerpted from Curcio's co-authored 2013 autobiography titled "Heist and High," detailing a nearly identical trading card fraud that Curcio ran, as direct evidence of the charged offenses. (*See* Exhibit A (USAO_000022707-11, 16 (highlighted portions of pages 84-86, 88-92, 103); USAO_000022701-02, 19-20 (front and back cover pages)), in its entirety, "Curcio's Book"). In the alternative, the Government submits that such evidence is properly admissible pursuant to Federal Rule of Evidence Rule 404(b) in order to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, lack of accident, and modus operandi with respect to the offenses charged in Indictment. While Curcio does not identify in his book a precise time period in which he operated this prior trading card fraud scheme, he describes this conduct occurring while he was a student at Washington State University, from which he graduated in 2004.

> 1.  <u>Factual Background</u>

According to Curcio's own descriptions of events in his book, he ran a prior trading card scheme that was stunningly similar to the charged conduct. (*See* Exhibit A (USAO_000022707-11, 16 (highlighted portions of pages 84-86, 88-92, 103))). Curcio personally and extensively discussed this prior conduct and understanding of certain matters critical to the instant charged offenses, including the following:

- That trading cards were valuable and selling cards was lucrative (*e.g.*, "There were cards that sold for over a million dollars[,]" pages 84, 85, 88-91; page 90 ("The $20,000 made in less than one week changed everything."));

- Curcio's expertise regarding trading cards (*e.g.*, "he decided to learn everything there was to know about it," "After working hard to understand all the ins and outs," pages 84-85);

- His interest in vintage cards ("Vintage cards were where the money was," page 85);

- The materiality of card ratings, or "grading" ("the most important thing wasn't the card's make, year or player—it was the 'grading' that mattered. It determined everything. Grading a card determines the worth of the card based on the centering, edges, surface condition and the corners. . . . The point value determined the worth of the card," page 85);

- His ownership of his own card grading company, (page 85);

- His contentious history with and negative feelings about "major grading companies," such as PSA, (pages 86 ("After some research, Anthony learned that the major grading companies typically under-graded as much as possible to keep their names valued and respected. Meanwhile, the companies' employees were buying, regrading and selling on the side differently and making big cash"), 91 ("PSA saw the fraud and returned it to the owner with an explanation"));

- Curcio's physical alteration of cards, including trimming cards, improving color-fixing, and making cards appear aged, to "allow him to improve the [purported] grade on quite ordinary, cheap cards[,]" (page 90);

- Curcio's "discover[ing] how to open sealed card cases and reseal them without any outward appearance of tampering. That allowed him to change the grade of other, well-known, companies' cards. He could re-grade a PSA-4 Mantle to a PSA-7. He would make the barcode reflect the change while trimming[,]" (page 90; page 103 ("I handed over a PSA Mantle that I had broken into and resealed and watched him inspect it"));

- Curcio's defrauding a victim by selling a falsely graded PSA-8 Mickey Mantle card for $20,000 (Curcio "bought insurance for $20,000 on a shitty baseball card worth fifty cents and put the card in the mail," pages 89-90);

- Curcio's receipt and sale of counterfeit Mantle and Michael Jordan cards, (pages 90-91);

- PSA's detection of Curcio's fraud, which prompted police to confront Curcio about the fraud, wherein Curcio admittedly deceived the police, (page 91 ("Detective Bell had been told what to look for, but it was clear to Anthony that he didn't know much,"));

- Curcio's use of false identities (Curcio "was reminded of one thing that day: never to do anything in his own name again[,]" (page 91; *see also* pages 89 ("Anthony used another student's debit card and address, and set up new eBay and PayPal accounts"); 103 (to further the card fraud, describing Curcio's creation of a sham escrow company online purportedly owned and operated by two attorneys but, in truth and in fact, Curcio made up the identities of the attorneys and personally impersonated them)); and

- eBay and PayPal shut down Curcio's accounts, and eBay banned Curcio from the site for life, (page 92).[2]

---

[2] To be clear, the Government intends to admit all of the above evidence from Curcio's Book in its case-in-chief. However, and separately, if Curcio testifies at trial, in order to impeach him,

2. <u>Applicable Law</u>

i. <u>Other Acts Evidence as Intrinsic or Direct Proof</u>

If evidence is relevant to a charged offense, it is generally admissible at trial. Fed. R. Evid. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).[3] As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are

---

challenge his credibility, and attack his character for truthfulness, the Government intends to cross-examine Curcio about many of his other prior statements from his book, including his: serial and sophisticated use and creation of aliases, fake identities, and fake personal and corporate identity documents; admitted false statements to law enforcement; meticulously planned prior armored car robbery for which he was federally convicted; extensive prescription drug and real estate/mortgage fraud schemes; and unprosecuted thefts (including of computers and furniture, involving planning and using disguises).

With respect to Curcio's prior armored car robbery federal conviction, the parties are endeavoring in good faith to reach a stipulation about its use at trial, given Curcio's repeated and detailed discussions of it in relevant communications with numerous witnesses to the charged card fraud. If the parties are unable to reach an agreement, we will raise the matter with the Court.

[3] All case citations herein omit internal citations, alterations, and quotation marks unless otherwise indicated.

"necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007).

Where, as here, an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999); *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Even if the evidence does not directly establish an element of the offense charged, it can be admitted "in order to provide background for the events alleged in the indictment," including motive or intent for a charged crime. *Coonan*, 938 F.2d at 1561. In particular, "[b]ackground evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821 (1988)). Similarly, "evidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense." *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994).

## ii.    Other Acts Evidence Pursuant to Rule 404(b)

Evidence of a defendant's prior crimes, wrongs, or acts are admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). It is well settled that evidence of uncharged crimes, wrongs, or other acts is admissible under Rule 404(b) as long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; (3) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (4) if requested, is admitted with limiting instructions to the jury. *See United States v. Scott*, 677 F.3d 72, 79 (2d Cir.

2012); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Pitre*, 960 F.2d 1112, 1118-19 (2d Cir. 1992); *United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990). Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Dupree*, 870 F.3d at 76 (citing *Diaz*, 176 F.3d at 79); *see also United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) (citing *Pitre*, 960 F.2d at 1119). The Second Circuit takes an inclusionary approach to the admission of prior act evidence, under which evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity as long as it is not substantially outweighed by the danger of unfair prejudice. *See United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013); *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006).

Prior conduct offered on the issue of the defendant's knowledge and intent is relevant and admissible when there is similarity between the prior conduct and the charged conduct. *Paulino*, 445 F.3d at 223; *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987) (holding that a prior act is probative of knowledge if it is sufficiently similar "to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence"). "Where only knowledge or intent is in issue, the similarity requirement is simply a rule of relevance." *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996); *see also United States v. Brand*, 467 F.3d 179, 197 (2d Cir. 2006) (citing Federal Rule of Evidence 401 as test for similarity where other acts evidence is used to prove knowledge and intent). A defendant's knowledge and intent are at issue unless the defendant has expressed with sufficient clarity a decision not to dispute that element of the offense. *See United States v. Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *Pitre*, 961 F.2d at 1119.

It is also proper for a trial court to admit "other crimes, wrongs, or acts" evidence if it helps to prove the existence of a common scheme or plan. *See* Fed. R. Evid. 404(b) (establishing that "[e]vidence of any other crime, wrong, or act . . . may be admissible" to prove a "plan"); *United States v. Reed*, 639 F.2d 896, 906 (2d Cir. 1981) ("[E]vidence of the [other] transactions was . . . admissible to show a common scheme or plan."); *see also United States v. O'Connor*, 580 F.2d 38, 41 (2d Cir. 1978) ("The rubric of scheme or plan has been used to cover a multitude of particular situations, which do not fall into simple categories.").

