UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ANTHONY CURCIO,

Defendant.

24-CR-312 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

On January 28, 2026, after a two-week trial, a jury convicted Defendant Anthony Curcio of wire fraud and conspiracy to commit wire fraud. The fraud involved a scheme to deceive collectors of trading cards by falsely telling them that the cards Curcio sold had received higher grades from third-party authentication companies, such as Professional Sports Authenticator ("PSA"), than they had actually received. These grades significantly affect the value of cards on the secondary market. The evidence of Curcio's guilt was, in the Court's view, overwhelming. The Government introduced physical evidence from a search of his home, from which the jury could reasonably infer that Curcio had falsified the grades himself; text messages in which Curcio described the mechanics of his scheme to co-conspirators and others; testimony from a cooperating witness, a corporate representative of PSA, and ten victims; as well as excerpts from a previously published memoir in which Curcio admitted to defrauding customers in a similar manner.

Curcio now moves for a new trial or, alternatively, an evidentiary hearing, citing alleged juror misconduct. He also claims that his trial counsel, Simpson Thacher & Bartlett LLP ("Simpson Thacher" or the "Firm"), labored under a conflict of interest that rendered them ineffective. Neither argument presents a close question.

Following the verdict, a juror informed counsel for Curcio that, during the trial, he had spoken to his brother, who had previously traded sports cards. The juror's brother told him that one of the cards at issue—a Charizard Pokémon trading card—was worth $500,000, roughly $100,000 above the highest estimate of the card's value in evidence. That valuation matters, Curcio argues, because it undermines one of the Government's arguments as to why he knew the grades given to the cards he was selling were not genuine: how those cards were stored. The Government introduced evidence, from a search of Curcio's home, demonstrating that investigators found seemingly valuable cards strewn about the floor of his garage and stuffed inside a workbench, and thus argued that this method of storage demonstrated that Curcio knew that the cards he possessed were not valuable. (The Government also introduced many other pieces of evidence from which a jury could infer that Curcio had such knowledge.) Curcio argues that this extrinsic information is prejudicial because a reasonable juror would find this theory of Curcio's knowledge more compelling if the Charizard card was worth $500,000, rather than $400,000. The Government responds by arguing that, even if the Court accepts Curcio's argument regarding this information's relevance to his guilt, it is unpersuasive and cumulative of the other evidence of this card's value introduced at trial.

The Court finds that the Government has rebutted the presumption of prejudice that arises when a juror receives extra-record information. It holds that this extrinsic information about the potential value of a Charizard card—assuming that information was indeed relayed to the juror—was not prejudicial because, if it was considered by a hypothetical average jury, it (1) would not be substantially different from and would be merely cumulative of other, properly admitted evidence introduced at trial, and (2) could not have affected the outcome at trial given the other, overwhelming evidence of Curcio's guilt. It also finds that an evidentiary hearing is not warranted

because Curcio has not demonstrated that reasonable grounds for further investigation exist. Accordingly, Curcio's motion for a new trial on this basis is denied.

In his supplemental motion for a new trial, Curcio further contends that Simpson Thacher suffered from an actual or potential conflict due to its previous and concurrent representations of distant corporate affiliates of PSA, a representative of which testified for the Government at trial. For the reasons that follow, though, the Court holds that Curcio's interests and the Firm's interests did not diverge and would not have placed the Firm under inconsistent duties in the future. It also finds that the Firm did not advance Curcio's proposed alternative defense—a direct attack on PSA's conduct and credibility—because the Court excluded evidence relevant to that defense in a ruling on an *in limine* motion, despite the Firm's vigorous and effective advocacy, not because that defense conflicted with the Firm's other loyalties or interests. And finally, the Court rejects Curcio's alternative ineffective assistance of counsel claim, which is predicated on an argument that the Firm unreasonably failed to disclose both that it conducted a conflicts check as to PSA, and the results of that check. The Court finds that, given the circumstances of the Firm's limited client relationships with a third party, it was not reasonably obligated to disclose these facts. Accordingly, Curcio's supplemental motion for a new trial is also denied.

## BACKGROUND

The Court assumes the parties' familiarity with the evidence adduced at trial and procedural history of this case, and recites only those facts necessary to resolve the instant motions. On May 20, 2024, a grand jury indicted Defendant Anthony Curcio on two counts: wire fraud and conspiracy to commit wire fraud. Dkt. 3 ("Indictment") ¶¶ 13–14, 16. The Government alleged that Curcio and Iosif Bondarchuk engaged in a scheme to "defraud buyers and marketplaces" of

"sports and Pokémon trading cards." *Id.* ¶ 1. Their scheme focused on replicating the card grading and packaging system used by PSA, "a reputable card authentication company." *Id.*

PSA receives trading cards from collectors and returns them in a distinctive, tamper-resistant plastic case—called a "slab"—with a PSA-branded label indicating the grade the card received from PSA's evaluators. *E.g.*, Dkt. 120–140 ("Trial Tr." or "Tr.") at 113:12–23 (Joseph Baudo); *id.* at 1439:2–9 (Jackie Curiel). The evidence at trial established that Curcio and Bondarchuk deceived buyers of cards by falsely representing that PSA had given a high grade to a card that had, in reality, received a lower grade from PSA or had not been graded at all. To do so, they would place cards in plastic cases resembling those used by PSA, then forge and affix fake labels with false PSA grades. PSA grades cards on a scale out of 10. *Id.* at 1443:4–7 (Curiel). These grades reflect the print quality and condition of a given card, such as the "centering," the condition of card "edges" and "corners," and other "surface issues," though there are more subjective components, such as "overall eye appeal." *Id.* at 1443:18–1444:12. If a given card has a higher PSA grade, it generally commands a higher price from collectors.[1] By falsely representing that a card had received a high grade from PSA, Curcio and Bondarchuk fraudulently induced buyers to pay more for trading cards than they otherwise would have.

The Government introduced voluminous evidence at trial that—in the Court's view, overwhelmingly—established Curcio's guilt beyond a reasonable doubt. In brief, this evidence included the testimony of ten victim customers;[2] Bondarchuk, Curcio's co-conspirator; and

[1] This difference in value can be significant. Witness testimony established that a card graded a PSA 10 could command a price one hundred times greater than an ungraded version of that same card. Tr. at 710:12–22 (Darren Adams). And for certain valuable cards—such as Michael Jordan basketball cards, for example—a PSA 9 could be worth about $25,000 to $35,000, while a PSA 10 could be worth as much as $500,000. *Id.* at 508:13–24 (Ashish Jain); *see id.* at 1452:9–11 (Curiel) ("Sometimes from one grade to—like, from a 9 to a 10, for instance—can be tens to hundreds of thousands of dollars difference." (cleaned up)).

[2] These testifying victims were Joseph Baudo, Tr. at 107–205, Ryan Dills, *id.* at 306–73, Luke Raynolds, *id.* at 373–430, Sean McMillan, *id.* at 433–60, Ashish Jain, *id.* at 506–57, Corey Trammell, *id.* at 557–612, Darren Adams, *id.* at 708–41, Michael Grossbarth, *id.* at 1189–202, Brian Rzewnicki, *id.* at 1275–305, and Dan Bliss, *id.* at 1409–31.

representatives of PSA, eBay, and MySlabs, an online marketplace for graded trading cards. The victims testified that they had purchased or otherwise received cards from Curcio and/or Bondarchuk with falsified PSA grades. Bondarchuk directly testified that Curcio falsified PSA labels and slabs "to add value" to the cards they sold. Tr. at 638:20–643:3 (Iosif Bondarchuk). The Government also introduced text messages between Curcio and Bondarchuk, which Bondarchuk testified showed him and Curcio discussing "the process of putting cards into counterfeit slabs with counterfeit labels." Tr. at 762:15–763:14 (discussing GX 227).

The jury saw incriminating text messages with third parties, including Stephanie Brown, in which Curcio appeared to repeatedly acknowledge that he was defrauding buyers. *See, e.g.*, Tr. at 1358:15–1371:13 (Braden Florczyk) (discussing GX 2359 and GX 2360). The Government also introduced physical evidence from a search of Curcio's home, and Christopher Campbell, a Federal Bureau of Investigation Special Agent, testified that the Government recovered, from that search, loose, genuine PSA labels with printed text removed; authentic PSA slabs which had been cracked open; tools with which to forge PSA labels and slabs; and cards in slabs that had falsified PSA grades. *See, e.g.*, GX 1–77; GXP 14; GXP 17; GXP 23-E2; GXP 24; GXP 26–27; GXP 30–31; Tr. at 1120–1221 (Special Agent Christopher Campbell). That search also recovered digital templates for apparent PSA labels on Curcio's devices, and a spreadsheet Curcio used to track his labeled cards, stored in a folder named "Ill Eagle."[3] *See, e.g.*, GX 2296; GX 4159; GX 4287; Tr. at 1505:6–1507:7, 1520:7–17, 1590:5–21 (Curiel). The Government argued that more than one dozen of the label templates so recovered matched the cards with fake PSA grades he had sold to victims. *See* Tr. at 1828:9–1832:5 (counsel for the Government) (arguing that "Curcio had and

---

[3] As the Government stated in summation: "[c]heck out the file path . . . where he saves the finished card tracking spreadsheet[:] in a folder titled 'Ill Eagle.' Two words. He may have spelled it in a clever way, but say it aloud a few times. Ill Eagle. Ill Eagle. Ill Eagle. It's clear that Curcio isn't referring to a sick bird, but rather, his illegal conduct, the charged fraud." Tr. at 1835:10–15 (counsel for the Government).

used PSA grade templates on at least 17 of the very same fake PSA-graded cards he sold to buyers"); *see also* Dkt. 103 ("Gov. Opp'n") at 3. And the Government opened the trial by having a paralegal read an excerpt from Curcio's published memoir (written in the third person with Dane Batty, a biographer). *See* GX 101 at 10. In that memoir, Curcio admitted that he had previously engaged in a scheme to sell cards with false PSA grades after having been the victim of a similar fraud. *See* Tr. at 101:4–9 (Olivia Sebade) ("[Curcio] discovered how to open sealed card cases and reseal them without any outward appearance of tampering. That allowed him to change the grade of other, well-known compan[ies'] cards. He could regrade a PSA-4 Mantle to a PSA-7. He would make the [label's] barcode reflect the change while trimming." (quoting GX 101)); *id.* at 100:13–15 ("[Curcio] was pleased that he'd made back the money he had lost and placed the, quote, 'victim' tag on someone else." (quoting GX 101)).

