**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

August 12, 2026

**BY ECF**

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Anthony Curcio*, 24 Cr. 312 (RA)**

Dear Judge Abrams:

The Government opposes defendant Anthony Curcio's request for a *Fatico* hearing. The Government respectfully submits that, as set forth below, the trial and evidentiary record more than adequately establish factual bases for all the contested issues under the applicable standard and, thus, no *Fatico* hearing is necessary.

## Applicable Standard

Just because a defendant requests a *Fatico* hearing does not make one necessary. *United States v. Phillips*, 431 F.3d 86, 983 (2d Cir. 2005) ("The district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. All that is required is that the court afford the defendant some opportunity to rebut the Government's allegations.") (quoting *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996)). "[T]he procedure followed in resolving disputed factors at sentencing rests in the district court's sound discretion." *United States v. Prescott*, 920 F.2d 139, 144 (2d Cir. 1990). Indeed, the "sentencing court is afforded broad discretion in resolving disputed factual issues." *United States v. Ambrosio*, 129 F.3d 114, 1997 WL 701368, at *2, n.1 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991)). When deciding between a *Fatico* hearing and another means of resolving a factual dispute, the sentencing court should consider "the nature of the dispute, its relevance to the sentencing determination, and applicable case law." United States Sentencing Guidelines ("U.S.S.G.") § 6A1.3 cmt.

A district court's "factual findings at sentencing need be supported only by a preponderance of the evidence." *United States v. Ryan*, 806 F.3d 691, 694 (2d Cir. 2015). Furthermore, "a sentencing court, like a jury, may base its fact-finding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

The sentencing court "is entitled to rely on any type of information known to it" in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). At a sentencing hearing, the Federal Rules of Evidence do not apply, and the Court is not bound by rules governing hearsay, so long as the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights. *See United States v. Fatico*, 579 F.2d 707, 711 (2d Cir. 1978); U.S.S.G. § 6A1.3 cmt. (same); *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("Both the Supreme Court and this Court, however, have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."). "[O]ral and written statements" and a chance to submit evidence constitute "adequate opportunity" to challenge a sentence. *United States v. Brinkworth*, 68 F.3d 633, 640-41 (2d Cir. 1995) (upholding trial court's decision not to grant a *Fatico* hearing where the court decided contested issues based on legal memoranda, grand jury testimony, and oral argument). Indeed, courts routinely impose enhancements under the Guidelines based on witness testimony—sometimes the testimony of a single witness. *See, e.g.*, *United States v. Frazier*, 805 F. App'x 15, 18 (2d Cir. 2020); *United States v. Cirineo*, 60 F. App'x 342, 344 (2d Cir. 2003). There is particularly little need for a *Fatico* hearing where, as here, the Court presided over a lengthy trial where there has been extensive evidence presented as to the matters the defendant disputes. *See United States v. Guang*, 110 F.3d 110, 122 (2d Cir. 2007) (affirming the district court's decision not to hold a *Fatico* hearing where the district court "had heard extensive trial testimony, had observed the demeanor of the witnesses and assessed their credibility[,] . . . [and] had reviewed the submissions of all parties, as well as the presentence investigation report," and the defendants "had notice of the proposed enhancements, including the evidence upon which the enhancements were based, and had an opportunity to dispute the evidence").

**No *Fatico* Hearing Is Necessary**

The defendant has requested a *Fatico* hearing to resolve his objections to the Presentence Investigation Report ("Presentence Report" or "PSR"). The defendant in substance made three objections. First, the defendant contends that the area of his home where cards with fake grades and various tools were found was not a "workshop" for creating cards with fake grades and that the tools found there were not used for creating cards with fake grades, as described in paragraph 14 of the Presentence Report. (PSR at 47). Second, the defendant objects to including in the intended loss amount, as described in paragraphs 45, 47, and 54 of the Presentence Report, the market value of the cards on the "Finished Cards List" (GX 4159) on the basis that there is purportedly insufficient evidence to show the defendant intended to sell those cards. (PSR at 48). Third, the defendant objects to the obstruction of justice enhancement in U.S.S.G. § 3C1.1, as set forth in paragraphs 48 and 49 of the Presentence Report, on the basis that the defendant did not intimidate or threaten any witnesses and did not file a frivolous lawsuit against a victim. (PSR at 49). The Court can readily resolve all these objections based on the trial record, reliable documents, and undisputed facts and the defendant has received ample "notice of the proposed enhancements, including the evidence upon which the enhancements were based," and "had an opportunity to dispute the evidence." *Guang*, 110 F.3d at 122. Thus, no *Fatico* hearing is needed.