An evaluation of whether other acts evidence should be excluded as too remote in time to be relevant or reliable "must be made on a case-by-case basis to determine whether the significance of the prior acts has become too attenuated and whether the memories of the witnesses has likely become too frail. Neither Rule 403 nor any analogous Rule provides any bright-line rule as to how old is too old." *United States v. Larson*, 112 F.3d 600, 605 (2d Cir. 1997); *see, e.g.*, *United States v. Curley*, 639 F.3d 50, 59 (2d Cir. 2011) (upholding admission of incidents pre-dating the charged conduct by as much as fifteen years); *United States v. Terry*, 702 F.2d 299, 316 (2d Cir. 1983) (upholding *in limine* ruling that 20-year-old narcotics conviction would be admissible), *cert. denied*, 461 U.S. 931 (1983); *United States v. Lingat*, No. 21 Cr. 573 (MKV), 2024 WL 1051633, at *2-3 (S.D.N.Y. Mar. 11, 2024) (admitting as direct evidence and under Rule 404(b) uncharged tax evasion evidence "dating back approximately 20 years prior to the charged period"), *aff'd sub nom. United States v. Lemay*, No. 24-2328-CR, 2025 WL 1873404 (2d Cir. July 8, 2025).

### iii.    Rule 403 and Evidence of Other Bad Acts

Regardless of whether the evidence is admitted as direct evidence or as other acts evidence under Rule 404(b), the evidence is, like all other evidence, admissible under Federal Rule of Evidence 403 if its probative value is not substantially outweighed by the danger of unfair prejudice. Rule 403 provides that relevant evidence may be excluded "if its probative value is

substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Other crimes evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (noting that evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]"); *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) ("Evidence is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case); *cf. Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*."). The fact that evidence may be "damning" does not render it inadmissible. *See United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir. 1972).

Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendants are not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58,

68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system—is that juries can be trusted to follow the trial court's instructions."); *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

   3.   Discussion

Curcio's own writings in his 2013 book about his nearly identical prior trading card fraud should be admitted as direct evidence of the charged conduct because they provide relevant background and explain his intent in conducting the charged offense. The prior trading card fraud provides important background and context showing the circumstances surrounding key events, such as (a) why eBay banned Curcio causing Curcio, during the charged fraud, to use eBay accounts in the name of third parties, (b) Curcio's contentious history with and negative feelings about PSA, (c) Curcio's development of his interest in and understanding of trading cards, including the importance and nuances of grading cards, and (d) how Curcio developed the technical abilities to create counterfeit graded cards. Such evidence is inextricably intertwined with the evidence regarding the charged conduct and thus necessary to complete the story of the crime on trial. *United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012). For example, Curcio's own statements in his book that eBay shut down his accounts and banned him for life provide necessary background and context for, as we expect the evidence to show at trial, Curcio's use of eBay accounts in the names of third parties as part of the charged scheme. Likewise, Curcio's statements in his book provide relevant background and context regarding his longstanding, hostile view of and history with PSA. Indeed, without such evidence, necessary background to understand the events alleged in the Indictment would be shielded from the jury. *See United States v. Mercado*, 573 F.3d 138, 141-42 (2d Cir. 2009); *Hsu*, 669 F.3d at 118; *Coonan*, 938 F.2d at 1561; *Inserra*,

34 F.3d at 89. Moreover, Curcio's statements in his book are direct evidence of the charged fraud because his book's statements regarding his familiarity, knowledge of, and experience with trading cards contradicts his later false statements to victims, during the charged fraud, minimizing his knowledge and experience with trading cards as an excuse to explain away his misconduct.

The Second Circuit has repeatedly affirmed the admissibility of similar act evidence as direct proof of a charged offense under similar circumstances, where the prior conduct provided relevant background and context or had "carry over" effects relevant to the charged offense. *See, e.g.*, *Lingat*, 2024 WL 1051633, at *2-3 (admitting, as direct evidence, uncharged tax evasion evidence "dating back approximately 20 years prior to the charged period" as background to the charged tax scheme); *United States v. Kaiser*, 609 F.3d 556, 571 (2d Cir. 2010) (in securities fraud case, holding that bad acts predating the conspiracy were admissible as direct evidence, without regard to Rule 404(b), because they had carry-over effects during the conspiracy); *United States v. Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'"); *Roldan-Zapata*, 916 F.2d at 804 (evidence of pre-existing drug trafficking relationship between defendant and co-conspirator admissible to aid jury's understanding of how transaction for which defendant was charged came about and his role in it).

In the alternative, this evidence is plainly admissible pursuant to Rule 404(b). This evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See Scott*, 677 F.3d at 79; *United States v. Guang*, 511 F.3d 110, 121 (2d. Cir. 2007). The

prior and charged trading card scheme evidence is stunningly similar. This evidence—involving the same item (valuable vintage trading cards); identical or nearly identical means and methods (*i.e.*, regrading PSA-graded cards, opening and sealing card holders, using the names of third parties to further the frauds, and Curcio personally creating and using fake identities); the same major card grading company (PSA); and the same marketplace (eBay)—is plainly relevant to the crimes for which Curcio will stand trial, particularly given his intention to challenge his knowledge and criminal intent. The evidence is admissible under Rule 404(b) to show Curcio's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, lack of accident, and modus operandi with respect to the charged offenses. *See, e.g.*, *United States v. Sliker*, 751 F.2d 477, 486-87 (2d Cir. 1984); *Curley*, 639 F.3d at 59; *United States v. Edelmann*, 458 F.3d 791, 810 (8th Cir. 2006); *United States v. Chavez*, 119 F.3d 342, 347 (5th Cir. 1997). Here, Curcio has confirmed that his criminal intent will be in dispute at trial and, indeed, a central issue in the case. Under circumstances "where it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief." *Pitre*, 960 F.2d at 1120.

The Second Circuit requires knowledge or intent evidence to be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge or intent inference advocated by the proponent of the evidence." *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994). This standard is easily met here where the prior acts are essentially identical to the charged conduct. Given the strikingly similar nature of the prior conduct to the charged crimes, this evidence of Curcio's prior conduct is probative of Curcio's knowledge, intent, identity, absence of mistake, lack of accident, and modus operandi. Further, this evidence is probative of Curcio's financial motive to engage in the charged crimes and recounts his familiarity with and negative feelings about major grading companies, such as PSA. Likewise, this evidence is

probative of Curcio's opportunity, preparation, and plan to carry out the charged crimes, in light of his pertinent expertise, experience, and possession of the relevant equipment and tools.

Curcio's nearly identical prior trading card fraud was not too long ago to be relevant. Relevance is not determined based merely on the date of the prior acts; rather, the Second Circuit focuses on whether the prior acts are "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge or intent inference advocated by the proponent of the evidence." *Aminy*, 15 F.3d at 260. They clearly are here, given the marked similarity of the schemes. Moreover, given that the Government will be relying on Curcio's own, carefully chosen words that were written closer in time to the prior acts at issue, there is no concern that a witness's memory has become faded or frail. *See Larson*, 112 F.3d at 605. And as the Fifth Circuit has recognized, "prior crimes involving deliberate and carefully premeditated intent—such as fraud and forgery—are far more likely to have probative value with respect to later acts than prior crimes involving a quickly and spontaneously formed intent—such as assault." *United States v. San Martin*, 505 F.2d 918, 922–23 (5th Cir. 1974).

Unsurprisingly, the Second Circuit and other circuits have upheld the admission of similar and even older Rule 404(b) evidence, especially where, as here, the defendant's state of mind is in controversy. *See, e.g.*, *Curley*, 639 F.3d at 59 (upholding admission of incidents pre-dating the charged conduct by as much as 15 years); *Terry*, 702 F.2d at 316 (upholding *in limine* ruling that 20-year-old narcotics conviction would be admissible); *Lingat*, No. 21 Cr. 573 (MKV), 2024 WL 1051633, at *2-3 (admitting under Rule 404(b) uncharged tax evasion evidence approximately 20 years before the charged period); *United States v. Valenzuela*, 57 F.4th 518, 523 (5th Cir. 2023) (17-year-old prior narcotics conviction not too remote); *Edelmann*, 458 F.3d at 810 (approximately 15 year-old prior convictions, two of which involved filing false currency transaction report to

conceal her identity from Internal Revenue Service, and the third of which involved fabricating court orders to escape from federal custody, were not too remote in time given their similarities with charged offenses of mail fraud, wire fraud, and money laundering); *United States* v. *Spillone*, 879 F.2d 514 (9th Cir. 1989) (affirming Rule 404(b) ruling to admit an approximately 18-year old conviction for a similar crime to prove knowledge and intent in a loan-sharking case); *United States v. Ross*, 886 F.2d 264, 267 (9th Cir. 1989) (improperly using spouse's social security number 13 years before similar current charges not too remote). Accordingly, the age of the prior card fraud does not render it inadmissible, particularly given the relevance of the evidence here to Curcio's intent and knowledge and the numerous parallels between his self-described prior scheme and the current charges.