On January 28, 2026, after a two-week trial, a jury convicted Curcio on both counts. *See* Dkt. 97. Curcio was zealously represented at trial by Simpson Thacher pursuant to a Criminal Justice Act ("CJA") appointment. Following the guilty verdict, Juror No. 4 spoke with members of the defense team. Dkt. 102 ("Def. Br.") at 6. According to Nicholas Lussier and Gineen Abuali, two associates at the Firm who represented Curcio, Juror No. 4 informed them that (1) "his brother knows about cards," and had previously traded sports cards, including at least one PSA-graded Mickey Mantle card; (2) "he asked his brother about how much a Charizard card is worth and was told that it is worth half a million dollars"; and (3) he thought "that it did not make sense for valuable cards to be lying on the floor." *Id.* at 6–7; *see* Def. Br., Ex. A ("Lussier Decl.") ¶¶ 6–7; *id.*, Ex. B ("Abuali Decl.") ¶ 4. David Kushner, a journalist writing an article on the Curcio trial, also spoke to this juror, who "stated that he had spoken with his brother-in-law and asked him

about the value of a Charizard trading card." Dkt. 104, Ex. A ("Kushner Decl.") ¶ 3.[4] Lussier reported this conversation to Martin Bell, a Simpson Thacher partner who served as lead trial attorney for Curcio. Bell then approached Juror No. 4, "who denied having engaged in any conversations concerning the subject matter of the case before deliberations." Lussier Decl. ¶ 8. Kushner also spoke to Juror No. 4—after their initial conversation—and asked if "he had spoken to anyone during the trial"; the juror "denied speaking to anyone about the case." Kushner Decl. ¶ 4. To the extent Juror No. 4 did so, as alleged, he violated the Court's instructions to the contrary. The Court had repeatedly instructed jurors during the trial not to discuss or research anything about the case; it did so, as the Government notes, "at least 17 times." Gov. Opp'n at 7 (collecting transcript citations).[5]

Curcio now moves for a new trial or, in the alternative, an evidentiary hearing to "determine the full extent" of the extra-record information received by Juror No. 4. Def. Br. at 2. The Government filed an opposition to both requests, *see* Gov. Opp'n at 1, to which Curcio replied. Dkt. 104 ("Def. Repl.").

While this motion—filed by Curcio's trial counsel—was pending, Curcio filed an *ex parte* letter with the Court stating that he was "deeply concerned that an undisclosed relationship or conflict of interest may have affected strategic decisions in [his] defense." Dkt. 117 ("May 4 Ltr."). In brief, Curcio claimed that Simpson Thacher suffered from an actual or potential conflict

[4] Although the affidavits are inconsistent as to whether Juror No. 4 spoke to his "brother," Lussier Decl. ¶¶ 6–7, or "brother-in-law," Kushner Decl. ¶ 3, the precise relation is not material to the Court's analysis. The Court will refer to him as Juror No. 4's "brother."

[5] None of this information conflicted with the statements given by Juror No. 4 during *voir dire*, and, though Juror No. 4 did not disclose his brother's experience with trading cards during *voir dire*, he was not obligated to do so. In Question 14 of the juror questionnaire, members of the venire were asked: "Have you ever collected trading cards? If so, to what extent and what kinds? Would that make it difficult for you to render a fair and impartial verdict?" Dkt. 97, Ex. 1 ("Juror Questionnaire"). This question only asked about the juror's personal knowledge, rather than the knowledge of friends or family. Accordingly, Curcio does not move for a new trial on the basis that "a juror failed to answer honestly a material question during *voir dire*," nor does he, in the Court's view, have grounds to do so. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

due to its prior representation of entities affiliated with Steven A. Cohen, who Curcio claimed was the majority owner of PSA, the card-grading company whose corporate representative testified for the Government at trial. *Id.* at 1. The Firm responded to this letter, arguing that its representation of Curcio was "free of conflicts of interest" and was "at all times guided solely by what was best for the defendant, in accordance with our ethical obligations." Dkt. 118 ("May 11 Ltr."). Curcio filed a response to this letter, disputing the Firm's representations. Dkt. 119 ("May 19 Ltr.").

After receiving these letters, the Court held a hearing on May 20, 2026, to appoint independent counsel to advise Curcio as to the possibility of waiving any potential conflict with Simpson Thacher, pursuant to the procedures set forth in the Second Circuit case that shares his name. *See United States v. Curcio*, 680 F.2d 881, 888–90 (2d Cir. 1982). Esere J. Onaodowan, the CJA attorney on duty, was present at the hearing to advise Curcio. On the consent of both Curcio and the Firm, the Court relieved it of its representation of Curcio and appointed Onaodowan to represent Curcio going forward.[6] Dkt. 113; Dkt. 147 ("May 20 Tr.") at 4:16–24. Curcio then filed a supplemental motion for a new trial, arguing that he suffered from ineffective assistance of counsel on the basis of the Firm's allegedly conflicted representation, Dkt. 145 ("Def. Suppl. Br."), which the Government also opposed. Dkt. 146 ("Gov. Suppl. Opp'n").

## LEGAL STANDARD

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "This rule confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to

[6] The Court initially asked Onaodowan to serve as *Curcio* counsel to advise Curcio on the conflict concerns he raised in his letter. *See* May 20 Tr. at 2:16–3:23; *United States v. Arrington*, 941 F.3d 24, 32 (2d Cir. 2019) (describing the role of *Curcio* counsel). Because Curcio made clear that he no longer wanted Simpson Thacher to represent him, however, the Court did not conduct a *Curcio* colloquy and instead relieved the Firm and appointed Onaodowan to serve as Curcio's primary counsel. May 20 Tr. at 3:18–23, 4:16–24.

avert a perceived miscarriage of justice." *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009).[7] As relevant here, a new trial may be granted under Rule 33 based on allegations of juror misconduct, *see, e.g.*, *United States v. Maxwell*, 2022 WL 576306, at *4 (S.D.N.Y. Feb. 25, 2022), or ineffective assistance of counsel, *see, e.g.*, *United States v. Feyrer*, 333 F.3d 110, 115 (2d Cir. 2003).

Nevertheless, a district court "must exercise the Rule 33 authority sparingly" and only "in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). In short, "before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009); *see also Ferguson*, 246 F.3d at 134 ("The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.").

## DISCUSSION

### I. Juror Misconduct

Curcio first brings a motion for a new trial, or, alternatively, an evidentiary hearing, on the basis of alleged juror misconduct due to Juror No. 4's receipt of extra-record information. For the reasons that follow, Curcio's motion is denied.

#### A. Legal Standard

"While the law presumes prejudice from a jury's exposure to extra-record evidence, that presumption may be rebutted by a 'showing that the extra-record information was harmless.'" *United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011) (quoting *Bibbins v. Dalsheim*, 21 F.3d

---

[7] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

13, 16 (2d Cir. 1994)). "The touchstone of decision is thus not the mere fact of infiltration of some molecules of extra-record matter[,] but the nature of what has been infiltrated and the probability of prejudice." *Bibbins*, 21 F.3d at 16. "The necessary inquiry is objective, and focuses on two factors: (1) the nature of the information or contact at issue, and (2) its probable effect on a hypothetical average jury." *Farhane*, 634 F.3d at 169; *see also Bibbins*, 21 F.3d at 17–18 (analyzing the hypothetical effect of extrinsic information on the "reasonable juror"). A finding that extra-record information was received by a jury creates a rebuttable presumption that this information was prejudicial. *Farhane*, 634 F.3d at 168.

Courts examine the "entire record" in determining the prejudicial effect of extra-record information on a hypothetical average jury. *Farhane*, 634 F.3d at 169. Accordingly, "courts have looked to factors such as whether the external information was cumulative; whether the information could have been part of the jury's fund of ordinary knowledge and experience; what any objective statements made by the jurors post-verdict reflect regarding the circumstances of how the information was introduced; and whether the introduced information could be construed as essential to the prosecution's case." *Curet v. Graham*, 2019 WL 13184139, at *35 (S.D.N.Y. Jan. 14, 2019), *R. & R. adopted*, 2022 WL 1486492 (S.D.N.Y. May 11, 2022). Courts also consider the potential prejudicial effect of the extrinsic evidence in context with other, properly admitted evidence of a defendant's guilt. *See United States v. Guzman Loera ("Guzman Loera II")*, 24 F.4th 144, 161–62 (2d Cir. 2022), *cert. denied*, 142 S. Ct. 2780 (2022); *United States v. Stasiv*, 2021 WL 4888865, at *2 (2d Cir. Oct. 20, 2021) (summary order). "[N]ot every instance," therefore, "of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial. Many such instances do not." *United States v. Schwarz*, 283 F.3d 76, 99 (2d Cir. 2002). At bottom, a "trial court has broad discretion" in determining the prejudicial effect of extra-

record evidence, and such a determination "is only reviewable for abuse of discretion." *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985).

One way to assess the "nature of the information or contact at issue" is through an evidentiary hearing at which a juror testifies about extra-record information he or she may have received. Pursuant to Federal Rule of Evidence 606(b), a juror may testify at such a hearing as to whether "extraneous prejudicial information was improperly brought to the jury's attention," but "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict." Fed. R. Evid. 606(b). "[T]he only fact-finding which is germane *after* a verdict has been rendered is a determination of the precise nature of the information proffered and the degree, if any, to which that information was actually discussed or considered." *United States v. Calbas*, 821 F.2d 887, 896–97 (2d Cir. 1987). The Court may not inquire as to "the impression which jurors actually had about" extra-record information. *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002); *see Bibbins*, 21 F.3d at 17 ("Even when a juror attests to receiving information outside the record, the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations."). Any such investigation into the extraneous information received by a jury should conclude "when and if it becomes apparent that reasonable grounds to suspect prejudicial jury impropriety do not exist." *United States v. Aiyer*, 33 F.4th 97, 128 (2d Cir. 2022) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)).