*Curcio's Workshop*

Paragraph 14 of the Presentence Report states, "the FBI found a workshop at his home where CURCIO was creating the fake PSA grades." Based on the trial record, "workshop" is an accurate description of the workspace found in the defendant's home.

There was ample evidence introduced at trial—testimony, photographs, and physical evidence—showing that the defendant used a room on the first floor of his home as a workshop to create the cards with fake grades. In that room, the FBI recovered multiple tools that could be used to create fake graded cards, as well as numerous cards with fake grades, and the component parts that the defendant used to make the cards with fake grades, such as loose PSA labels, ungraded cards, and counterfeit PSA plastic holders, as well as authentic PSA holders that had been cracked open. (Tr. 1540-41, 1544-49, 1558-62 (Curiel testimony identifying cards with fake grades, loose PSA labels, counterfeit PSA plastic holders, and cracked open authentic PSA holders recovered during the search of Curcio's residence); GX 5702 (summary chart identifying cards with fake grades reviewed by Curiel, including sample cards from search); Tr. 1160-68 (Campbell testimony identifying tools recovered during the search); GXPs 13 (binder of graded trading cards), 14 (toolbox containing sand paper, razor blade, buffing attachments, erasers, Q-tips), 16 (roll of label stickers and blank card holders), 17 (box containing rubber gloves, lens wipes, Q-tips, Kurt's card care tin, sharpie), 20 (physical 3D printer), 21 (trading cards), 22 (Zebra label printer), 23 (box with loose labels from PSA and other grading companies, including PSA 10 labels), 24 (drill with buffing and electric grinding pen), 25B-C (bags with graded and raw trading cards), 30 (rotary tool), 31 (cutting tool and instructions for handheld inkjet printer), 34 (acetone), and 35 (resin)). Photos of the defendant's workspace taken at the time of the FBI's search—admitted as evidence and about which Special Agent Christopher Campbell testified—depict a room storing many types of items, including tools that could be used for making cards with fake grades, cards with fake grades, and a desk set up as a workspace. (GXs 3-71; Tr. 1126-30, 1136-56 (Campbell testimony describing what was found during the search of the defendant's residence)). For example, Government Exhibit 7 shows a desk covered in trading cards, labels, empty card cases, a screwdriver, Swiss army knife, paint brushes, and toothbrush, among other things. Indeed, at the time of the defendant's arrest, he appeared to be actively working on creating fake PSA grades based on the arrangement of these items in his workshop. Thus, whether the defendant used this area of his residence *exclusively* for making fake grades, as the defendant suggests is required to be a "workshop," is wholly irrelevant to whether he *also* used the space, at least in part, as a workshop for making the fake grades.

The defendant also objects to the description that various items recovered at his residence were tools that could be used to create fake graded cards on the basis that there was no expert testimony on this topic. Expert testimony is not necessary for the Court to easily conclude that the acetone, erasers, glue, buffing and sanding tools, razor blades, loupe, 3D printer, and Zebra label printer, and other items admitted in evidence and found at the defendant's residence could be used as tools to create cards with fake grades. Evidence admitted at trial and collected during the investigation overwhelmingly established that these items could be—*and in fact were*—tools to create inauthentic PSA graded cards. For example, Curcio texted co-conspirator Dennis Ha that, as part of their fraud, Curcio used "cracked off cards- sanded down from 400 to 10,000 grit, then

buffed with tiny ass machine" and "it's not easy. Takes me sometimes days to get one good enough to attempt. Then when I do, the welder becomes another issue. Start again. Repeat and repeat. I'll get it right, I always do, just takes time." (GX 2466-E2). Law enforcement recovered these "cracked off cards" and "sand[ing]" and "buff[ing]" tools from Curcio's workshop. Additionally, co-defendant Iosif Bondarchuk testified that he saw the defendant use chemicals, erasers, razor blades, drills, and buffers, to create and put together the cards with the fake grades, holders, and labels. (Tr. 637-42). The witness from PSA also testified that acetone, among other household chemical products, could be used to remove text from a PSA label. (Tr. 1566). In messages between the defendant and victim Luke Raynolds admitted at trial, the defendant discussed that a loupe was a useful tool for examining cards. (Tr. 392-93; GX 1101E-4). In addition, PSA used a Zebra label printer to print its labels, which the Government had disclosed to the defendant before trial. Accordingly, the Presentence Report's characterization of these items as tools that could be used to create fake graded cards is accurate.