Moreover, Curcio's prior similar dealings are neither "more sensational" nor more "disturbing" than the evidence of the charged crimes. Instead, compared to the prior conduct, the charged crimes are for a longer, more lucrative fraud involving significantly more victims, cards, and losses. *Roldan-Zapata*, 916 F.2d at 804. Indeed, the proffered evidence here is far *less* prejudicial than that previously approved by the Second Circuit. *See, e.g.*, *Diaz*, 176 F.3d at 79 (permitting Government to offer evidence of the defendant's gang affiliation because such evidence would "help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed"). Given the similarities between the charged and prior card fraud schemes and the vital importance of the prior card fraud scheme in understanding the charged fraud, the prior scheme's considerable probative value is not outweighed, much less substantially outweighed, by the danger of unfair prejudice.

Finally, any potential prejudice can be adequately minimized through a limiting instruction to the jury, and the Government would consent to an appropriate limiting instruction. *See Zackson*, 12 F.3d at 1182; *Ramirez*, 894 F.2d at 568.

**B.  The Court Should Admit Lay Opinion Testimony from PSA Representatives**

The Government moves to admit testimony by PSA employees regarding (1) the authenticity of purported PSA-issued card holders and labels; and (2) purported PSA-issued grades as fact testimony and lay opinion testimony under Federal Rules of Evidence 602 and 701.

1.  <u>Relevant Facts and Anticipated Testimony</u>

The Government intends to call two employees of PSA (the "PSA Witnesses"), each of whom have extensive firsthand experience with PSA's holders and labels and PSA's grading, who will testify, in sum and substance, to the following, among other topics: PSA evaluates cards to determine whether they are authentic and grades cards based on their physical condition. PSA uses a one to ten grading scale (ten being the best), and may also certify a card as authentic, without a numerical grade; PSA's publicly available website outlines PSA's general grading standards. The PSA Witnesses and other victims and witnesses from the trading card industry are expected to testify that, for certain cards, the difference in value between a PSA 9 or PSA 10 graded card can be hundreds of thousands of dollars. Once PSA has graded a card and determined that the card is authentic, it places the card in a clear plastic, sonically welded, PSA card holder, also known as a "slab," and affixes a PSA label to the holder, which includes the type of card, PSA's grade, PSA's certification number, and a bar code corresponding to the certification number, among other features. According to PSA policy, if a card owner cracks a card out of the PSA holder, PSA's grade is no longer valid. PSA maintains a public database of cards it has certified and the grade given to each such card. Starting in approximately May 2019, PSA began taking photos of certified cards to include in the public database, but PSA did not systematically keep photos of cards

certified before that date. If PSA learns of a problem with a card it has certified, PSA may either decertify or deactivate the certification, which is reflected in the public database. Card owners may also submit cards previously graded by PSA to be re-holdered, *i.e.*, to be removed from their PSA holder and placed in a new PSA holder. PSA maintains an internal audit log of each card it receives, including a timeline history of transactions such as authentication, grading, or re-holdering.

The Government expects the trial evidence to show that the defendant fraudulently sold victims trading cards that had been placed in inauthentic PSA card holders with inauthentic PSA labels, making it appear that PSA had given the cards a high grade, when PSA had not in fact done so. The defendant generally listed real PSA certification numbers on the label. The defendant, however, typically used certification numbers for cards that PSA had certified pre-2019, meaning there was no photograph of the certified card in the public PSA database. Thus, the defendant was able to fraudulently sell the same *type* of card associated with a given PSA certification number (for example, a 1986 Michael Jordan Fleer card), without the victim being able to compare the card or fraudulent PSA holder and grade to an image in the public PSA database of the actual card associated with the certification number.

The PSA Witnesses are further expected to testify as lay witnesses, based on their firsthand knowledge, regarding, among other things, the authenticity of purported PSA holders, labels, and grades of certain cards at issue in this case, namely cards the defendant sold or possessed. The first witness is the senior director of brand management at PSA, and she oversees PSA's response to and investigation into fraud connected to customers who submit fake or altered cards to PSA or who create or sell counterfeit PSA products, *i.e.*, counterfeit PSA card holders and labels. She has worked for PSA for nearly twenty years. She has been working on PSA counterfeit issues since approximately 2012, and she has been personally involved in investigating counterfeit or tampered

17

PSA products over the years, including cards sold by the defendant. She is expected to testify regarding, among other things, various observable features of the PSA holders and labels of certain cards at issue in this case that show the holders and labels—and thus the grades—were not issued by PSA. This witness will base her observations on, among other things: her extensive familiarity with PSA holders and labels and how they changed over time; PSA's audit logs, which the witness regularly consults in her employment to perform her duties and shows a timeline history of PSA's handling of the actual card associated with a given PSA certification number; and any images that PSA has of the card it actually certified. These physically observable indicia of inauthenticity for the holder, label, and grade include, for example: (1) features on the holder or label that PSA only began to use after the actual certified card was graded or re-holdered by PSA, such as the particular PSA logo etched in the bottom right corner of the holder; (2) irregularities with the frosting on the holder; (3) differences in the kerning and font between the letters on the labels at issue and PSA-printed labels; (4) the lack of notches on the sides of the holders that are present on PSA-issued holders and caused by the mold used to make the holders; (5) physical defects on the card, like a crease, that would preclude the card from being graded a ten by PSA, although the card label purportedly reflects a ten grade; and (6) where PSA has an image of the actual card it certified or the actual physical card, visible distinctions between the actual card and the card at issue. This witness will thus explain these physical characteristics of authentic PSA holders, labels, and PSA-graded cards. She will further testify as to whether specific cards at issue in this case have authentic PSA holders, labels, and grades based on her observations regarding those physical characteristics.

The second witness is the director of grading at PSA. He has been the director of grading since 2002, and he has worked at PSA since 1998, starting his career as a grader. As the director of grading, the second witness is in charge of PSA's grading operations, which includes overseeing

approximately 200 employees in the grading department, and he has reviewed countless cards for grading in his career. He is expected to testify regarding, among other things, various observable features of the cards at issue in this case and explain why those cards could not receive the grade they purportedly received from PSA, as reflected on the counterfeit PSA label. The second witness is expected to testify that PSA has certain criteria to determine the physical condition of the card for grading purposes, such as: (1) centering, within a tolerance not to exceed approximately 55/45 percent on the front, and 75/25 percent on the reverse, in order to receive a ten grade, according to PSA's public guidelines; (2) print defects; (3) scratches and wear; (4) creases; (5) touching on the corners; (6) the straightness and smoothness of the edges, and the degree of wear and tear on the edges; and (7) signs of alteration, such as trimming or color touchups. This witness is further expected to testify that he examined certain cards at issue in this case for PSA and explain, based on these kinds of observations, whether the card could receive the grade it purportedly received from PSA.

## 2. Applicable Law

A lay witness may testify to matters where "evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," Fed. R. Evid. 602, including both facts and, in certain circumstances, opinion. *See* Fed. R. Evid. 701. With respect to what constitutes factual, rather than opinion, testimony, the Second Circuit has noted that:

> "[T]he distinction between statements of fact and opinion is, at best, one of degree."
> We need not adopt verbatim Judge Posner's observation that "[a]ll knowledge is inferential, and the combined effect of [Federal] Rules [of Evidence] 602 and 701 is to recognize this epistemological verity but at the same time to prevent the piling of inference upon inference to the point where testimony ceases to be reliable" to acknowledge its essential truth.

*United States* v. *Cuti*, 720 F.3d 453, 458 (2d Cir. 2013) (citations omitted).

Lay witnesses may offer opinion testimony so long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *Id.* Testimony is "rationally based on the witness's perception" where it is "*both* (a) based on the witness's first-hand perceptions *and* (b) rationally derived from those first-hand perceptions." *United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007) (emphasis in original). A lay witness's specialized knowledge does not on its own make that witness an expert under Rule 702, as the Second Circuit has explained:

> A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise. If, however, the witness's testimony was not a product of his investigation, but rather reflected his specialized knowledge, then it was impermissible expert testimony. In particular, Rule 701(c), which prohibits testimony from a lay witness that is based on scientific, technical, or other specialized knowledge, is intended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.