When considering whether to hold a post-verdict hearing into potential juror misconduct based on the receipt of extra-record information, some courts in this Circuit begin by considering whether the allegations of juror misconduct set forth by a defendant, if taken to be true, are

prejudicial. *See United States v. Guzman Loera ("Guzman Loera I")*, 2019 WL 2869081, at *15 (E.D.N.Y. July 3, 2019), *aff'd*, 24 F.4th 144 (2d Cir. 2022); *United States v. Stewart ("Stewart I")*, 317 F. Supp. 2d 426, 429 (S.D.N.Y. 2004), *aff'd*, 433 F.3d 273 (2d Cir. 2006) (denying hearing in part because "even if the affidavit were more complete, these allegations would not satisfy the test for determining whether the extra-record information would have prejudiced defendants in the eyes of the average juror"); *United States v. Yeagley*, 706 F. Supp. 2d 431, 434–35 (S.D.N.Y. 2010) ("[W]herever the line is, the allegations here, even taken as true, are insufficient to mandate such a [post-verdict] hearing."). The Court takes the same approach here, and ultimately concludes that, even if the communications between Juror No. 4 and his brother occurred as relayed in the affidavits submitted by Curcio, the effect of this information on a "hypothetical average jury," *Schwarz*, 283 F.3d at 99, would be harmless given the other, overwhelming evidence of Curcio's guilt introduced at trial.

**B. Nature of Information at Issue**

The Court will begin by placing the alleged extrinsic evidence in context with the trial evidence and the Government's theory of guilt. As alleged by Curcio, Juror No. 4 received a discrete fact that was not part of the trial record: that "a Charizard card" is "worth half a million dollars." Lussier Decl. ¶ 7; Abuali Decl. ¶ 4 ("Juror No. 4 stated that he asked his brother about how much a Charizard is worth and that his brother told him it is worth about half a million dollars."). Curcio contends that evidence of the value of the Charizard card sold by Curcio was the "cornerstone of the Government's case-in-chief" and a "core piece of evidence in the Government's case." Def. Br. at 3, 8. The Government asserts that the value of the Charizard card was "cumulative and less—or at least no more—prejudicial than other evidence at trial that trading cards graded PSA 10 can sell for over a million dollars." Gov. Opp'n at 17.

A 1999 Charizard card offered for sale by Curcio, purportedly graded a PSA 10, featured in the Indictment. Indictment ¶ 8. This card was labeled as a "1999 Pokemon Game Charizard—Holo 1st Edition," as pictured below:




GX 1410; *see* GX 1411; Tr. at 335:20–336:13 (Dills). At trial, this card was exhibited five times to four witnesses: Ryan Dills, *see* Tr. at 335:20–336:13, Ashish Jain, *see id.* at 515:3–6, *id.* at 515:7–13, Darren Adams, *see id.* at 718:16–721:6, and Special Agent Campbell, *see id.* at 1172:15–19. Dills valued the card "in the $250,000 range" at trial, *id.* at 336:13, though in text messages with Curcio, he had previously indicated that $125,000 might be a good initial asking price for a potential sale of the card. Tr. at 344:21–24 (discussing GX 1401-F). Curcio responded

that this price would be comparable to a $200,000 sale at auction, given the lack of associated transaction fees. *Id.* On Dills's direct examination, the Government also introduced Government Exhibit 1415, which provided the prices of seven previous sales of other copies of a 1999 Charizard card graded a PSA 10. Tr. at 345:3–20. These sales, which occurred before Curcio's scheme began, ranged from approximately $36,000 to $400,000. GX 1415; *see* Def. Br. at 9.[8] Dills sent this image to Curcio because he understood that "Curcio was having a hard time figuring out a good value for that card," and thus would benefit from pricing comparators. Tr. at 345:11–16. Jain valued this card at "200 plus thousand dollar[s]" or "[a] couple hundred thousand." Tr. at 510:9–15, 515:14–15.

Given the record evidence at trial, it is therefore undisputed that the jury heard evidence that 1999 Charizard cards with PSA 10 grades are valuable—indeed, that they can be worth hundreds of thousands of dollars—but that sales of those cards have occurred at a wide range of prices. *See* Def. Br. at 9; Gov. Opp'n at 16 & n.2. The parties also appear to agree that the trial evidence regarding the value of a 1999 PSA 10 Charizard card is part of the evidence supporting the jury's determination of Curcio's guilt. *See* Def. Br. at 10; Gov. Opp'n at 16. Most obviously, it is probative of whether Curcio knew that the PSA grades given to the cards he sold were falsified. The Government asked the jury to infer that Curcio knew that the cards he was selling were not as valuable as he claimed in part because he stored them around his garage—rather than in a secure location, like a safe—and because he often sold them below prevailing market prices.

The Government also introduced evidence and elicited testimony at trial about its search of Curcio's home in Washington state. Special Agent Campbell testified that "trading cards in binders" were found on the floor of Curcio's garage, Tr. at 1126:10–11; *see id.* at 1128:23–1129:8;

[8] GX 1415 lists the following prices for prior sales of a 1999 PSA 10 Charizard card: (1) $252,000.00, (2) $270,600.00, (3) $399,750.00, (4) $350,100.00, (5) $295,300.00, (6) $36,110.54, and (7) $40,000.00. GX 1415.

*id.* at 1136:4–6, as well as "several plastic [Ziploc-type] bags containing sports cards," including "an ungraded Pokémon Charizard card." *Id.* at 1141:24–1143:7. Other "loose cards" were found on top of the workbench in Curcio's garage. *Id.* at 1145:10–15. A Pokémon card, along with other loose cards, was found in a drawer of that same workbench. *Id.* at 1147:18–25. Special Agent Campbell testified that no trading cards were recovered from Curcio's safe. *Id.* at 1157:18–19.

The Government further elicited testimony from eleven trading-card collectors—nine of whom were Curcio's victims[9]—about how they store their trading cards. These witnesses stated that they stored their card collections in safes and other secure locations, rather than on the floor. *See, e.g.*, Tr. at 122:10–11, 161:16–21 (Baudo); *id.* at 242:20–243:8 (Remington Ewald); *id.* at 374:18–20 (Raynolds); *id.* at 436:13–14 (McMillan); *id.* at 507:25–508:3 (Jain); *id.* at 559:22–23 (Trammell); *id.* at 710:2–5 (Adams); *id.* at 1018:15–19 (Matt Greaney); *id.* at 1189:24–25 (Grossbarth); *id.* at 1276:15–1277:2 (Rzewnicki); *id.* at 1410:18–21 (Bliss). These collections included cards valued between several thousand dollars and hundreds of thousands of dollars. For example, Brian Rzewnicki, a hobbyist collector, testified that he stored his collection—worth at most $20,000—"out of harm's way," and not on the floor, because he did not "want them to get damaged or lost or kicked around or broken." Tr. at 1276:15–1277:2. And Remington Ewald, a trading card dealer, testified that his most valuable cards, worth as much as $1,500,000 each, were stored "in a vault" which is "usually used for art" and would "withstand a nuclear explosion," as well as that he stored less-valuable cards in the "many safes in [his] house." Tr. at 242:18–243:2.

Curcio was charged with wire fraud and conspiracy to commit wire fraud. The jury was asked to determine, as an element of wire fraud, whether Curcio "knowingly participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to

---

[9] Of the ten victim-witnesses who testified, only Ryan Dills did not state how he stored his cards. *See* Tr. at 306–73.

defraud." Dkt. 97, Ex. 3 ("Jury Instructions") at 10, 12; *see, e.g.*, *United States v. Autuori*, 212 F.3d 105, 115–18 (2d Cir. 2000). The Government argued in summation, as one of several of its arguments about Curcio's knowledge, that Curcio's "haphazard way" of storing the cards found in his garage, as compared to other collectors, should lead the jury to conclude that Curcio knew the cards he was selling were not, in fact, valuable. Tr. at 1836:6–13. Put another way, this argument posits that a person who believed a given card was valuable would have stored it with more care; the fact that Curcio did not do so supports the inference that he knew the cards stored this way were not worth the prices for which he sold them. This inference is, therefore, plausibly relevant to whether Curcio participated in a scheme to defraud with knowledge of its fraudulent nature and whether he had specific intent to defraud.

Curcio argues that because the extrinsic evidence established a value for a 1999 PSA 10 Charizard card that was above the range of values introduced at trial, it provides a stronger inference of guilt, on this theory, than evidence properly admitted. Notably, though, the Government did not introduce evidence that this specific 1999 Charizard card, ostensibly graded a PSA 10, was found on the floor of Curcio's garage.[10] And the Government did not even discuss this specific Charizard card in its closing argument, either when it advanced this theory of knowledge or more generally. *See* Def. Repl. at 3 (acknowledging this).

Curcio also argues that this extrinsic evidence is relevant because it created a greater gap between the potential market value of the card and the prices at which he attempted to sell it. As the argument goes, a reasonable juror could conclude that this discount in price strengthens the

[10] Special Agent Campbell testified that "an ungraded Pokémon Charizard card" was so found. Tr. at 1142:21–1143:9. He also stated that an empty slab—without a card inside—bearing a PSA label for a "1999 Pokémon game Charizard holo first edition Mint 9" was also found in a bag on the floor. *Id.* at 1163:23–1164:22. A PSA "Mint 9" is an inferior grade to a PSA 10, and thus less valuable. *See, e.g.*, Tr. at 375:5–6 (Raynolds) ("The lower the grade, the less valuable a card can be.").

inference that Curcio knew the card was not genuine. *See* Oral Arg. Tr. at 20:12–19 (counsel for Curcio) ("I would respectfully submit that . . . a $500,000 valuation represents a steeper discount than anything else that exists with respect to that card within the body of evidence [introduced at trial]." (cleaned up)). Curcio attempted to sell the Charizard card several times, and indicated that he would sell it to Jain for $95,000.[11] Tr. at 515:12–17 (Jain). As Jain remarked in his testimony, "[s]o, I mean, anybody that would own this card, you know, probably wouldn't sell it for 95,000 if it's worth 200, right? You would send it to an auction house or put it on eBay. Anything but sell it for half of its value." *Id.* at 515:19–23. The extrinsic evidence thus served to, at best, reiterate the idea, advanced by Jain and the Government, that Curcio was selling this card below its fair market value.

In the Court's view, this extrinsic evidence, when situated in context, only tangentially bears on the ultimate question of Curcio's guilt—and, even then, through a chain of somewhat tenuous inferences. For one, Juror No. 4 merely received information about the value of "a Charizard card," rather than the value of the specific 1999 PSA 10 Charizard Curcio attempted to sell. Lussier Decl. ¶ 7; Abuali Decl. ¶ 4. And even if a juror were to impute a $500,000 valuation to this card, the extrinsic evidence is cumulative: it represents just another data point in the wide range of valuations introduced at trial, albeit approximately $100,000 above the highest valuation of about $400,000 introduced into evidence. *See* GX 1415.