In sum, to the extent the Court even thinks this matter will affect sentencing, *see* Fed. R. Crim. P. 32(i)(3)(B), there is more than sufficient evidence in the trial record for the Court to conclude by a preponderance of the evidence that the defendant had a workshop to create cards with fake grades in his home and that the defendant could—and did—use the tools recovered there to create cards with fake grades.

*The Intended Loss Amount and the Finished Cards List*

Paragraphs 45, 47, and 54 state that the intended loss amount is $1.5 to $3.5 million based on: (1) known sales or attempted sales to victims and on certain online marketplaces for which records were obtained; and (2) an estimated market value during the time period of the conspiracy of the cards on Curcio's "Finished Cards List," which is GX 4159. The estimated value of the cards on the "Finished Cards List" should be included in the intended loss amount because there was ample evidence at trial showing that the cards on that list had fake grades and that the defendant intended to sell them.

The "Finished Cards List," which is the given file name, is an Excel file recovered from Curcio's electronic device from a folder named "ill eagle". (GX 4159-M, S-5). The "Finished Cards List" lists 162 cards, including columns listing their PSA certification number, the card year, the card manufacturer, the player, the grade, and "notes." (GX 4159; Tr. 1504).

Evidence inherent to the "Finished Cards List" and other trial evidence shows the defendant intended to sell the cards on the list. First, GX 5702, a summary chart listing cards with fake grades that were sold to victims or recovered from auction sites and for which the physical cards where recovered by law enforcement, shows that at least twenty of those cards sold to victims were also on the defendant's "Finished Cards List." (Tr. 1506, 1519, 1524, 1526, 1528-30, 1534, 1536-38, (Curiel testimony regarding whether cards listed in GX 5702 appear in GX 4159)). Thus, Curcio in fact sold many of the cards on the "Finished Cards List" to victims and those cards had fake PSA grades. For many other cards on the "Finished Cards List," the notes column lists the names of auction sites that sells trading cards or notes trades, indicating that the defendant sold or attempted to sell the cards. (GX 4159 (*see, e.g.,* notes mentioning eBay, PWCC, Goldin, and Veriswap, which are websites where one can sell trading cards, as well as notations of trades)). As

to those entries on the spreadsheet, however, law enforcement has not found or recovered the physical cards. The spreadsheet also lists the cards the defendant sent to PSA to reholder, and the PSA witness testified at trial that those cards had fake grades. (GX 4159 (*see* rows noting "sent to PSA for reholder"); Tr. 1570-75)). Notably, for one of the cards on the "Finished Cards List" listed as a PSA 10, the note states it was "prev BGS 5.5"[1], indicating the defendant had changed the grade of a card that had previously been graded a BGS 5.5 to have a fake PSA 10—further corroboration that this was a list tracking the cards with fake grades that the defendant had created to sell. (GX 4159 (*see* row 13)). In addition, the fact that the file was titled "Finished Cards List" suggests this was a list of cards with fake grades the defendant had *finished* making. Lastly, the fact that the defendant saved the "Finished Cards List" in a folder titled "ill eagle"—*i.e.*, illegal—shows that the defendant intended to use the cards on that list for his fraud scheme. There was also no credible evidence at trial that the defendant intended to use the cards with fake grades for any purpose other than his fraudulent scheme to defraud buyers.

Moreover, the Court can easily conclude by a preponderance of the evidence that the intended loss amount was between at least $1.5-$3.5 million even without accounting for the market value of the cards in the "Finished Cards List." The defendant's known sales or attempted sales to victims and on certain online marketplaces for which records were obtained totals approximately $1.55 million. The intended loss amount as currently calculated in the Presentence Report also does not include an estimated market value of the many cards with fake grades recovered from the defendant's residence, which, if included, would drive the intended loss higher. Thus, even without the market value of the "Finished Cards List," the intended loss amount was comfortably between $1.5 million and $3.5 million.