*Rigas*, 490 F.3d at 224. "In other words, whether a witness possesses specialized knowledge is not material; the question is whether the witness improperly strays from his own experience and testifies as an expert as outlined in Rule 702." *United States v. Hild*, 644 F. Supp. 3d 7, 48 (S.D.N.Y. 2022) (citing *Rigas*, 490 F.3d at 224), *aff'd*, 147 F.4th 103 (2d Cir. 2025).

3. Discussion

The anticipated testimony of the PSA Witnesses, described above, is admissible as fact testimony and lay opinion testimony under Rules 602 and 701. The anticipated testimony by the senior director of brand management regarding her physical observations of certain holders and labels at issue in the case and how those observations compare to features of PSA-issued holders and labels, as well as any comparison of the at-issue cards to the cards actually certified by PSA,

is fact testimony. Likewise, the anticipated testimony by the director of grading regarding his physical observations of certain cards at issue in this case, consistent with the criteria relevant for grading, is fact testimony.

The anticipated testimony by the senior director of brand management that, based on her physical observations, certain purported holders and labels are counterfeit, *i.e.*, were not issued by PSA, is permissible lay opinion testimony. Likewise, the anticipated testimony by the director of grading that certain cards, based on his physical observations, could not receive a ten grade from PSA, is permissible lay opinion testimony. The proposed testimony for each witness easily satisfies the first prong of Rule 701, as their testimony is based on their personal examination of the holders, labels, and cards at issue in this case. The proposed testimony for each witness also satisfies the second prong of Rule 701 for it will be helpful to determining a fact at issue, namely whether the defendant sold counterfeit PSA graded cards or real PSA graded cards.

As to the third prong of Rule 701, the PSA Witnesses' proposed opinion testimony is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Instead, their testimony is based on their "knowledge and participation in the day-to-day affairs of the [PSA] business." Fed. R. Evid. 701 advisory committee's note to 2000 amendment. Specifically, because their testimony about the authenticity of the purported PSA card holders, labels, and grades is based on their familiarity with PSA products as PSA employees, as well as their observations of the cards at issue in this case, it is lay opinion testimony. *See Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) ("Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his [ ] position in the business." (quoting *id.*)).

Under Second Circuit case law, lay witnesses do not offer expert testimony merely because their opinions draw on their industry or professional experience. *See*, *e.g.*, *United States v. Krikheli*, 461 F. App'x 7, 10 (2d Cir. 2012) (cooperating witness's testimony about what he understood defendant to mean based on witness's lengthy experience in the diagnostic imaging industry was admissible lay opinion); *United States v. Ferguson*, 676 F.3d 260, 294 & n.42 (2d Cir. 2011) (cooperating witnesses' lay opinion testimony explaining the meaning of jargon based on the witnesses' industry experience was admissible). Although these PSA Witnesses have some specialized knowledge regarding PSA's products because of their PSA employment, their testimony regarding the authenticity of the purported PSA holders, labels, and grades is based on their investigation of cards sold or possessed by Curcio as part of their employment at PSA and reflects their investigatory findings, and is therefore not expert testimony. *See Cuti*, 720 F.3d at 460 ("[T]hat a witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony expert as long as the testimony was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." (quoting *Bank of China, N.Y. Branch*, 359 F.3d at 181)); *see also In re Perry H. Koplik & Sons, Inc.*, 382 B.R. 599, 602-03 (Bankr. S.D.N.Y. 2008) (explaining that lay opinion testimony is permissible where based on the witness's perception, even where the witness "was aided in forming his perceptions by an ability, aided by his training and experience, to understand what he saw").

The PSA Witnesses' proposed lay opinion testimony is akin to other cases in which lay witnesses who had expertise in different areas were permitted to provide lay opinion testimony based on their own perceptions and investigations that were informed by their expertise. *See Cuti*, 720 F.3d at 456 (accountants' testimony regarding how they had accounted for the proceeds from

the defendants' fraudulent transactions, and how they would have accounted for the transactions had they been aware of the true facts, which incorporated testimony about accounting rules and principles governing the types of financial transactions at issue was admissible both as factual testimony and, in the alternative, as lay opinion); *United States v. Yannotti*, 541 F.3d 112, 125 (2d Cir. 2008) (member of the Gambino crime family permitted to testify about cryptic comments made by defendant during intercepted phone calls because the testimony was based on the witness's own perception, which was derived from his direct participation in the loansharking activities of the charged enterprise"); *Rigas*, 490 F.3d 208 at 223-25 (accountant who had analyzed company's books and records in the course of conducting an investigation to correct the company's financial statements provided lay opinion testimony when he testified about the hypothetical impact on the company's accounting by reclassifying certain debts); *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 382 (S.D.N.Y. 2010) (Fendi's Logistics Director and Industrial Director of Leather Goods permitted to offer lay opinion testimony regarding the inauthenticity of certain counterfeit goods); *Koch v. Greenberg*, 14 F. Supp. 3d 247, 268 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015) (employee of Sotheby's permitted to testify regarding the authenticity of purportedly fraudulent wine as lay opinion testimony); *Burris v. Nassau Cty.*, 332 F. Supp. 3d 596, 607 (E.D.N.Y. 2018) (radiologists permitted to testify as fact witnesses about location of bullet as depicted on x-rays they personally examined during treatment) (citation omitted).

In sum, the PSA Witnesses' anticipated testimony regarding the inauthenticity of the purported PSA-graded cards, based on their personal observations of the cards at issue and their familiarity with PSA products and grading as PSA employees, is admissible under Rule 602 and Rule 701.

**C.  Statements of the Defendant's Co-Conspirator are Admissible at Trial**

At trial, the Government anticipates offering evidence of out-of-court statements made by Curcio's co-conspirator ("Cooperating Witness-1" or "CW-1") in furtherance of the conspiracy. This evidence will include CW-1's testimony regarding CW-1 providing updates to Curcio about trading card transactions and communications between CW-1 and would-be and actual victims of the trading card scheme, and documentary evidence such as postings of trading cards listed on eBay that CW-1 listed at Curcio's direction with specific instructions regarding the content. The statements the Government intends to elicit are admissible as co-conspirator statements in furtherance of the conspiracy, *see* Fed. R. Evid. 801(d)(2)(E). These statements were made in furtherance of the charged trading card scheme and during the relevant time period.

1.  <u>Applicable Law</u>

The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay is admissible only if it falls within an enumerated exception. Fed. R. Evid. 802. However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Thus, a statement offered to show its effect on the listener is not hearsay. *Id.*; *see also United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides, in relevant part, that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by

the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

When determining whether the predicate conspiracy has been established, the district court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181); *see also United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) ("In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself."). "Although Rule 801(d)(2)(E) requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013).

Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not particularly restrictive. The requirement is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Thus, statements are in furtherance of the conspiracy if they, for example:

> (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001);

(2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990);

(3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158;

(4) "provide reassurance," *id.*;

(5) "serve to foster trust and cohesiveness," *id.*; *see also United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991);

(6) "facilitate and protect" the conspiratorial activities, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or

(7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *see also United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

This principle is not limited to statements regarding ongoing events or future conduct. "Discussion of past events may be treated as made in furtherance of the conspiracy if the discussions served some current purpose," including any of the purposes identified above. *United States v. Rodriguez*, 761 F. App'x 53 (2d Cir. 2019) (citing *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994); *Desena*, 260 F.3d at 158); *accord United States v. Heinemann*, 801 F.2d 86, 95–96 (2d Cir. 1986). Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted); *see also United States v. Salerno*, 868 F.2d 524, 535–37 (2d Cir. 1987) (finding co-conspirator statements were made to further the goals of the charged conspiracy where

conversations about past events helped to coordinate future criminal activities and brief co-conspirators).