[11] Ryan Dills initially suggested to Curcio that he sell the 1999 PSA 10 Charizard card to Jain for $125,000. Tr. at 344:19–24. Jain testified that he and Curcio ultimately agreed to a sale price of $95,000, though the transaction was not consummated. *Id.* at 515:16–17. Curcio also consigned the Charizard card to Corey Trammell, a card dealer, victim, and witness, for sale. Through Trammell, the card was listed on MySlabs, an online marketplace, for $140,000. *Id.* at 579:4–580:17 (Trammell); *id.* at 1169:13–1170:3 (Campbell). Trammell testified that he arrived at this price based on his estimation of the "going . . . rate" in the market. *Id.* at 580:1–3.

**C. Prejudice**

As discussed, the Government bears the burden of rebutting the presumption of prejudice that accrues when a juror receives extra-record information. This can be accomplished by a showing that the extra-record information was harmless: that the exposure did not prejudice a defendant's right to a fair trial. *Farhane*, 634 F.3d at 168; *Schwarz*, 283 F.3d at 99. The Government has made such a showing here.

As noted, though, "not every instance of a juror's exposure to extrinsic information results in the denial of a defendant's right to a fair trial"; indeed, "[m]any such instances do not." *Schwarz*, 283 F.3d at 99. "In reviewing extra-record information, 'the trial court should assess the possibility of prejudice by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware.'" *United States v. Sabir*, 628 F. Supp. 2d 414, 423 (S.D.N.Y. 2007) (quoting *Weiss*, 752 F.2d at 783). "The court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to" the subject matter of the extra-record information "exists." *Weiss*, 752 F.2d at 783. For example, where extra-record evidence "merely duplicate[s] other trial evidence" such that "the jury heard essentially the same undisputed fact through multiple sources," the Second Circuit has concluded that such exposure to the extra-record information is "harmless." *United States v. James*, 151 F.4th 28, 40 (2d Cir. 2025).

Even accepting Curcio's representations of the relevance of the Charizard card to Curcio's knowledge that he was selling counterfeit goods—which, as discussed above, is tenuous at best—the extra-record evidence regarding the value of that card was merely cumulative of other evidence properly introduced at trial, and thus not prejudicial. *See, e.g.*, *Bibbins*, 21 F.3d at 16–17; *Curet*, 2019 WL 13184139, at *35–36. Curcio's primary theory of prejudice appears to be that a

reasonable jury might have found it sensible to store a card valued at $400,000 on the floor of a garage, but would have found the wisdom of doing so for a card valued at $500,000 to be questionable. *See, e.g.*, Oral Arg. Tr. at 18:12–20:2 (counsel for Curcio). Because the Government did not establish a valuation at which it would have been unreasonable to store a card on the floor, the argument goes, a reasonable juror may well have set that threshold above $400,000, but below $500,000. *See id.*

This argument, though, rests on pure speculation. For one, as noted above, it was not clear from the record evidence that this specific Charizard card was stored on Curcio's garage floor. But even if it were, the specific number attached to the market value of the Charizard card is largely irrelevant to the inference the Government asked the jurors to draw regarding Curcio's knowledge that he was selling cards with false grades. The key evidence the Government used to establish this inference—which, it bears repeating, was never explicitly predicated on this specific Charizard card—was that other collectors took more care than Curcio did in storing cards of lesser value, or more care in storing their collections more generally. Finally, even if the Court were to conclude that a reasonable juror would engage in this arbitrary threshold-setting exercise, Curcio's argument is unpersuasive on its own terms. Evidence at trial established that other collectors chose safer methods of storage for entire collections valued well below the lowest valuation of this Charizard card. *E.g.*, Tr. at 1276:15–1277:2 (Rzewnicki) (testifying that he kept his graded card collection, worth at most $20,000, in "a case" and not "on the floor"). Curcio points to no reason why any evidence—whether extrinsic or properly admitted—would lead a juror to conclude that it would be responsible to store a $400,000 card on the floor, but not a $500,000 one. In this context, then, the extrinsic evidence was "essentially the same" and cumulative of the record evidence of the card's value. *James*, 151 F.4th at 40.

Curcio's second theory of prejudice—that this extrinsic information makes the price at which he attempted to sell the Charizard card more inculpatory—fares no better. As discussed, Curcio argued that this extrinsic evidence strengthened the inference that, because he was selling his cards at a discount, he knew that those cards' grades were falsified. *See* Oral Arg. Tr. at 20:3–19. But even assuming that a reasonable juror would draw this inference, all that the Government would need to establish is that Curcio attempted to sell the card meaningfully below other estimations of its market value. Whether that fair value was $200,000, as Jain testified, $400,000, as other trial evidence indicated, or $500,000, as the extrinsic evidence suggested, strikes the Court as immaterial to a reasonable juror. As with the inference predicated on Curcio's manner of storage, and as the Government argues, "there's no meaningful difference between . . . $400,000 and . . . $500,000" if a reasonable juror were to assess whether Curcio's offer to sell the card for $95,000 constituted "a discount." Oral Arg. Tr. at 33:18–21 (counsel for the Government). In this context, too, the extrinsic evidence was cumulative.

Regardless of whether this extrinsic evidence was cumulative, the Court also concludes that a new trial is not warranted because of the other overwhelming evidence of Curcio's guilt. "The effect inquiry properly considers the entire record in making an objective assessment of possible prejudice." *Farhane*, 634 F.3d at 169. As a result, "the more overwhelming the evidence of guilt against [a defendant], the more difficult it is for [the] defendant to show the necessary level of prejudice that would warrant a new trial. That is the situation in any area of the law in which prejudice to a criminal defendant must be assessed, and there is no reason for a different standard here." *Guzman Loera I*, 2019 WL 2869081, at *17.

Two recent Second Circuit opinions similarly counsel that the prejudice analysis should be informed by the other evidence of a defendant's guilt introduced at trial. The *Guzman Loera* case

involved an appeal of the high-profile conviction, at trial, of the drug cartel leader known as El Chapo. *Guzman Loera II*, 24 F.4th at 149. On appeal, the Second Circuit observed that "any possible prejudice" resulting from post-verdict allegations that the jury followed news coverage of the trial while it occurred and learned that the defendant allegedly "drugged and raped underaged girls," offenses with which he was not charged, was harmless in view of the "overwhelming evidence of . . . [the defendant's] guilt that was presented at his three-month long trial." *Id.* at 161–62. Likewise, in *United States v. Stasiv*, the jury discovered extra-record evidence which "likely led the jury to conclude that" the defendant "had [previously] been detained at Rikers Island." 2021 WL 4888865, at *2. The panel concluded that the presumption of prejudice had been "easily rebutted" given the other, "overwhelming" evidence of the defendant's guilt, and thus the jury's exposure to evidence of the defendant's criminal history was "harmless." *Id.*

The Court agrees with the Government that the other trial evidence "evincing Curcio's knowledge that the PSA grades were fake was staggering." Gov. Opp'n at 19. Rather than being the "cornerstone" of the Government's case, as Curcio contends, evidence about the 1999 PSA 10 Charizard card, which was never sold to a victim, was peripheral. Def. Br. at 3. If a hypothetical average jury had heard no evidence as to the value of a 1999 PSA 10 Charizard card—or had heard no evidence about such a card at all—its ultimate verdict would not have changed.

In its brief in opposition, the Government points to five other categories of evidence introduced at trial, and reasonable inferences a jury might draw from that evidence, which speak to Curcio's knowledge that the PSA grades of the cards he sold were not genuine.[12] *See* Gov.

[12] Curcio challenges the Government's interpretation of the trial evidence in its brief in opposition. Oral Arg. Tr. at 23:9–11 (counsel for Curcio) ("I think for each of these, there are alternative interpretations of the evidence, that's why we had a trial."). The Court finds, however, that the interpretations advanced by the Government are reasonable, and, critically, finds that they are in line with the conclusions a "hypothetical average jury" might draw from the trial evidence. *Farhane*, 634 F.3d at 169.

Opp'n at 19. First, the jury heard evidence raising a credible inference that Curcio printed labels with false PSA grades himself. The Government introduced, for example, seventeen different examples of falsified PSA label templates, found on Curcio's personal computer, for seventeen different cards sold as part of the scheme.[13] *See* Tr. at 1828:9–1832:5 (counsel for the Government) (summarizing this evidence). Second, Curcio's text messages with Bondarchuk, his co-conspirator, demonstrated that he was personally removing cards from slabs, falsifying PSA labels, and altering individual cards so that they would appear to be of a higher grade. Tr. at 762:15–763:14 (discussing GX 227); *see* GX 219; GX 229; GX 240. Third, in other text messages between Curcio and third parties, Curcio discussed his process of opening and resealing PSA slabs and buying counterfeit slabs from China. Tr. at 1337:12–1341:25, 1350:10–1351:4, 1354:23–1355:6 (Florczyk); *see* GX 2390; GX 2466-E2; GX 2466-E6. Fourth, he openly discussed, in text messages with Stephanie Brown, an unindicted co-conspirator, that he was engaging in "fraud" with trading cards. Tr. at 1358:23–1359:22 (Florczyk); *see* GX 2359-E3; GX 2359-E5; *see also* Tr. at 1362:14–15 ("You've heard of good cop, bad cop, right? Well, with us, it would be good criminal, bad criminal." (quoting GX 2466-E14)). And fifth, after buyers returned cards to him and informed him that the PSA grades they had received were fraudulent, Curcio repeatedly resold those cards to other buyers without informing them that the grades were false. The Government introduced evidence at trial, for example, from which the jury could infer that Curcio attempted to sell the same creased 1986 Michael Jordan rookie card to different victims—with a different PSA grade each time. *See* GX 3113; GX 3301; GX 4524. In the Court's view, these categories of

[13] For examples of this, see GX 1407, GX 1429, GX 1905, GX 1912, GX 2107, GX 2142, GX 2195, GX 2224, GX 2227, GX 2232, GX 2262, GX 2263, GX 2270, GX 2286, GX 2296, GX 2300, GX 2304, GX 2325, GX 2331, GX 3202, GX 4430-E4, and GX 4442.

evidence speak much more compellingly to Curcio's knowledge than extrinsic information regarding the value of a 1999 PSA 10 Charizard card.[14]

In considering "the entire record," the Court thus finds that the Government has clearly met its burden to rebut the presumption of prejudice here. *Weiss*, 752 F.2d at 783. As in the *Guzman Loera* case, the Court concludes that "a rational, hypothetical, average jury would certainly have convicted" Curcio "of the crimes charged in the indictment based on the overwhelming amount of direct evidence presented during trial that . . . [he] did, in fact, commit those crimes." *Guzman Loera I*, 2019 WL 2869081, at *16. Here, the Court has already concluded that the extrinsic evidence was merely cumulative of other estimations of a 1999 PSA 10 Charizard card's value. But even if it had not, "when," as here, "the record of guilt overwhelmingly suggests that a hypothetical, average jury would convict defendant based on the admissible, credible evidence," that provides another, independent ground on which to find harmlessness. *Id.* at *18.