In sum, there is abundant evidence for the Court to conclude that the "Finished Cards List" listed the cards with fake grades the defendant created and that the defendant intended to sell. The Court can—and should—thus consider the market value of the cards on that list to determine the intended loss amount. In all events, regardless of whether the Court incorporates the market value of the cards on the "Finished Cards List," other evidence shows the intended loss amount was between $1.5 to $3.5 million.

*Obstruction of Justice*

Paragraphs 48 and 49 correctly apply an enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice on the basis that: (1) the defendant threatened a victim with violence by invoking the Hells Angels gang, and (2) the defendant filed a frivolous lawsuit based on false information against one of his victims during his fraud scheme.

First, regarding the threat, victim Ashish Jain testified at trial that, after he sought to reverse his card deal with the defendant because Jain realized the cards had fake grades, and after Jain informed the defendant that he would contact the FBI and the police (GX 1916 at 11, 18), the defendant (while pretending to be Bondarchuk) falsely claimed the cards were owned by a leader of the Hells Angels gang, which Curcio intended and Jain understood to be a violent threat. Text messages admitted at trial show the defendant made this threat to Jain after describing Fabel as

[1] BGS is Beckett Collectibles, another prominent grading card company. (Tr. 1575).

someone who "damag[es] others" and had "no concern about any rule or law or boundary that should" be crossed (GX 1916 at 20, 30), and Jain's testimony confirms that he understood the defendant's threat as such and that the defendant was threatening violence. (*See, e.g.*, Tr.535:23-25 ("Rick Fabel is the head of the Hells Angels that had just recently got released from prison"); 536: 3-4, 6-7 ("who would want to deal with that? Right? Like -- because I'm not stupid"; "Gangster biker gang -- biker gang. Similar to the mob, the New York mob."); 541:4-7 (Jain confirming that he understood the Fabel threats as referring to violence)). The Court can securely conclude based on this trial evidence that the defendant intended to threaten Jain to prevent him from both reporting the conduct and keeping the cards with fake grades as evidence of the defendant's fraud. *See* U.S.S.G § 3C1.1 cmt. 4(K) ("threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction").

Second, regarding the lawsuit, paragraphs 34 and 35 of the Presentence Report provide a summary. While committing his fraud scheme, the defendant sued a victim[2] to whom the defendant had sold cards with fake grades and to whom the defendant had given cards with fake grades to sell on the defendant's behalf. The defendant frivolously and brazenly sued the victim for breach of contract and defamation, among other claims. The defendant falsely alleged in his complaint that the victim had mistakenly believed the cards had fake grades, had refused to return the defendant's property, and had defamed the defendant by posting on Facebook that card collectors should not do business with the defendant because the defendant sold counterfeit cards.[3] The lawsuit, notably, also appears to repeat the lie the defendant concocted with co-conspirator Dennis Ha that the defendant obtained the fake graded cards as partial compensation from the sale of a gym to Ha. (Ex. A ¶ 3.1 (claiming that in 2019 the defendant "acquired a large number of valuable cards as partial compensation when he sold his business entity"); *see* GX 2466-E2, E5, E6). No judge has determined the lawsuit was meritorious. The defendant obtained a default judgment against the victim because the victim did not respond to the lawsuit.[4] The cards the defendant provided the victim and at issue in the lawsuit have been recovered by law enforcement, and they have fake grades. Two of the cards were listed on the summary chart of cards with fake grades (GX 5702 (*see* entries for GXP 55A and B)), and those cards were on the "Finished Cards List." (GX 4159). In addition, before giving cards to the victim, the defendant sold three of the cards to two other victims who testified at trial and who returned the cards to the defendant when they realized the grades were fake. There is ample basis for this Court to determine by a preponderance of the evidence that the defendant's lawsuit against the victim was based on false information and thus frivolous, and that the defendant obstructed justice by filing this lawsuit against a victim. *See* U.S.S.G § 3C1.1 cmt. 4(F) ("providing materially false information to a judge or magistrate judge"), and 4(K) ("threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction.").

---

[2] This victim did not testify at trial.

[3] The defendant's complaint against the victim is attached as Exhibit A, with the victim's name redacted. In light of the evidence introduced at the defendant's criminal trial, the frivolity of the complaint is, frankly, self-evident.

[4] The default judgment against the victim is attached Exhibit B, with the victim's name redacted.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

by: /s/______________________________
David R. Felton
Kingdar Prussien
Cecilia Vogel
Assistant United States Attorneys
(212) 637-2299/-2223/-1084