Co-conspirator statements must also satisfy Federal Rule of Evidence 403 to be admitted. Evidence is admissible under Rule 403 when its probative value is not substantially outweighed "by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. This Rule is concerned only with *unfair* prejudice. Evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *Roldan-Zapata*, 916 F.2d at 804; *see also Livoti*, 196 F.3d at 326 (noting that evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]"). The fact that evidence may be "damning" does not render it inadmissible. *See Cirillo*, 468 F.2d at 1240.

    2.  Discussion

CW-1's statements during and in furtherance of the conspiracy are admissible under Rule 801(d)(2)(E). The evidence at trial will demonstrate that Curcio recruited CW-1 to serve the relatively limited but critical purpose of operating as a "front" for Curcio to continue his fraudulent trading card practices under CW-1's name. As a result, the Government intends to introduce the following categories of co-conspirator statements at trial, whether in the form of testimony or documents: (1) CW-1's and Curcio's conversations regarding and in furtherance of the trading card scheme, (2) postings on eBay to sell cards CW-1 made at Curcio's direction, and (3) CW-1's statements with both would-be and actual victim buyers, the latter of which CW-1 introduced to

Curcio when the victim buyers raised concerns about the trading cards they received. With respect to each of the categories of proof, the statements of CW-1 are admissible under Rule 801(d)(2)(E).

The Government expects CW-1 to testify at trial, in substance and in part, that he allowed Curcio to list cards on CW-1's preexisting eBay account and use CW-1's address for shipping and receiving cards. After sales were completed, CW-1 created shipping labels and sent them to Curcio, who would then use the shipping labels to mail the cards to purchasers. CW-1 is expected to provide a vivid picture of his involvement in the trading card scheme, with a specific focus on how he followed Curcio's instructions. CW-1 will testify about how Curcio often listed cards for sale himself, in CW-1's name, but sometimes Curcio asked CW-1 to list cards for sale on eBay. When CW-1 was involved in listing cards for sale, Curcio provided CW-1 all the details—*i.e.*, the name and description of the card, and the price for sale—and CW-1 simply followed those directions, including by copying and pasting the name and description of the particular card onto eBay's platform. These postings, and CW-1's communications with victims, were all made during the conspiracy and in furtherance of its objectives of fraudulently obtaining victims' money because they "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." *Maldonado-Rivera*, 922 F.2d at 958. Moreover, CW-1's contemporaneous communications with Curcio are classic communications updating co-conspirators on the process of the conspiracy. *Desena*, 260 F.3d at 158.

Furthermore, as part of the trading card scheme, CW-1 referred angry, complaining victims to Curcio without providing Curcio's name. For example, CW-1 is expected to testify at trial about one occasion during the scheme where CW-1 told Curcio that CW-1 was contacted by an angry purchaser who threatened to kill him multiple times. CW-1 told Curcio about these threats, and Curcio said he would take care of it. Curcio then prepared a response and told CW-1 to send it to

the customer. A few days later Curcio told CW-1 that he refunded that customer. According to CW-1, this was how issues with customers were typically resolved—*i.e.*, CW-1 would notify Curcio that a customer was complaining that the trading cards they received were not legitimate, and CW-1 would rely on Curcio to determine how to address that customer's complaints. CW-1's statements to and conversation with complaining victims, and those looping in Curcio, are admissible because they were made in furtherance of the conspiracy in which Curcio was not only a member, but was the leader. *See United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994) (communications to someone not a member of the conspiracy can be in furtherance of conspiracy's goals); *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) (affirming admission of recorded conversations between government informant and co-conspirator of trial defendant); *United States v. Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) ("Statements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group."); *United States v. Salerno*, 868 F.2d 524, 535-37 (2d Cir. 1987) (statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators).

## II. THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENTS THAT ARE IRRELEVANT AND UNFAIRLY PREJUDICIAL

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

### A. The Court Should Exclude Evidence and Argument that Curcio's Victims Were Negligent or Failed to Conduct Adequate Due Diligence

The defendant should be precluded from arguing or adducing evidence that the individuals who traded with him or paid him for trading cards were insufficiently vigilant trading card experts, or otherwise at fault for not detecting or preventing the fraud. "Such evidence routinely is excluded from trials on wire and mail fraud charges because 'reliance is not an element of criminal fraud,' and 'the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent.'" *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023) (quoting *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017)). Indeed, "[t]he Court of Appeals routinely has rejected a gullible victim defense for wire-fraud charges." *United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) (citing *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007), and *Weaver*, 860 F.3d at 96). Accordingly, Curcio may not argue that his victims were to blame for a lack of due diligence or that their independent expertise in the trading card industry meant that they accepted the risk of their transactions with Curcio.

In particular, Curcio should be precluded from cross-examining victim witnesses about whether they did adequate diligence concerning the cards in their transactions with Curcio or his co-conspirator, or whether the victims were reckless, negligent, or irresponsible in engaging in

such transactions. Because a defendant may not assert a victim's negligent failure to discover the fraud as a defense, *see United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004), Curcio should not be permitted to cross-examine witnesses in a manner that implies that their due diligence was inadequate.

### B.    The Court Should Exclude Evidence and Argument that PSA Has Engaged in Misconduct or Is Otherwise to Blame for the Defendant's Conduct

First, the defendant should be precluded from arguing or adducing evidence that PSA has engaged in purported misconduct. Curcio has previously made statements criticizing PSA. Specifically, while committing the charged crimes, Curcio has discussed making a documentary exposing purported corruption at PSA and filing a lawsuit regarding the same.[4] Other individuals in the trading card industry have alleged in online fora and civil lawsuits that PSA has done a poor job at rooting out and exposing the bad actors in the trading card industry or is otherwise complicit in the misconduct. *See, e.g.*, *Cardregistry, Inc. v. Collectors Universe, Inc.*, Case No. 22 Cv. 5308 (E.D.N.Y. filed Jan. 25, 2023) (PSA accused of authenticating a trading card despite purportedly knowing that the card was not authentic).[5] The Court should preclude any such evidence or arguments on the basis that they are irrelevant, unduly prejudicial, and would result in a mini-trial that would be both significantly distracting and confusing to a lay jury. *Cf. Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) ("Admitting evidence about previous cases 'inevitably results in trying those cases before the jury,' and 'the merits of the other cases would become inextricably intertwined with the case at bar.'"). The Government is not aware of any substantiated claims of misconduct by PSA related to grading or authenticating cards, let alone any such claims that are

---

[4] Curcio, however, has neither made such a documentary nor filed any lawsuit against PSA.

[5] This lawsuit was dismissed with prejudice upon a motion to dismiss. The Government is not aware of any lawsuits in which there was a finding that PSA engaged in corruption or misconduct in connection with grading.

related to the defendant's cards at issue in this case. Accordingly, any general claims or arguments that PSA engaged in misconduct is wholly irrelevant to any element or material fact at issue in the charged offenses.

Moreover, while the allegations against PSA appear to be no more than conclusory allegations, and therefore do not form a proper good faith basis for cross-examination, even to the extent there is some substantiation, Curcio should be precluded from cross-examining witnesses in a way that implies that PSA was negligent or engaged in misconduct for the same reasons discussed above with respect to the card-purchaser victims. *See United States v. Korogodsky*, 4 F. Supp. 2d 262, 265-66 (S.D.N.Y. 1998) ("It is no defense that the victims of the fraud may have been engaged in some misconduct" and therefore "possible misconduct of the victim [is] not relevant . . . ."); *cf. Kay v. United States*, 303 U.S. 1, 6 (1938) (upholding a conviction of making false statements in connection with the Home Owners' Loan Act of 1933 and explaining "[w]hen one undertakes to cheat the Government or to mislead its off[i]cers, or those acting under its authority, by false statements, he has no standing to assert that the operations of the Government in which the effort to cheat or mislead is made are without constitutional sanction[]").