Given the full sweep of the record evidence of Curcio's guilt, the cases on which he relies are easily distinguishable. In *United States v. Schwarz*, the jury was exposed to portions of a co-defendant's guilty plea allocution which implicated the defendant on trial, and "[t]he jurors asserted that had they known about" other, omitted factual context to the allocution "before reaching a verdict, they would have had reasonable doubt as to [the defendant's] guilt." *Schwarz*, 283 F.3d at 88–89, 99. And in *United States v. Camporeale*, an unredacted transcript of the defendant's grand jury appearances was erroneously sent back to the jury room; the transcript disclosed the defendant's extensive criminal record. 515 F.2d 184, 187–88 (2d Cir. 1975).

[14] Though not relied on by the Government in its brief in opposition, Curcio's published memoir is also compelling evidence that he participated in a scheme to defraud with knowledge of its fraudulent nature and that he had specific intent to defraud his victims. Curcio described, for example, how he previously "discovered how to open sealed card cases and reseal them without any outward appearance of tampering," which "allowed him to change the grade" of PSA-graded cards. Tr. at 101:4–7 (Sebade) (quoting GX 101). And he detailed a scheme in which he falsely graded counterfeit 1952 Mickey Mantle cards and sold them to a number of unwitting buyers. *Id.* at 102:1–16 (Sebade) (quoting GX 101).

Because the "principal issue" before the jury was the "credibility" of the defendant, "the jury's knowledge" of the defendant's "prior conviction and . . . arrests . . . could well have led it to resolve that issue against him." *Id.*

Thus, rather than bearing on the "principal issue" before the jury or directly contradicting the defense theory at trial, as in *Camporeale* and *Schwarz*, the extrinsic information relating to the precise value of the Charizard card bore on an issue that was not seriously in dispute at trial, was only tangentially material to the Government's theory of guilt, and was cumulative of evidence properly admitted. This case is much more like *Guzman Loera* and *Stasiv*. Here, as in those cases, the Government introduced overwhelming evidence, not just of Curcio's guilt more broadly, but of his specific knowledge that he was falsely representing the PSA grades of the cards he was selling. The Court is, in other words, persuaded that the Government has met its burden to show that the extrinsic information "could not have affected the outcome" at trial. *Camporeale*, 515 F.2d at 188. The Court thus concludes that Juror No. 4's exposure to such information "was harmless" and "did not deprive [Curcio] of a fair trial," *James*, 151 F.4th at 40, because there is not "a reasonable possibility that the [extrinsic] evidence complained of might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 23 (1967).

**D. Evidentiary Hearing**

Finally, because the Court has concluded that the Government has rebutted the presumption that the extra-record information alleged to have been received by Juror No. 4 was prejudicial, it will not hold an evidentiary hearing to further question Juror No. 4. The Second Circuit has cautioned that courts should be "reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989); *Aiyer*, 33 F.4th at 127 (noting "that district judges

should be particularly cautious in conducting investigations into possible jury misconduct after a verdict"). This caution is rooted in sound policy concerns: "post-verdict inquiries may lead to evil consequences" such as "subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *Ianniello*, 866 F.2d at 543.

"Nevertheless, a defendant has a constitutional right to be tried by an impartial jury, unprejudiced by extraneous influence, and when reasonable grounds exist to believe that the jury may have been exposed to an improper influence, the entire picture should be explored." *Schwarz*, 283 F.3d at 97. "Accordingly, probing jurors for potential instances of bias, misconduct or extraneous influences after they have reached a verdict is justified only when reasonable grounds for investigation exist, in other words, where there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial." *United States v. Stewart ("Stewart II")*, 433 F.3d 273, 302–03 (2d Cir. 2006). As previously noted, however, such an inquiry "should end whenever it becomes apparent to the trial judge that reasonable grounds to suspect prejudicial jury impropriety do not exist." *Id.* at 303; *see Moon*, 718 F.2d at 1234. And even if the Court were to convene an evidentiary hearing, Rule 606(b) would bar Juror No. 4 from testifying about how the extrinsic information influenced his or his fellow jurors' verdicts, or any juror's mental processes. *See Calbas*, 821 F.2d at 896–97; Fed. R. Evid. 606(b).

Curcio argues that the Court has a duty to question Juror No. 4 and investigate whether his brother communicated any other relevant and prejudicial pieces of extra-record information to him. *See* Oral Arg. Tr. at 5:6–11 (counsel for Curcio) ("[W]e happened to hear this individual, Juror No. 4, remark upon this conversation that he had with respect to the Charizard card in what

would seem to be a pretty bare and flagrant violation of the Court's instructions . . . . It opens the door to the possibility that more was said."). But, for the reasons previously discussed, such a hearing is not warranted. Curcio has alleged one specific impropriety: Juror No. 4's conversation with his brother about the price of a Charizard card. *Stewart II*, 433 F.3d at 303. Even viewing the affidavits in the light most favorable to Curcio, however, the Court finds that the Government has rebutted the presumption that this impropriety "could have prejudiced the trial," and so no hearing on that topic is necessary. *Id.*

Further, Curcio's bare intimation that "more was said" between the brothers, Oral Arg. Tr. at 5:10–11 (counsel for Curcio), is not a showing of the kind of "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred" that is required before a court will engage in "[p]ost-trial jury scrutiny." *Stewart II*, 433 F.3d at 302–03. There is always the abstract possibility, when considering an allegation of potential juror impropriety, that more was said and done than what was communicated to the Court. But here, there is no good reason to suspect that the affidavits before the Court, if taken as true, would not tell the complete story. Curcio points to no caselaw mandating such a searching inquiry here, and the Court is aware of none. *See* Oral Arg. Tr. at 6:8–7:12 (counsel for Curcio) (acknowledging the absence of such authority). Indeed, in the Court's view, any further inquiry into other potential improprieties would constitute the kind of "fishing expedition" the Second Circuit has repeatedly advised against. *Ianniello*, 866 F.2d at 543; *see Taus v. Senkowski*, 134 F. App'x 468, 470 (2d Cir. 2005) (summary order); *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978). Accordingly, the Court declines to cast its line into the water and haul Juror No. 4 back into court. Curcio's motion for an evidentiary hearing is, therefore, also denied.

## II. Conflicted Representation

Curcio next brings a motion for a new trial on the basis of an alleged conflict suffered by his trial counsel which, he claims, rendered them ineffective. For the reasons that follow, this motion is also denied.

### A. Simpson Thacher's Alleged Conflict

Jackie Curiel, the Senior Director of Brand Protection for Collectors Holdings, Inc. ("Collectors"), PSA's parent company, *see* Tr. at 1610:14–18 (Curiel), testified for the Government at trial as a representative of PSA and Collectors. In her position, Curiel largely worked with the PSA team. *See id.* at 1437:8–21 ("Q. . . . Do you focus on a particular part of business at Collectors? A. Yes, PSA."). Curcio now argues that because Simpson Thacher previously and concurrently represented several entities with a tenuous affiliation with Collectors and its subsidiary, PSA, it suffered from an actual or potential conflict of interest. *See* Def. Suppl. Br. at 5.

In its May 11, 2026 letter, the Firm detailed the extent of its relationship with PSA. Curcio does not dispute—and, in fact, appears to affirmatively adopt—the Firm's representations regarding the client relationships put at issue by the instant motion. The Court thus takes those facts as undisputed, as detailed below, for the purposes of this Opinion and Order.

Importantly, the parties agree that the Firm has never had a client relationship with PSA itself. Nevertheless, its current and former clients have distant connections to PSA. First, a former client of the Firm is a part-owner of PSA's parent company, Collectors. May 11 Ltr. at 2. This former client—D1 Capital Partners L.P. ("D1 Capital")—was last represented by the Firm in January 2021, one month before D1 Capital announced its acquisition of Collectors in February 2021. *Id.* at 2 n.2; *see* Def. Suppl. Br. at 5. The Firm did not assist Collectors with that acquisition.

May 11 Ltr. at 2. Second, Steven A. Cohen is a co-investor in Collectors "through his private investment vehicle, Cohen Private Ventures, LLC" ("CPV").[15] Def. Suppl. Br. at 6. The Firm's "only current client relationship" with "an entity controlled by Mr. Cohen is with Point72 Asset Management, L.P." ("Point72"), a hedge fund founded by Cohen "which the Firm advises with respect to matters" that are "wholly unrelated to its representation of Mr. Curcio."[16] May 11 Ltr. at 3; *see* Def. Suppl. Br. at 6.

**B. Legal Standard**

"The Sixth Amendment right to effective assistance of counsel generally ensures that an accused may be represented by any attorney who will agree to take his case." *United States v. Arrington*, 941 F.3d 24, 39 (2d Cir. 2019). "The right to the effective assistance of counsel . . . includes the right to be represented by an attorney who is free from conflicts of interest." *United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003); *see Wood v. Georgia*, 450 U.S. 261, 271 (1981). A conflicted representation can, therefore, be the basis for an ineffective assistance of counsel claim under the Sixth Amendment. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).

The Second Circuit has outlined three categories of attorney conflicts which may give rise to an ineffective assistance claim—"*per se*, actual, and potential conflicts"—each attended by different requirements and presumptions. *Guzman Loera II*, 24 F.4th at 160; *see United States v.*

---

[15] Caroline Geiger, a partner of Simpson Thacher who did not represent Curcio, represented CPV at her prior firm, but "did not establish a client relationship with CPV upon her arrival at the Firm in February 2025." May 11 Ltr. at 3. Curcio does not raise Geiger's prior representation as an actual or potential conflict in his supplemental motion for a new trial.