Furthermore, the Second Circuit has recognized that a defendant may not argue for acquittal "on the basis of extraneous public policy considerations." *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1074 (2d Cir. 1977); *see also id.* at 1073 (affirming instruction to jury that "law enforcement policy was not its concern," and that it should "focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt"); *United States v. Josephberg*, 562 F.3d 478, 497 (2d Cir. 2009) (affirming district court's finding that it was improper for defendant to argue in summation "that the Internal Revenue Service was 'arrogant,' … and that because of this, Defendant should be acquitted"). It

would be confusing to the jury and unfairly prejudicial to turn the trial into a referendum on the role of PSA in the trading card industry, similar to how it is impermissible for other white-collar defendants to blame "big banks" and "wall street" as a means to deflect from their own wrongdoing. *See Abu Dhabi Comm. Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508 (SAS), 2013 WL 1155420, at *7 (S.D.N.Y. Mar. 20, 2013) (precluding evidence about general failures by credit rating agencies leading up to financial crisis and noting that court will not "let this trial become an inquiry into the role of the Rating Agencies in the financial crisis"). Because such evidence and argument would have no probative value, and would serve only to create a danger of unfair prejudice, confusion of the issues, and misleading the jury, it should be precluded.

Additionally, Curcio should be precluded from offering evidence or arguing that PSA should have graded certain trading cards higher (but did not); and/or that Curcio genuinely believed that PSA should have graded certain trading cards higher. Whether PSA *should have* assigned a perfect or near-perfect grade instead of a lower grade to a trading card is simply irrelevant where it, in fact, did not. That is, even if PSA erred in rating certain cards or Curcio genuinely believed as much, that did not give Curcio a license to unilaterally alter PSA's ratings. While Curcio could have complained to PSA, sought a different grade from PSA, or disclosed to customers the truthful grade that PSA assigned and explained why Curcio believed PSA erred, Curcio plainly was not justified in making knowingly false statements by claiming that PSA assigned perfect or near-perfect grades to certain cards (when they had not) because he purportedly believed that PSA was wrong or treating him unfairly. *See United States v. Guldi*, 141 F.4th 435, 445 (2d Cir. 2025) (upholding fraud conviction where defendant knew money was only given to him "because the[ victims] believed a lie" even if defendant believed false statements were otherwise justified because "the money rightfully belonged to him"); *cf. United States v. Stewart*,

590 F.3d 93, 111 (2d Cir. 2009) (explaining how "there are appropriate and inappropriate ways to challenge acts of government thought to be unconstitutional. . . . [But the defendant] was indicted for engaging in a voluntary, deliberate and calculated course of fraud and deceit. This is a prosecution directed at [the defendant's] fraud, not an action to enforce the law claimed to be unconstitutional."). Because such a defense is insufficient as a matter of law, the Court should not allow the defendant to present the evidence, or advance the defense, to the jury. *See Paul*, 110 F.3d at 871 (citing *Bailey*, 444 U.S. at 416-17).

### C. The Court Should Preclude the Defense that the Defendant Did Not Intend to Defraud Because He Refunded Certain Victims

The defendant should be precluded from arguing that he repaid certain victims and therefore did not act with intent to defraud. While the crime of wire fraud requires a "contemplated harm to the victim," *Jabar*, 19 F.4th at 76, it does not require that the defendant "intended to permanently deprive the victim's money or property," *United States v. Males*, 459 F.3d 154, 159 (2d Cir. 2006). That is why "an intent to return money or property is not a defense to the charge of embezzlement." *United States v. Thomas*, 581 F. App'x 100, 102 n.3 (2d Cir. 2014) (citing *United States v. Buckley*, 101 F.3d 685, 1996 WL 282140, at *2 (2d Cir. 1996)). "Nor is it a defense to [wire fraud] that the accused voluntarily returned the funds." *United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005). Indeed, "it is immaterial as a matter of law whether the defendant intended to repay the misappropriated funds because the offense is 'complete' where, as alleged here, there is an 'immediate intent to misapply and defraud.'" *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773, at *9 (S.D.N.Y. June 27, 2023).

Here, Curcio should not be permitted to argue that he did not intend to defraud because he intended to repay or actually did return the funds of certain victims upon request, or that he believed they would be made whole in the end if they sold those cards to downstream third parties.

34

Because even no loss or temporary misappropriation of money or property is sufficient to sustain a wire fraud conviction, such arguments are improper. At the point in time when Curcio made false representations, he obtained money or property based on those representations, which is sufficient to establish a scheme to defraud a victim of money or property. Any belief that victims would ultimately be made whole is immaterial as a matter of law. *See United States v. Watts*, 934 F. Supp. 2d 451, 473 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid); *cf. United States v. Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) ("Were a jury to find that [the defendant] intentionally caused others to issue materially false or misleading statements of the [company's] value to its investors . . . he properly would be found guilty, even if he 'firmly believed' that, in the end, his strategy would 'work out.'"); *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) (where a defendant and his co-conspirators "intended to immediately deprive investors of their capital through fraud," their belief, even if truly held, "that in the long-term [their companies] would ultimately succeed," is not a defense to securities fraud or wire fraud); *United States v. Sindona*, 636 F.2d 792, 800 (2d Cir. 1980) ("The offense occurred and was complete when the misapplication took place. What might have later happened as to repayment is not material and could not be a defense."). Thus, Curcio should not be permitted to argue that he is not guilty because he thought his victims would not ultimately be harmed. That argument has no bearing on the elements of the charged offenses, and would be highly prejudicial and burdensome to the Court, jury, and parties. It should be precluded.

### D. The Court Should Exclude Evidence and Argument About the Government's Investigation

Curcio's pretrial motions have sought to denigrate the Government's investigation and prosecution of the defendant, claiming that the Federal Bureau of Investigation ("FBI")

investigation that led to the instant charges was not only a sham, but was a conspiracy between the FBI, PSA, and other private parties to steal Curcio's property and attack his reputation. (*See* Dkt. 33). The Court should preclude evidence and argument that the Government's investigatory or charging decisions were improper, or that otherwise invites the jury to question or speculate as to the propriety of those decisions: for example, decisions as to whether to charge co-conspirators, and the timing of the Government's charges. Similarly, any evidence or argument regarding the Government's motives or that the defendant is being selectively prosecuted should be precluded. Additionally, the Court should preclude any evidence and argument that the defendant's conduct should have been redressed through civil or state court proceedings. Finally, the Court should preclude all evidence and argument concerning the Government's techniques in investigating and prosecuting crimes. None of these claims or arguments are relevant to the central question of the defendant's guilt.

It is well established that the Government's motives for and conduct during the investigation and prosecution of a defendant are irrelevant to guilt or innocence and therefore cannot be presented to the jury. *See United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir. 1997) (affirming decision precluding "evidence at trial that the grand jury investigation was illegitimate"); *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (finding that defendant's trial arguments involving, *inter alia*, "invit[ation of] jury nullification by questioning the Government's motives in subpoenaing appellants and prosecuting them for contempt" functioned as a defense "ploy for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"). Moreover, the Second Circuit has recognized that a defendant may not argue for acquittal "on the basis of extraneous public

policy considerations." *Cheung Kin Ping*, 555 F.2d at 1074; *see id.* at 1073 (affirming instruction to jury that "law enforcement policy was not its concern," and that it should "focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt").

Here, evidence and argument relating to the Government's charging decisions and motives should be precluded because they would have no probative value as to the defendant's guilt, may lead to mini-trials on irrelevant topics such as prosecutorial charging policies and practices, and would serve only to confuse and distract the jury. *See United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the Government's investigation); *United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (noting that the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case"), *aff'd*, 173 F. App'x 899 (2d Cir. 2006).

Additionally, any claims that the charged conduct should have been brought in a civil (rather than criminal) or state (rather than federal) proceeding provide no defense to the criminal charges and are not relevant to the merits of the charges. As a result, any such argument and evidence—including a suggestion that the defendant's conduct should be addressed solely as a civil dispute by PSA—should be precluded because it is irrelevant, will confuse the jury, distract from the evidence at trial, and improperly encourage jury nullification. *See Reese*, 933 F. Supp. 2d at 583-84; *Demosthene*, 334 F. Supp. 2d at 380.

The same is true of the Government's techniques in investigating and prosecuting crimes. *See United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000) ("The jury correctly was instructed that the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and that the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged."). Curcio may not put the motivations or conduct of prosecutors or law enforcement agents in issue at trial to invite the jury to acquit based on alleged governmental misconduct.