[16] In his May 4, 2026 letter, Curcio also raised, as a possible conflict, Simpson Thacher's representation of S.A.C. Private Capital Group, "a Steve Cohen company," Gov. Suppl. Opp'n at 3 n.3, in connection with its $1.3 billion recapitalization of Cosmos Bank in 2007. *See* May 4 Ltr. at 1. He does not, though, allege that this prior representation constitutes an actual or potential conflict in his supplemental motion for a new trial. Simpson Thacher represented that S.A.C. Private Capital Group "is a former client of the Firm that the Firm last assisted in 2015." May 11 Ltr. at 2 n.3.

*Williams*, 372 F.3d 96, 102 (2d Cir. 2004); *Perez*, 325 F.3d at 125. In general, "(1) a *per se* conflict requir[es] automatic reversal without a showing of prejudice; (2) an actual conflict of interest . . . carries a [rebuttable] presumption of prejudice; and (3) a potential conflict of interest . . . requires a finding of both deficient performance by counsel and prejudice." *United States v. Hild*, 644 F. Supp. 3d 7, 34 (S.D.N.Y. 2022), *aff'd*, 147 F.4th 103 (2d Cir. 2025); *see United States v. John Doe No. 1*, 272 F.3d 116, 125 (2d Cir. 2001). In other words, only potential conflicts of interest are governed by the familiar *Strickland* standard for ineffective assistance of counsel claims, under which a defendant must show that (1) his counsel's performance "fell below an objective standard of reasonableness," and (2) he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 688, 691–92 (1984).

First, the Second Circuit has found unwaivable, *per se* conflicts to occur "only where trial counsel is not authorized to practice law and where trial counsel is implicated in the same or closely related criminal conduct for which the defendant is on trial." *Williams*, 372 F.3d at 103; *see Guzman Loera II*, 24 F.4th at 160. Curcio does not claim that Simpson Thacher suffered a *per se* conflict, nor would such a claim be meritorious.

Second, "[t]he lynchpin in finding an actual conflict is that counsel's interests diverged with respect to a material factual or legal issue pertaining to the representation itself." *Hild*, 644 F. Supp. 3d at 35; *see Arrington*, 941 F.3d at 40 (noting that an actual conflict exists "when . . . the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action"). There must be "some objective basis" upon which to find an actual conflict; "it is not enough . . . merely to assess the attorney's state of mind." *Strouse v. Leonardo*, 928 F.2d 548, 553 (2d Cir. 1991). In other words, an actual conflict exists where "the incentives for lawyer

and client were *inherently* in conflict, or misaligned, due to an attorney's other loyalties." *Hild*, 644 F. Supp. 3d at 35.

In the rare circumstance in which a defendant establishes an actual conflict, he "must [also] establish an actual lapse in representation." *Hild*, 644 F. Supp. 3d at 35. "To prove a lapse in representation, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken *due to* the attorney's other loyalties or interests." *Schwarz*, 283 F.3d at 92. "Under this second step—unlike the traditional *Strickland* approach—a defendant need not establish that the alternative defense would necessarily have been successful," or that it otherwise would have affected the outcome of the trial. *Hild*, 644 F. Supp. 3d at 35. Instead, a defendant must establish (1) that the defense "possessed sufficient substance to be a viable alternative," and (2) causation, "by demonstrating that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.*; *see LoCascio v. United States*, 395 F.3d 51, 56 (2d Cir. 2005); *Schwarz*, 283 F.3d at 92; *United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995) (similar). Nevertheless, the Second Circuit has cautioned that "a mere theoretical division of loyalties" "does not present grounds for a new trial." *Feyrer*, 333 F.3d at 116.

Finally, "[a] potential conflict is found when the interests of the defendant could place the attorney under inconsistent duties in the future." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004); *see Arrington*, 941 F.3d at 40 (similar). "If a defendant demonstrates a potential conflict of interest, then he must demonstrate both deficient performance by counsel and prejudice, under the standard established in *Strickland*." *United States v. Lemay*, 2026 WL 18625, at *8 (S.D.N.Y. Jan. 2, 2026).

**C. Application**

In his supplemental motion for a new trial, Curcio does not clearly explain how Simpson Thacher's attenuated relationship with entities affiliated with PSA would establish an actual or potential conflict of interest. *See* Def. Suppl. Br. at 8 ("Should the Court have found that there was an actual conflict of interest given Simpson Thacher's connection to PSA, then during Simpson Thacher's representation of Mr. Curcio, Simpson Thacher and Mr. Curcio's interests would have diverged in the ways described in case law."). The core of Curcio's argument here appears to be that the Firm did not "pursue a line of cross-examination that would have exposed PSA's inability to be truthful" and "credible" because doing so "may have inherently been in conflict with or not undertaken due to Simpson Thacher's other loyalties to Steven A. Cohen . . . [or] former client D1 Capital." *Id.* at 9–10. He also claims that the Firm's failure to inform the Court that it had run a conflicts check concerning PSA, and to disclose the results of that check, independently constituted ineffective assistance of counsel. *Id.* at 6–7.

The Court disagrees. In view of the undisputed facts presented by Curcio and Simpson Thacher, the Court finds that an actual or potential conflict did not exist because (1) Curcio's interests and the Firm's interests did not "diverge with respect to a material factual or legal issue or to a course of action," and (2) Curcio's interests would not have "place[d] [the Firm] under inconsistent duties at some time in the future." *Arrington*, 941 F.3d at 40. And even if Curcio could show that such a conflict existed, the Court finds that his proposed "alternative defense" was not "inherently in conflict with or not undertaken due to" any "other loyalties or interests" the Firm may have had. *Malpiedi*, 62 F.3d at 469. The Court also finds that Curcio's alternative ineffective assistance of counsel claim fails because it was reasonable for the Firm not to disclose to the Court

both that it conducted a conflicts check as to PSA, and the results of that check, and because Curcio was not prejudiced by trial counsel's nondisclosure. *See Strickland*, 466 U.S. at 688, 691–92.

**1. Actual or Potential Conflict**

Under Second Circuit caselaw and the New York Rules of Professional Conduct, a conflict may exist when a lawyer concurrently represents or has represented both a defendant and an adverse witness at trial. *United States v. Lussier*, 71 F.3d 456, 462 (2d Cir. 1995) ("When a defense attorney cross-examines a former client who is a witness against the defendant, a conflict of interest may exist."); *see United States v. Kliti*, 156 F.3d 150, 154 (2d Cir. 1998) (similar); N.Y. R.P.C. 1.7 cmt. 6 ("[A] conflict may arise when a lawyer is required to cross examine a client appearing as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client represented in the lawsuit.").[17] Simpson Thacher, however, has never represented either PSA or Collectors, and so this type of direct conflict is simply not at issue here. Instead, as the Government observes, the Firm's prior and concurrent representations are simply too attenuated—both in their subject matter and relationship to PSA and Collectors—to constitute an actual conflict.

First, the Firm's prior representation of D1 Capital, a part-owner of Collectors, does not give rise to a conflict. It is true that an actual conflict of interest may exist "when the attorney's

[17] Curcio cites no caselaw dealing with an alleged actual or potential conflict in which a lawyer was concurrently representing or formerly represented a corporate affiliate with interests adverse to his or her client, and the Court is aware of none. The Court thus looks, as other courts have, to the New York Rules of Professional Conduct for guidance on whether a conflict may exist in this or a similar circumstance. *See, e.g.*, *Amato v. United States*, 2017 WL 1293801, at *17 (E.D.N.Y. Apr. 6, 2017) ("The court once again turns to the New York Rules of Professional Conduct, which provide a standard for assessing [defense counsel's prior] representations."), *aff'd*, 763 F. App'x 21 (2d Cir. 2019) (summary order). It recognizes, however, that "the existence of a potential ethical violation" under the New York Rules of Professional Conduct is not "dispositive" of the question of whether an actual or potential conflict exists. *Medrano v. United States*, 2015 WL 4522857, at *5 (S.D.N.Y. July 27, 2015), *aff'd*, 691 F. App'x 663 (2d Cir. 2017) (summary order); *see also Mickens v. Taylor*, 535 U.S. 162, 176 (2002) ("Breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel."); *Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable, but they are only guides.").

representation of the defendant is impaired by loyalty owed to a prior client." *Jones*, 381 F.3d at 119; *see United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998) (similar). The potential for a conflict in this circumstance is grounded in the fear that "the attorney's ethical obligation not to disclose the prior client's confidences and secrets might make the attorney's cross-examination of" the prior client "less vigorous than it might otherwise be." *United States v. Armaza*, 280 F. Supp. 2d 174, 180 (S.D.N.Y. 2003); *see Lussier*, 71 F.3d at 462; *United States v. Oberoi*, 331 F.3d 44, 48 (2d Cir. 2003). Even assuming this principle applies to prior clients who are merely corporate affiliates of an adverse witness, this concern is wholly inapplicable here. Simpson Thacher could not have learned any of D1 Capital's relevant "confidences and secrets" during its prior representation, as D1 Capital had not yet acquired its interest in Collectors—and, through it, PSA—at the time of that representation. *Armaza*, 280 F. Supp. 2d at 180; *see* May 11 Ltr. at 2 n.2.[18]

Nor does the Firm's concurrent representation of Point72 give rise to a conflict. As previously discussed, Steven A. Cohen, a part-owner of Collectors through his investment vehicle CPV, also controls Point72, a current Firm client. Def. Suppl. Br. at 5–6. In general, "[a] lawyer who represents a corporation or other organization does not, simply by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary." N.Y. R.P.C. 1.7 cmt. 34. Both the New York Rules of Professional Conduct and the Second Circuit contemplate, however, that "representation adverse to a client's affiliate can, in certain circumstances, conflict with the lawyer's duty of loyalty owed to a client." *GSI Com. Sols.,*

[18] Nor would this representation have, as the Government observes, given rise to a conflict under the New York Rules of Professional Conduct. Pursuant to Rule 1.9, a conflict exists where a lawyer represents "another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." N.Y. R.P.C. 1.9. For the reasons discussed above, Simpson Thacher's prior representation of D1 Capital was not in "the same" matter as, or in a matter "substantially related" to, its representation of Curcio. *Id.*

*Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 210 (2d Cir. 2010); *see* N.Y. R.P.C. 1.7 cmt. 34. The Second Circuit has provided a list of general factors for lawyers to consider, such as "(i) the degree of operational commonality between affiliated entities, and (ii) the extent to which one depends financially on the other," though it cautions that "affiliates should not be considered a single entity for conflicts purposes based solely on the fact that one entity is a wholly-owned subsidiary of the other, at least when the subsidiary is not otherwise operationally integrated with the parent company." *GSI Com. Sols.*, 618 F.3d at 210–11. Likewise, the New York Rules of Professional Conduct contemplate that "[w]here the entities are related only through stock ownership, the ownership is less than a controlling interest, and the lawyer has had no significant dealings with the affiliate or access to its confidences, the lawyer may reasonably conclude that the affiliate is not the lawyer's client." N.Y. R.P.C. 1.7 cmt. 34A.