Ultimately, invitations for jury nullification based on the overall propriety of the Government's investigation are not allowed. *See, e.g.*, *Reese*, 933 F. Supp. 2d at 583; *Demosthene*, 334 F. Supp. 2d at 380; *Stewart*, 2004 WL 113506, at *1; *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court—in the words of the standard oath to jurors in the federal courts, to 'render a true verdict according to the law and the evidence.' We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." (emphasis in original)). Here, any argument that "the FBI had not been investigating this case independently but rather acting as a proxy" for PSA or other third parties (Dkt. 33 at 11), should be barred. Such evidence and argument would have no probative value, and would serve only to create a danger of undue prejudice, confusion of the issues, and misleading the jury.

### E. The Court Should Preclude Evidence and Argument Concerning the Defendant's Purported Good Acts

As alleged in the Indictment, the defendant is charged with wire fraud offenses in connection with his trading card fraud scheme. The Government has not alleged that *every* card that Curcio ever sold or attempted to sell was fraudulently mislabeled. Accordingly, Curcio should

not be permitted to argue, elicit on cross-examination, or offer evidence at trial that, on certain instances not at issue at this trial, he conducted legitimate card transactions. In other words, Curcio should be precluded from offering evidence or making arguments to establish that he did not defraud or attempt to defraud *every* purchaser—and that therefore he did not commit the charged crimes—because such evidence is irrelevant and may lead to confusion under Rules 401 and 403.

It is settled law that "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). "The reasoning behind this rule is straightforward: A single occurrence of lawful conduct is 'simply irrelevant' to other occurrences of unlawful conduct." *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) (quoting *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999)).[6] Similarly, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait" of character, or the witness's opinion of the defendant as regards to that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait where that trait is not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *United States v. Fazio*, No. 11 Cr. 873 (KBF), 2012 WL 1203943, at *5 (S.D.N.Y. Apr. 11, 2012) ("[A] defendant may not affirmatively try to prove his innocence by reference to

---

[6] Circuit courts elsewhere have similarly held that evidence that a defendant did not commit crimes on other occasions is irrelevant. *See, e.g.*, *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (affirming district court's ruling precluding the defendant from offering evidence of his legitimate business activities in order to negate evidence of his fraudulent intent as to the charged conduct); *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) (finding defendant's performance of some legitimate trades irrelevant to his knowledge of illegal trades).

specific instances of good conduct; character is to be proven by reputation or opinion evidence."),
*aff'd*, 770 F.3d 160 (2d Cir. 2014).

Furthermore, pursuant to Federal Rule of Evidence 403, "a district court may exclude evidence of a defendant's prior good acts if it finds that any minimal probative value of such evidence is outweighed by the likelihood of jury confusion and the risk of jury nullification." *United States v. Rivera*, No. 13 Cr. 149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (citing *United States v. Al Kassar*, 660 F.3d 108, 124 (2d Cir. 2011) ("And the trial judge was rightly concerned that, to the extent any of the evidence [of prior good acts] could be construed to relate to the charged conspiracies, the jury would find it extremely confusing, if not incomprehensible.")).

Here, Curcio should be precluded from offering evidence and argument, including in his opening statement, of specific instances of his prior alleged "good acts," for example, evidence and argument regarding the defendant's lack of commission of other bad acts, including specific instances in which the defendant did not fraudulently mislabel cards he sold or attempted to sell. Courts routinely preclude such evidence and argument. *See, e.g.*, *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (affirming district court's exclusion of testimony that witnesses did not pay defendant any bribes "because such testimony would in effect be an attempt to demonstrate appellant's good character by proof of specific good acts"); *Walker*, 191 F.3d at 336 (affirming district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *Chambers*, 800 F. App'x at 46 (rejecting defense argument that defendant's "running of a legitimate law practice makes it less likely that he had

corrupt intent" to pay bribes as "precisely the type of propensity inference that Rule 404(b)(1) is intended to prohibit").

The Indictment does not allege, and the Government does not intend to argue, that Curcio engaged in "ceaseless" criminal conduct or that he defrauded or attempted to defraud *every* card customer with whom he interacted. *See United States v. Nekritin*, No. 10 Cr. 491 S-2 (KAM), 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011) (noting that where the Government did not seek to prove that all of the defendants' Medicare and Medicaid billings were fraudulent, evidence of defendants' legitimate billing practices was not relevant to whether they fraudulently billed Medicare and Medicaid as charged). Evidence that the defendant is not guilty of crimes that have been neither alleged nor charged is therefore irrelevant. Fed. R. Evid. 401; *see also, e.g.*, *United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) ("A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branches in Brooklyn or the Bronx on April 22 or that he did not rob the Manhattan branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22.") (citing cases); *United States v. Boykoff*, 68 F. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."). Such evidence, or evidence and argument regarding the defendant's purportedly good conduct, "is propensity evidence that does nothing to establish [the defendant's] innocence of the charged offenses." *United States v. Maxwell*, 534 F. Supp. 3d 299, 317 (S.D.N.Y. 2021). Thus, as in the cases cited above, evidence of lawful card transactions simply would not be probative of whether the defendant committed the charged wire fraud offenses. In addition, an attempt by Curcio to "drown out" evidence of the charged offenses by introducing irrelevant instances in which he engaged in

lawful transactions would also lead to a confusion of the issues, undue delay, and waste of time, and is independently excludable on this basis. *See* Fed. R. Evid. 403.

Curcio should thus be precluded from offering evidence or making arguments regarding the absence of the defendant's bad acts—or, at a minimum, this Court should require Curcio to proffer the evidence he plans to offer and the basis for the admissibility of such evidence.

### F. The Court Should Exclude Evidence and Argument About the Defendant's Personal Circumstances and Potential Punishment

The Government is unaware of any lawful basis for the defendant to offer evidence or argument concerning his family background (including his children or marital history), good works (such as writing children's books and publicly speaking, following his prior federal conviction, about crime prevention), history of drug addiction, health, age, or any other similar factors. Accordingly, the defendant should be precluded from doing so, and from mentioning such subjects in his opening statement, absent a showing that such a factor bears on his guilt. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *see also United States v. Harris*, 491 F.3d 440, 447-48 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The Government understands from meeting and conferring that defense counsel does not intend to offer evidence or argument about the punishment or consequences the defendant faces if convicted, and so makes no motion at this time seeking to preclude such evidence and argument. *See, e.g.*, *Shannon v. United States*, 512 U.S. 573, 579 (1994) (where the jury has no role at

sentencing, it "should be admonished to reach its verdict without regard to what sentence might be imposed" because considering punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."); *United States v. Avenatti*, No. 19 Cr. 374 (JMF), Dkt. 288 at 9-10 (S.D.N.Y. Jan. 13, 2022) ("[A]nything that adverts to possible punishments, including possibility of incarceration, however obliquely, is improper and will not be permitted," including, for example, a statement in opening or closing arguments that the defendant's "liberty is at stake," which would be "a not-so-thinly veiled reference to the prospect of incarceration, which is altogether improper").

## III. THE COURT SHOULD PRECLUDE CROSS-EXAMINATION ON IRRELEVANT ISSUES THAT ARE UNRELATED TO WITNESS CREDIBILITY

As part of its production of witness materials, statements under 18 U.S.C. § 3500, and impeachment material under *Giglio v. United States*, 405 U.S. 150 (1972), the Government will provide to the defense material relating to a witness whom the Government anticipates will testify pursuant to a cooperation agreement, as well as material regarding at least three other witnesses with prior arrests and/or convictions. The Government submits that these witnesses should not be subject to cross-examination regarding any criminal activity that (i) is more than 10 years old and either did not result in a conviction or did result in a conviction, where the probative value of which does not substantially outweigh any prejudicial effect; (ii) is less than 10 years old and did not result in a conviction; (iii) is less than 10 years old, resulted in a misdemeanor conviction or does not constitute a *crimen falsi*—a conviction involving dishonest of false statements; or (iv) is uncharged criminal conduct that has no bearing on the witnesses propensity for truthfulness.