Though the Court has somewhat limited information about the relationship between Point72 and Collectors or PSA, it has enough to conclude that this concurrent representation did not give rise to an actual or potential conflict. As discussed, Point72 and PSA are not in a direct parent-subsidiary relationship: they share a common owner, Steven A. Cohen, through several intermediate entities. Put another way, they are distant horizontal affiliates. And they are in separate lines of work: it appears undisputed that the Firm's concurrent representation of Point72, a hedge fund, concerns matters "wholly unrelated to its representation of Mr. Curcio" in his criminal trial. May 11 Ltr. at 3; *see* Def. Suppl. Br. at 5–6; Gov. Suppl. Opp'n at 3. Curcio cites no cases—and the Court is aware of none—in which an actual or potential conflict was found to have existed due to such an attenuated connection. Curcio does not, in other words, provide any reason, other than "a mere theoretical division of loyalties," *Feyrer*, 333 F.3d at 116, as to why his

trial counsel's performance was or would be "adversely affected" by these representations. *Armienti v. United States*, 313 F.3d 807, 811 (2d Cir. 2002).

Given these facts, Curcio has made no showing—though it is his burden to do so—that his interests and the interests of the Firm "diverge[d] with respect to a material factual or legal issue or to a course of action" to create an actual conflict. *Schwarz*, 283 F.3d at 91. Nor does he provide any factual basis from which to conclude that the Firm could have been placed "under inconsistent duties in the future" to create a potential conflict during its representation of him. *Jones*, 381 F.3d at 119. Accordingly, the Court finds that Simpson Thacher did not suffer from an actual or potential conflict in its representation of Curcio.

**2. Lapse in Representation**

Even if the Court had concluded that an actual or potential conflict existed due to Simpson Thacher's representation of D1 Capital and Point72, Curcio's motion would also fail because he has not demonstrated that "some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to" the Firm's "other loyalties or interests." *Schwarz*, 283 F.3d at 92. Curcio contends that the Firm did not "cross-examin[e] PSA regarding their untruthfulness and calculated attack on Mr. Curcio" due to its alleged conflict of interest. Def. Suppl. Br. at 9. But that argument is completely undercut by his trial counsel's persistent and steadfast efforts to admit evidence and offer argument right along those lines at trial. In short, Curcio can establish no "actual lapse in representation" stemming from the alleged conflict. *United States v. Moree*, 220 F.3d 65, 69 (2d Cir. 2000).

The Firm sought, in an *in limine* motion, a ruling from the Court to "allow evidence that would tend to undermine the jury's confidence in PSA's grading system." Dkt. 73 ("Jan. 7 Ltr.") at 3.[19] In relevant part, it sought to admit "different forms" of evidence relevant to this topic:

> To the extent that witnesses are aware of [PSA's] inconsistencies, chronic sloppiness, problems with record keeping, and the like, the jury should be allowed to consider them. PSA employees, in particular, should be able to . . . be questioned about these matters. And to the extent that individual incidents demonstrated that a PSA decision to take action with respect to a card was driven by impermissible outside forces—including the influence of law enforcement—the jury should be able to consider this as well.

*Id.* Curcio's lawyers argued that this evidence was relevant to Curcio's intent and the separate question of whether individual PSA grades, and PSA's grading system more generally, were reliable:

> If the primary or exclusive mechanism through which the Government will attempt to establish what the victims would have paid relies on PSA's grades, it is not only permissible but essential that the defense be allowed to present evidence that would influence how much trust *they*, as jurors, should put in that grading system. In the absence of an effort by the Government to establish value, the only evidence of the actual value of certain cards that comes into evidence will be unadorned, unexplained, unsubstantiated PSA grades themselves—some of it likely over hearsay objections. . . .
>
> It cannot be that PSA is assigned an oracular role in the determination of a critical issue at trial, free from any scrutiny. . . . Mr. Curcio must be permitted to show the jury that the Government has and continues to construct its case against him on unquestioned determinations from PSA, which, he will show, are open to serious doubt. . . . Relatedly, the Government's continued entanglement with PSA also tainted PSA's own internal processes as applied to Mr. Curcio. . . . Mr. Curcio intends to show at trial that, misguided or not, his actions were driven by a desire to expose PSA as a monopoly whose promise to authenticate and objectively evaluate the physical condition of collectible cards was a sham. . . .

[19] The Government initially sought a ruling *in limine* that Curcio "be precluded from arguing or adducing evidence that PSA has engaged in purported misconduct," and "cross-examining witnesses in a way that implies that PSA was negligent or engaged in misconduct." Dkt. 64 at 31–32. In opposition, Curcio argued that he should not be precluded from offering evidence of the "ongoing conflict between him" and PSA, because "his actions during the purported fraud period were directly influenced by PSA's actions over the same timeline." Dkt. 66 at 19–21. Curcio would expand the scope of this request in his January 7 letter-brief, moving there to "present evidence that would influence how much trust . . . [the jury] should put in . . . [PSA's] grading system," even if that evidence was unrelated to the issue of Curcio's intent. Jan. 7 Ltr. at 2–6. The Court ruled on these related *in limine* motions at a conference on January 13, 2026. Tr. at 173:4–185:8.

> In sum, the Government cannot distance itself from PSA now, for purposes of trial, because it bears directly on the reliability of the evidence and merit of the charges against Mr. Curcio, including as to the questions of whether there was any misrepresentation and whether there was any intent to defraud. Moreover, as a matter of both evidentiary soundness and basic fairness, the Government should not be allowed to simultaneously rely on PSA to assess the grading value of evidence that will be presented at trial and testify at trial that Mr. Curcio misrepresented his cards or their holders while shielding PSA's role, its methods, and the Government's communications with its employees from scrutiny. PSA's evidence collection, determinations, validation criteria, and interactions with investigators go to the heart of the alleged fraud, and Mr. Curcio should be permitted to tell that story.

*Id.* at 3–6.

Despite the Firm's zealous and highly effective advocacy, the Court ultimately denied this *in limine* motion in part, primarily on relevance grounds:

> I am going to allow evidence . . . of PSA's practices and . . . so-called misconduct as it goes to Mr. Curcio's intent. But I am not going to allow the more objective evidence of PSA's practices or conduct that don't relate to his state of mind or any other proper purpose, such as whether the cards were actually . . . tampered with or actually sold by Curcio. . . . [S]aid another way, I will allow in evidence that provides context for his state of mind. So if it's something that PSA did and testimony is coming in about how he felt about it and why he did what he did, and you need that context, I will allow that in. But what shouldn't come in is the evidence and argument that PSA's grading system is subjective or inconsistent simply to corroborate his belief because PSA is not on trial here, and thus, it's not relevant. . . . It's not relevant whether PSA properly . . . graded a particular card. But what is relevant is what Mr. Curcio felt about that and what he did as a result.

Tr. at 178:12–180:14. As the Court went on to explain, it wanted to allow Curcio to "present to the jury an alternative theory of what his intent was in executing the transactions at issue"—for example, that Curcio "wanted to embarrass PSA or call attention to its errors"—and would thus allow in evidence to the extent it supported a theory that could "negate fraudulent intent."[20] Tr. at 182:24–183:17.

[20] As the Court further explained, under relevant caselaw, "a defendant violates the wire fraud statute by acting knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another." Tr. at 183:11–14; *see Kousisis v. United States*, 605 U.S. 114, 121–22 (2025) ("A defendant commits federal wire

Within the boundaries set by the Court's *in limine* ruling, the Firm vigorously and repeatedly advanced the argument that Curcio acted to "get back at PSA."[21] Tr. at 88:25 (counsel for Curcio). This effort included several sustained attacks on PSA's conduct and its motives in assisting the Government in this prosecution, which were linked to Curcio's subjective beliefs. As Meredith Karp—a Simpson Thacher partner and one of Curcio's attorneys—argued in her opening statement:

> PSA dominates the sports card market. It is the proverbial 600-pound gorilla. If PSA tarnishes a collector's reputation, it can end his ability to buy, sell, or trade cards, and destroy his livelihood in the process. . . . The evidence will show that [Curcio] threatened legal action against PSA, and the evidence will show that he told PSA itself that he would expose its flawed grading system for all the world to see. He wanted to show that PSA was simply a house of cards. Ultimately, in February of 2023, PSA shut down Mr. Curcio's account entirely, effectively banning him from the collectibles market, and preventing him from pursuing his livelihood and his passion. The evidence will show that Mr. Curcio believed that he had been wrongly singled out and wrongly accused of misconduct. . . . [Curcio] wanted to expose PSA both for its actions towards him specifically and to show that PSA's entire grading business model was a sham; again, a house of cards. PSA was unreliable, it was untrustworthy, it was corrupt, and he, Anthony Curcio, would expose the truth about PSA to the world. . . . [E]ventually the Justice Department charged Mr. Curcio . . . because they saw the world through PSA-colored glasses. . . . [Its] case . . . is so reliant upon PSA's view of the world.

Tr. at 86:10–13, 87:13–23, 88:25–89:15, 90:3–4. Curcio's trial counsel developed this argument when cross-examining witnesses: Bondarchuk, his co-conspirator, conceded that Curcio expressed, during the scheme, that "he was motivated to look for ways" to "expose" and "embarrass" PSA. Tr. at 832:11–17. And, as the Government notes, Curcio's trial counsel

---

fraud . . . only if he both engaged in deception and had money or property as an object of his fraud. . . . Obtaining the victim's money or property must have been the aim, not an incidental byproduct, of the defendant's fraud."); *United States v. Runner*, 143 F.4th 146, 157 (2d Cir. 2025) ("[A] defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a transaction that requires handing over her money or property."). Accordingly, in the Court's view, evidence of alleged PSA misconduct that was relevant to Curcio's *subjective intent* in entering into the transactions at issue was relevant, while objective evidence bearing on whether PSA's grading process was unreliable was not.