## A. **Factual Background**

### *Cooperating Witness-1*

The Government anticipates that, at trial, CW-1 will testify, in sum and substance, about

████████████████████████████████████████

████████████████████████

***Witness-1***

The Government anticipates that, at trial, Witness-1 will testify, in sum and substance, that

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

***Victim-1***

The Government anticipates that, at trial, Victim-1 will testify, in sum and substance, that

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

***Victim-2***

The Government anticipates that, at trial, Victim-2 will testify, in sum and substance, that

████████████████████████████████████████



B. **Applicable Law**

It is well established that the Court has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, . . . confusion of the issues . . . or interrogation that is repetitive or only marginally relevant" to the issues in dispute. *United States v. Figueroa*, 548 F.3d 222, 229 (2d Cir. 2008) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Courts have routinely held that "the scope and extent of cross-examination lies within the sound discretion of the trial judge." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990); *see also United States v. Caracappa*, 614 F.3d 30, 42 (2d Cir. 2010) (district courts have "broad discretion in controlling the scope of cross-examination"). Federal Rule of Evidence 611 makes clear that the Court should "protect witnesses from harassment or undue embarrassment" and "cross examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611; *see also* Fed. R. Evid. 611(a) (noting that courts "shall exercise reasonable control" over cross-examination to "avoid wasting time").

Additionally, the Court may restrict cross-examination about prior conduct by a witness if it finds that the conduct is not probative of truthfulness. *See* Fed. R. Evid. 608(a) & (b); *see also* Fed. R. Evid. 608(a) advisory committee's note ("In accordance with the bulk of judicial authority, the inquiry is strictly limited to character for veracity, rather than allowing evidence as to character generally."). Further, even if such prior conduct is relevant, the Court may still exclude cross-examination of such conduct if it finds that the "probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *accord Devery*, 935 F. Supp. 393, 407-08 (S.D.N.Y. 1996) ("Such [prior] acts

are only admissible insofar as they bear on a witness's propensity for truthfulness or untruthfulness, and, even if the prior act does concern the witness's character for truthfulness under Rule 608(b), its probative value must not be substantially outweighed by its unfairly prejudicial effect under Rule 403.").

Rules 608 and 609 of the Federal Rules of Evidence limit the circumstances under which specific acts of a witness may be introduced at trial, whether through extrinsic evidence or mere questioning of the witness. Rule 609 governs the admissibility of a witness's prior convictions. Any conviction more than 10 years old (meaning that "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later") is presumptively inadmissible unless "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b). Before admitting a conviction that is more than ten years old, a court must make an "on-the-record determination supported by specific facts and circumstances that the probative value of the evidence substantially outweighs its prejudicial effect." *United States v. Mahler*, 579 F.2d 730, 736 (2d Cir. 1978). The Second Circuit "ha[s] repeatedly 'recognized that Congress intended that convictions over ten years old be admitted very rarely and only in exceptional circumstances.'" *Farganis v. Town of Montgomery*, 397 F. App'x 666, 669 (2d Cir. 2010) (quoting *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993)).

Within the ten-year timeframe, there are two categories of convictions that must be admitted: (1) evidence of a witness's prior felony conviction, subject to the limits of Rule 403; and (2) convictions for crimes of dishonesty or false statements, regardless of whether they are felonies. Fed. R. Evid. 609(a)(1)(A), 609(a)(2). With respect to the second category—*crimen falsi*—a conviction involves a crime of dishonesty or false statements "if the court can readily

determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2). However, the Second Circuit has recognized that "Congress meant to narrowly define *crimen falsi*." *United States v. Khalil*, No. 05-0573-CR, 2005 WL 3117195, at *2 (2d Cir. Nov. 22, 2005) (citing *United States v. Payton*, 159 F.3d 49, 57 (2d Cir. 1998)). Thus, "[w]hile much successful crime involves some quantum of stealth, all such conduct does not, as a result," bear on a witness's veracity. *United States v. Estrada*, 430 F.3d 606, 614-15 (2d Cir. 2005); *accord United States v. Hayes*, 553 F.2d 824, 827 (2d Cir. 1977). Rather, "[t]he use of the second prong of Rule 609(a) is thus restricted to convictions that bear directly on the likelihood that the [witness] will testify truthfully (and not merely on whether he has a propensity to commit crimes)." *Khalil*, 2005 WL 3117195, at *2 (quoting *Hayes*, 553 F.2d at 827).

Rule 608 governs the admissibility of both extrinsic and intrinsic evidence of a witness's prior conduct more generally. Pursuant to Rule 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness," except for a criminal conviction that falls within the parameters of Rule 609. While the admissibility of extrinsic evidence is thus cabined, the Court "may, on cross-examination, allow [specific instances of a witness's conduct] to be inquired into," but only if the instances "are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1).

Any such cross-examination also must satisfy Rule 403—that is, specific instances of a witness's conduct may be inquired into on cross-examination only if their probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403. In this context, evidence is unfairly prejudicial if it would invite

the jury to decide an issue material to the outcome of the case for reasons that have nothing to do with the factual issues properly before the jury. *See United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993); *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995). Evidence is unfairly prejudicial if it would invite the jury to decide an issue material to the outcome of the case for reasons that have nothing to do with the factual issues properly before the jury. *See United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993).

Courts have repeatedly barred cross-examination regarding conduct that has no bearing on a witness's credibility. *See, e.g.*, *United States v. Jeffers*, 402 F. App'x 601, 603 (2d Cir. 2010) (affirming preclusion of cross-examination of cooperating witness regarding prior acts of domestic violence based on "determination that the purported prior acts of violence were not probative of [the witness's] credibility"); *United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) (affirming preclusion of cross-examination of cooperating witness regarding his role in a murder because the "murder was not relevant to [the witness's] credibility," and noting that "there was ample other material through which defendants could test his credibility and expose any bias"); *United States v. Estrada*, 430 F.3d 606, 621 (2d Cir. 2005) (noting that "crimes of violence . . . may bear so marginally on honesty or veracity, depending on the circumstances of those crimes, as to justify exclusion [even] under [the less exacting standard of] Rule 609(a)(1)."); *United States v. Agostini*, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003) (precluding cross-examination regarding witness's prior arrests for allegedly assaulting his girlfriend, finding that "they do not involve instances of dishonesty or making false statements" and noting "the Second Circuit's inclination to preclude the discussion of a witness's prior commission of violent crimes because of such crimes' lack of relevance to the issue of the witness's veracity").

As the Supreme Court long-ago recognized: "Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness." *Michelson v. United States*, 335 U.S. 469, 482 (1948); *see also Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 170 (2d Cir. 2017) ("[A]ccusations have little, if any, probative value because the innocent and guilty alike can be accused of wrongdoing." (citing *Michelson*, 335 U.S. at 482)). Accordingly, courts in this district routinely preclude cross-examination on the fact of an arrest. *See, e.g.*, *United States v. Urena*, No. 11 Cr. 1032 (PAE), 2014 WL 1303114, at *3 (S.D.N.Y. Apr. 1, 2014) ("As to the offenses which led to arrests but not convictions, counsel are directed not to elicit the fact of the arrest, which is itself irrelevant."); *see also United States v. Elmowsky*, 501 F. Supp. 3d 236, 242 (S.D.N.Y. 2020) (prohibiting cross examination of a 1996 arrest for harassment in connection with a domestic incident, which was ultimately dismissed).

Furthermore, where evidence is introduced "solely for the purpose of encouraging nullification, the court must exclude that evidence as irrelevant." *In re United States*, 945 F.3d 616, 631 (2d Cir. 2019) (explaining why evidence of sentencing consequences is typically inadmissible).

## C. **Discussion**

The conduct described above has no bearing on the witnesses' credibility, is highly inflammatory, and has no probative value or relation to the charged offenses. Most of the conduct is far too dated to be relevant or admissible. There is also no reason to believe the witnesses lied in connection with any of these incidents. Cross-examination on these topics would seek only to embarrass and harass the witnesses and advance arguments concerning jury nullification. Accordingly, the Government respectfully requests that the Court preclude the defendant, under Rules 608, 402 and 403, from inquiring into these topics.

*Cooperating Witness-1*

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

*Witness-1*

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

*Victim-1*

*Victim-2*

███████████████████████████████████

███████████████████████████████████

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated: New York, New York
       December 11, 2025

                                    Respectfully submitted,

                                    JAY CLAYTON
                                    United States Attorney

                            By: _____/s/_____
                                    David R. Felton
                                    Kingdar Prussien
                                    Cecilia Vogel
                                    Assistant United States Attorneys
                                    (212) 637-2299/-2223/-1084