[21] Indeed, Simpson Thacher attempted, at times, to cross-examine witnesses in ways that pushed the boundaries of these rulings, drawing objections from the Government that the Court sustained. *See, e.g.*, Tr. at 919:24–924:3, 937:11–14 (Bondarchuk); *id.* at 1714:13–1715:8 (Curiel).

thoroughly cross-examined Curiel "on issues regarding the reliability of PSA's grading, anomalies in PSA's card holders, purported mistakes PSA has made verifying the authenticity of its grades and holders, whether PSA treated . . . [Curcio] unfairly, whether the Government's investigation was outsourced to PSA, and PSA and Curiel's purported bias against" Curcio. Gov. Suppl. Opp'n at 6–7 (collecting transcript citations). Furthermore, Martin Bell—Curcio's lead trial counsel—reiterated these themes in his closing statement, arguing that Curcio's "purpose" in the alleged scheme was to "find ways to undermine and embarrass PSA," the company which had "blacklist[ed] him . . . from the card trade," the market over which it allegedly held a "monopoly." Tr. at 1878:11, 1894:22–24; *see also* Gov. Suppl. Opp'n at 7 (collecting transcript citations). After the trial, the Firm represented that it "operated aggressively within the bounds" of the Court's *in limine* rulings and "held nothing back." May 11 Ltr. at 5–6.

Curcio does not specify what additional evidence his trial counsel did not use in support of this defense strategy, which relied heavily on eliciting evidence and presenting argument about his opinion of PSA to cast doubt on the Government's argument that he acted with the specific intent to defraud his victims. Nor does he explain what evidence might have been introduced in support of some alternate strategy of directly attacking PSA's practices. Curcio has, therefore, failed to demonstrate that "some plausible alternative defense strategy or tactic might have been pursued" but for the alleged conflict, *Schwarz*, 283 F.3d at 92, because he has not shown that any alternative strategy or tactic would have "sufficient substance to be a viable alternative." *Hild*, 644 F. Supp. 3d at 35 (quoting *LoCascio*, 395 F.3d at 56); *cf. United States v. Garcia*, 2026 WL 817711, at *2 (2d Cir. Mar. 25, 2026) (summary order) (upholding denial of Rule 33 motion in part because the suggestion that an uncalled witness's "testimony would have been exculpatory or beneficial" was

"pure conjecture" because there "was no evidence to suggest" that the witness "would have had any testimony that was admissible or helpful to the defense").

But more importantly, and as the Government notes, Curcio has not demonstrated that his trial counsel's alleged failure to further attack PSA's conduct and credibility during trial was caused by any purported conflict. *See Feyrer*, 333 F.3d at 118; *Burke v. United States*, 2022 WL 175488, at *2 (2d Cir. Jan. 20, 2022) (summary order) ("[T]he defendant must show causation by demonstrating that the alternative defense was inherently in conflict with or not undertaken *due to* the attorney's other loyalties or interests." (emphasis in original)). Curcio faults his trial counsel for failing to "pursue a line of cross examination that shows PSA is untruthful and not credible," in addition to their efforts to elicit testimony about "what Mr. Curcio subjectively believed" about PSA. Def. Suppl. Br. at 9. But given its rulings on Curcio's motions *in limine*, the Court would not have allowed Curcio's trial counsel to pursue an attack on PSA's practices or credibility that was not grounded in or relevant to Curcio's subjective beliefs about PSA. It is not clear to the Court, given its prior ruling, what more Curcio's trial counsel could have done to develop this theme. Indeed, trial counsel did an admirable job presenting their defense to the jury through the narrow window the Court's ruling left open for them.

**3. Failure to Disclose**

Lastly, Curcio brings an ineffective assistance of counsel claim predicated on Simpson Thacher's failure to disclose its prior and concurrent representations to the Court. "To be entitled to relief pursuant to *Strickland*," Curcio "must show both that (1) his counsel's performance 'fell below an objective standard of reasonableness,' and (2) he suffered prejudice as a result." *Hild*, 644 F. Supp. 3d at 44 (quoting *Strickland*, 466 U.S. at 688, 691–92). In evaluating *Strickland*'s first prong, courts apply a "strong presumption that counsel's conduct falls within the wide range

of reasonable professional assistance." *Strickland*, 466 U.S. at 689. With respect to the second, a defendant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "Ultimately, to merit vacatur, 'counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Hild*, 644 F. Supp. 3d at 44 (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)); *see Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010) (similar). This is a higher standard for prejudice than that applied to Curcio's claim of an actual conflict, for which a defendant need only establish that such a conflict "adversely affected his counsel's performance." *Schwarz*, 283 F.3d at 91.

Curcio argues that the Firm's failure to disclose the existence of "any possible conflict with PSA" to the Court "falls squarely below an 'objective standard of reasonableness'" under the prevailing professional norms "required of competent counsel," under *Strickland*'s first prong, rendering its representation of Curcio ineffective. Def. Suppl. Br. at 7 (quoting *Strickland*, 466 U.S. at 688). The Court disagrees, and holds that, under *Strickland*'s first prong, the Firm's failure to inform the Court about its decision to conduct a review of potential conflicts involving PSA—or the results of that check—was a reasonable one. And because, as discussed above, Curcio was not prejudiced by the Firm's oblique and tenuous relationship with PSA, any failure to disclose that relationship does not raise a viable ineffective assistance of counsel claim under *Strickland*'s second prong. *See Strickland*, 466 U.S. at 687.

It is true, as Curcio observes, that "[d]efense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem." *Holloway v. Arkansas*, 435 U.S. 475, 485–86 (1978); *see Cuyler*, 446 U.S. at 347 ("Defense counsel have an ethical obligation to . . . advise the court promptly when a conflict of interest arises during the

course of trial."). But a defense attorney only has an obligation to disclose a conflict to the Court once he or she has reasonably determined that an actual or potential conflict may exist in a representation. As the Supreme Court has made clear, "trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel" as to whether a conflict may exist, as defense counsel "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." *Cuyler*, 446 U.S. at 347; *see also United States v. Aiello*, 814 F.2d 109, 110 (2d Cir. 1987) ("Because defense counsel are best positioned to know when a conflict exists or will likely develop during the course of trial, the initial responsibility for preventing the erosion of a client's rights rests on the lawyer's shoulders."); *United States v. Fish*, 34 F.3d 488, 493 (7th Cir. 1994) (similar).

Curcio first argues that the Firm's decision to "conduct[] a review specifically for potential conflicts involving PSA . . . indicate[s] that a specter of such a conflict may [have] existed." Def. Suppl. Br. at 6. But such a review is required under the New York Rules of Professional Conduct: as the Government observes, "every responsible law firm performs conflict checks at the intake of every case." Gov. Suppl. Opp'n at 16 n.5. Rule 1.10(e) of the New York Rules of Professional Conduct provides that "[a] law firm shall make a written record of its engagements, at or near the time of each new engagement, and shall implement and maintain a system by which proposed engagements are checked against current and previous engagements when: . . . (4) an additional party is named or appears in a pending matter." N.Y. R.P.C. 1.10(e). Because Curiel, a representative of Collectors and its subsidiary PSA, testified for the Government at Curcio's trial—and was therefore adverse to Curcio and cross-examined by his counsel—it was reasonable and expected for the Firm to prophylactically check for the existence of any conflict. *See* N.Y. R.P.C. 1.7 cmt. 6 (discussing the potential for a conflict in this circumstance); *Lussier*, 71 F.3d at 462

(same). The mere fact that such a check occurred does not raise the inference that the Firm reasonably knew or expected that it suffered a conflict of interest, and Curcio cites no caselaw to the contrary.

Second, Curcio also argues that the Firm was required to notify the Court about the results of its conflicts check, given the connections between the Firm and PSA that such a check would have uncovered. *See* Def. Suppl. Br. at 7. The Court again disagrees. A district court may rely on the "good faith and good judgment of defense counsel" to determine whether a possible conflict exists. *Cuyler*, 446 U.S. at 347. It is true, as Curcio observes, that the Court has an independent obligation, when "sufficiently apprised of even the possibility of a conflict of interest," to "investigate the facts and details of the attorney's interests." *United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994). But "[w]here the court does not or should not know about a [possible] conflict," due to, for example, defense counsel's "reasonable" assessment "that no conflict existed," "no inquiry is required."[22] *Torres v. Irvin*, 33 F. Supp. 2d 257, 263 (S.D.N.Y. 1998). In the Court's view, this is not a close question: there was no actual or potential conflict here. The Court thus holds that the Firm reasonably determined that no actual or potential conflict existed, for the reasons discussed above and in its May 11, 2026 letter, and that the Firm did not have an obligation to notify the Court about the results of its conflicts check. In short, Simpson Thacher's decisions to (1) conduct a conflicts check and (2) not inform the Court about the results of the

[22] In his supplemental motion, Curcio implies that the Court's failure to hold a *Curcio* hearing after Simpson Thacher was allegedly aware of "a specter of" a conflict of interest constitutes "per se reversible error." Def. Suppl. Br. at 6–7. Not so. "Because the Court was not aware of any alleged conflict of interest" before the post-trial *ex parte* letters from Curcio which precipitated the May 20 hearing and the instant motion, any alleged "failure to investigate the conflict of interest and conduct a *Curcio* hearing is not a basis for granting a new trial." *United States v. Garcia*, 2024 WL 2032990, at *6 (S.D.N.Y. May 7, 2024), *aff'd*, 2026 WL 817711 (2d Cir. Mar. 25, 2026) (summary order); *see also United States v. Rogers*, 209 F.3d 139, 143 (2d Cir. 2000) (noting that a district court's inquiry obligation is triggered "whenever it is *sufficiently apprised* of even the possibility of a conflict of interest" (emphasis added)); *Cuyler*, 446 U.S. at 346–47 ("Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.").

same were objectively reasonable under prevailing professional norms, and thus cannot form the basis of an ineffective assistance of counsel claim under *Strickland*'s first prong. And, for the reasons discussed above, because Curcio cannot demonstrate any prejudice accruing from these decisions, this claim fails under *Strickland*'s second prong, too.

## CONCLUSION

For these reasons, Curcio's motions for a new trial and for an evidentiary hearing are denied. Curcio's sentencing shall be held, as previously scheduled, on August 26, 2026, at 1:00 p.m. *See* Dkt. 143. The Clerk of Court is respectfully directed to terminate the motions pending at Docket Number 102 and Docket Number 145.

SO ORDERED.

Dated: July 27, 2026
New York, New York

Ronnie Abrams
United States District Judge