**SUPERIOR COURT OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

| | |
|---|---|
| ANTHONY J. CURCIO, AND CURCIO MEDIA, INC., its successors in interest and/or assigns,<br>Plaintiffs,<br>v.<br>[redacted]<br>Defendants. | No.<br><br>**SUMMONS** |

TO THE DEFENDANTS: A lawsuit has been started against you in the above-entitled court by Anthony J. Curcio and Curcio Media, Inc., ("Plaintiffs"). Plaintiffs' claims are stated in the written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing and serve a copy upon the undersigned attorney for the Plaintiffs within twenty (20) days (if service is made on you within the State of Washington) or within 60 days (if service is made on you outside the State of Washington) after the service of this summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is one where plaintiff is entitled to what it asks for because you have not

responded. If you serve a notice of appearance on the undersigned, you are entitled to notice before a default judgment may be entered.

You may demand that Plaintiffs file this lawsuit with the court. If you do so, the demand must be in writing and must be served upon Plaintiffs. Within fourteen (14) days after you serve the demand, Plaintiffs must file this lawsuit with the court, or the service upon you of this summons and complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 24th day of November, 2023.

**CURCIO MEDIA, INC.**

By: [signature]
Anthony Curcio

**SUPERIOR COURT OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

| | |
|---|---|
| ANTHONY J. CURCIO, AND CURCIO MEDIA, INC., its successors in interest and/or assigns,<br><br>Plaintiffs,<br><br>v.<br><br>[redacted]<br><br>Defendants. | No.<br><br>**COMPLAINT FOR BREACH OF CONTRACT, BREACH OF GOOD FAITH AND FAIR DEALING, CONVERSION OF PROPERTY AND DEFAMATION AND LIBEL PER SE.** |

Comes now Plaintiff Anthony J. Curcio, who claims and alleges as follows on information and belief except as otherwise stated:

## I. PARTIES

1.1 Plaintiff ANTHONY J. CURCIO is a resident of King County, Washington and has been a resident at all times material hereto.

1.2 Plaintiff CURCIO MEDIA, INC., is a Washington Corporation organized under the laws of the State of Washington, with its principal place of business in King County, Washington.

1.3 Defendant [redacted] is an individual and a resident of San Bernadino County, California.

1.4 Defendant [redacted] is a California Corporation organized under the laws of the State of California, with its principal place of business in San Bernadino County, California.

1.5 Defendant [redacted] appears to be a DBA of [redacted] and/or [redacted] and is not a separate legal entity.

## II. JURISDICTION AND VENUE

2.1 The Superior Court has original jurisdiction over this cause of action pursuant to RCW 2.08.010.

2.2 Venue is appropriate in King County, Washington pursuant to RCW 4.12.025(1), as the defendants conducted business within King County, Washington.

## III. FACTS

BASEBALL CARDS TRADED, PURCHASED AND CONSIGNED

### A. Background facts and Card information

3.1 Plaintiff Anthony J. Curcio ("Anthony") has owned, bought, sold and traded cards originally as a hobby and had a personal collection of cards since 2000. In 2019 he significantly expanded his collection when he acquired a large number of valuable cards as partial compensation when he sold his business entity. He has since bought, traded and sold some of those cards. The sports card industry started booming in 2020, with the value of cards doubling, tripling and many even increasing by 10x their value in a short time. Noticing the extreme jump in value of cards, Anthony began actively selling and trading cards as the president of Curcio Media, Inc. Baseball cards can be graded by third party entities, at which time they are assigned a case and a score, or "grade". Ungraded or "raw" cards are also extremely valuable, and simply mean they have never been graded or put into a case by a third-party grading company. Anthony began regularly selling, trading and purchasing cards at trade shows, local card shops, online auctions, with individual collectors he met in the industry, etc.

3.2 Anthony plead guilty to a non-violent, yet elaborately planned armored car heist,

executed under the influence of drugs in 2008, and was sentenced to six years in federal prison. Upon his release from prison, he has devoted his life to working with youth in the field of drug abuse and crime prevention, speaking to students and athletes across the U.S. He has coached his daughter's basketball teams as well as other local youth teams in the Northwest for multiple years. He also wrote multiple best-selling children's books, addressing challenging issues and delivering heartfelt messages to children through his books. He takes pride in his positive impact on children's lives and has spent countless hours serving the kids in his community, as well as his own. He has built an upstanding reputation and successful business ventures as a result of his dedication to giving back.

**B. Meeting [redacted] at Palm Springs Card Show**

3.3 On or about September 17, 2023, during the normal course of his trading card dealings, Anthony met [redacted] as the representative for "[redacted] acting on behalf of "[redacted]" at the Palm Springs Card Show (the "Card Show"). [redacted] explained he was the owner of [redacted] and sold sports cards through its consignment company called [redacted].

3.4 While at the Card Show, Anthony shows [redacted] a few cards from his Curcio Media collection, all of which [redacted] claims to be interested in. [redacted] examined Anthony's cards with a 10x jewelers loupe, explaining [redacted] verification process, while inspecting Anthony's cards, after which [redacted] asks Anthony whether he'd consider "consigning with the [redacted]." At the Card Show, Anthony and [redacted] agree to a trade involving several cards and $6,800.00 was paid to Anthony by [redacted] as part of the trade agreement reached (the "Trade"). [redacted] and Anthony share lunch together, are friendly in their conversation and Anthony discloses his criminal background, as he does with most people he meets and engages in conversation with. Before leaving the convention, [redacted] inquired if Anthony owned any other cards he would be interested in selling and expressed interest in doing business together. [redacted] advises Anthony he runs [redacted] which is an 'elite' invite-only collectibles auction house

and card shop that would be interested in consigning cards for Anthony. Anthony said he'd consider the idea and get back with him.

3.5 On or September 19, 2023, [redacted] requested photos of two of Anthony's cards and provided his email to do so. Because the photos weren't sent immediately, the following day [redacted] states via text "No super rush but "whales" don't grow on trees... " implying that Anthony needed to move faster if he wanted the make the transaction happen.

3.6 Once home, Anthony sent [redacted] photos of the requested cards and advised [redacted] they are two of the most expensive in his collection, so he would like to fly down and deliver the cards, if [redacted] found an interested buyer for them. Immediately [redacted] states he has an interested buyer. [redacted] promised huge dollar amounts he would receive from each sale, inducing him to send down the cards quickly. Because of time constraints, and having just returned from California, Anthony decided to send the cards insured and tracked via UPS, rather than flying down with the cards.

**C. <u>Transaction At Issue</u>**

3.7 In addition to the two high value graded cards that [redacted] was interested in, Anthony sent six ungraded cards and requested that [redacted] give him an idea of value, assuming they could range in value anywhere from $25-600 per card. Anthony was the rightful owner of the eight cards he sent to [redacted] for consignment and review.

3.8 Two of the cards were graded by PSA, in cases or "slabs" and provided with PSA registration numbers were:

a. Nolan Ryan 1968 TOPPS #177 PSA 9, Registration number 20932587

b. Joe Montana 1981 TOPPS #216 PSA 10, Registration number 25039430

Referred to together as (the "Consigned Cards").

3.9 The other six were "raw" or baseball cards had not yet been graded by any grading company. The cards are identified and described as follows:

a. 1968 TOPPS # 330 Roger Maris, ungraded

b. 1968 TOPPS # 220 Harmon Killebrew, ungraded

c. 1968 TOPPS #80 Rod Carew, ungraded

d. 1968 TOPPS #500 Frank Robinson, ungraded

e. 1968 TOPPS #100 Bob Gibson, ungraded

f. 1968 TOPPS #490 Super Stars, ungraded

Referred to together as (the "Raw Cards").

**D. Agreement Made**

3.10 It was agreed been Anthony and Defendant [redacted] on behalf of [redacted] and [redacted] that The Consigned Cards would be sent to Defendants to be consigned and sold to a third party for an agreed upon minimum amount of $80,000.00 gross proceeds to Curcio Media, of which Defendant [redacted] would retain 25% of the actual sales price for facilitating the sale. If the Consigned Cards were not sold for at least the minimum amount agreed upon, they were to be returned immediately to Anthony. The Raw Cards would be sent to Defendants to be assessed for value, and then returned to Anthony. (the "Agreement").

3.11 Anthony requested a written contract be put in place asking [redacted] to send "something simple used before as a BASIC contract for this type of thing" documenting the transaction and terms of their agreement. [redacted] seemingly agreed, stating "I use my LetterHead Trademarked Email for all deal." On September 25, the day Anthony shipped the cards to [redacted], he again requested a contract outlining the terms of the agreement via email. In the email Anthony outlined the terms of their agreement, which was that [redacted], on behalf of [redacted] would be responsible for safe keeping of the cards while in his possession and agreed to return the cards if not sold by an upcoming auction. (Exhibit "A")

3.12 UPS delivered the cards on or around September 28, 2023, at which time [redacted] confirmed receipt of the cards via email, acknowledging and in response to Anthony's written request for the agreed upon terms to be put into a written agreement. A copy of the email confirming receipt of the cards is attached as Exhibit "B".

3.13 Upon receipt and review of the cards, Defendant [redacted] emailed Anthony confirming that he had negotiated a sale, and that Anthony could expect to receive $71,000.00 from the sale of the Consigned Cards. A copy of the email confirming the expected sale proceeds for the Consigned Cards is attached as Exhibit "C".

3.14 Defendants did not sell the Consigned Cards, or, if they were sold, Defendants did not provide Anthony nor Curcio Media with the agreed upon proceeds from the sale.

3.15 Defendants have refused to return the Consigned Cards and Raw Cards, and contended that some of the cards were counterfeit. Defendants did not identify any specific reasoning for which they had believed some of the cards to be counterfeit, other than knowledge of Anthony's background; nor did Defendants provide any evidence, photos or other documentation supporting this claim.

3.16 On or about October 7, 2023, Defendant [redacted] advised Anthony that he would be providing the Consigned Cards to a third-party for-profit grading company (PSA). Anthony reminded [redacted] that he was the owner of the cards, and that unless Defendants intended to purchase the Consigned Cards, that he did not authorize the cards to be provided to this third party, and requested that the Consigned Cards be immediately returned.

**E. <u>Only Plaintiff was operating under good faith</u>**

3.17 On or about October 4, 2023 [redacted] mentions that he has a buyer who is interested in another one of Anthony's Graded Card, to which Anthony said he'd like to hold off and didn't want to send another card to [redacted]. [redacted] then responds via "Absolutely correct. PSA called today and asked if I had anymore cards... They want to examine all the PSA cards you gave me from that period...", implying the entire statement was an attempt to induce Anthony to provide him another valuable card and not actually act as a consigner to a third party buyer.

3.18 After claiming that the Consigned Cards were provided to a third party, for-profit business, Defendants further claimed that the Raw Cards were destroyed under [redacted]'s belief

they are counterfeit. Anthony informed Defendants they had no right to provide the Consigned Cards to a for-profit third party, nor destroy the Raw Cards, and he expected to be reimbursed for the full value if they were no longer in possession of the cards to return as demanded.

3.19 Once Anthony demanded full reimbursement and/or immediate return of the cards, Defendant [redacted] changed what he claimed happened to the Consigned Cards, and claimed they were surrendered to police. Despite multiple written requests by Anthony for badge information, case numbers or any identifying information so that he could verify Defendants' claim of surrender, no evidence has been provided by Defendants that the cards were seized by police.

3.20 On or about October 4, 2023, as part of an agreed upon unwinding of the first Trade agreement at the card show, Plaintiffs refunded [redacted] for funds Anthony received as a part of the Trade in the amount of $6,800, plus $200 in fees for assessed by Paypal. (Exhibit "D")

3.21 Despite multiple requests by Anthony, Defendants have not returned the Consigned Cards nor the Raw Cards, and he has not been compensated for the Cards.

## IV. <u>CAUSES OF ACTION</u>

BREACH OF CONTRACT – AGAINST [redacted] AND [redacted]

4.1 Plaintiffs incorporate by reference paragraphs 1.1 though 3.21 and further alleges.

4.2 A valid, binding Agreement exists between Plaintiffs and [redacted] in connection with the Consigned Cards being provided to the care of [redacted] and [redacted] to be sold to a third party, for which [redacted] would retain a percentage of the sale, and if for any reason the cards were unsold, immediately returned to Anthony.

///

///

4.3 Anthony performed his obligations under the Agreement, delivering the Graded Cards and Raw Cards to Defendants, of which receipt and confirmation of value was provided by Defendant [redacted]

4.4 Defendants materially breached the Agreement by the conducted alleged herein, including but not limited to, not finding a buyer for the Consigned Cards, as agreed. Defendants further breached the Agreement by not returning the Consigned Cards immediately upon the demand of Anthony.

4.5 Plaintiffs Anthony Curcio and Curcio Media was damaged as a direct result of Defendants' breach of the Agreement.

BREACH OF GOOD FAITH AND FAIR DEALING – AGAINST [redacted] AND [redacted]

4.6 Plaintiffs reallege and incorporate by reference paragraphs 1.1 though 4.5 as set forth herein and further alleges.

4.7 In Washington, every contract contains an implied covenant of good faith and fair dealing, including the agreement made between the parties.

4.8 The Agreement between Plaintiffs and Defendants constitutes a valid and binding contract, which, by operation of law, includes an implied duty of good faith and fair dealing, requiring the parties to cooperate with each other so that each may obtain full benefit of performance.

4.9 The covenant of good faith and fair dealing prohibits a party from doing anything to prevent the other party to the contract from receiving the benefits and entitlements of the contract.

4.10 By and through Defendants acts and omissions alleged herein, [redacted] both individual and acting on behalf of [redacted] and [redacted] intentionally breached the Agreement with Anthony, and in doing so breached the duty of good faith and fair

dealing. Defendant [redacted] advised Anthony that he was refusing to return the Raw Cards, with his opinion that "you should not be in possession of those cards."

4.11 As a direct and proximate result of the Defendants' breaches of the implied covenant of good faith and fair dealing associated with the Agreement, Plaintiffs Anthony Curcio and Curcio Media, Inc. have experienced substantial damages.

CONVERSION OF PROPERTY – AGAINST [redacted] AND [redacted]

4.12 Plaintiff realleges and incorporates by reference paragraphs 1.1 though 4.11 as set forth herein and further alleges.

4.13 Plaintiffs are the legal owner of the Graded Cards and Raw Cards, herein referred together as ("The Cards").

4.14 As soon as [redacted] provided the Graded Cards and Raw Cards to a for-profit third party against the specific request of Plaintiff not to do so, Defendants, with knowledge that the personal property was owned by the Plaintiff, took and unlawfully converted it to their own use and benefit.

4.15 Immediately upon Defendant [redacted] notifying Plaintiff he had unlawfully converted Plaintiff's personal property, Anthony demanded that [redacted] return the cards or reimburse him for its value.

4.16 Defendants have refused to return the cards to Plaintiffs, have refused to reimburse him for the value of the cards, and have continually refused to do so up to the time of the filing of this suit.

4.17 Defendant [redacted] insisted to Anthony that the cards Anthony had sent were "...COUNTERFEIT and now with Law Enforcement via PSA" despite providing no evidence to support that claim and multiple requests for any additional information pertaining to [redacted]s claims.

4.18 The taking and conversion of Plaintiff's personal property by Defendants was done willfully and maliciously, with no regard to Plaintiffs' rights to the property, causing Plaintiffs to suffer damages in the amount of the fair market value of The Cards, estimated at $141,000.00, plus attorney's fees and costs of suit.

DEFAMATION AND LIBEL PER SE – AGAINST [redacted]

4.19 Plaintiff realleges and incorporates by reference paragraphs 1.1 though 4.18 as set forth herein and further alleges.

4.20 Plaintiff Anthony Curcio has spent the past ten years rebuilding not only his reputation, but the community around him, through his books, volunteer work coaching kids, and public speaking engagements directly engaging children and teens. Anthony relies heavily on his rebuilt social connections within the community, and makes a consistent and conscious effort to ensure his prior conviction doesn't define the rest of his life.

4.21 Plaintiff Anthony Curcio has just recently released, through the world's leading public service broadcaster known for their impartial and independent content, a multi-country phased released series podcast beginning September 2023 with weekly releases throughout 2023.

4.22 Plaintiff Anthony is working on creating a docuseries, which is currently in production, which captures what lead to the conviction, as well as the life Anthony has built, including redeeming himself through extraordinary giving of both time and resources since release, and any false and misleading statements would create loss of revenue for not just Plaintiff Anthony, but other third parties involved in production.

4.23 Defendant [redacted]'s communications had been threatening law enforcement actions as well as referencing Anthony's family as forms of intimidation. On or about October 18, 2023, Anthony realized he was not going to get any further in his communications with Defendant [redacted] in his attempts to be reimbursed for the Cards or have the Cards returned. As such, he blocked text communications from him.

4.24 On or about October 19, 2023 Defendant [redacted] retaliated to Anthony blocking him via text, by creating a post to a public Facebook group entitled "Buying and Selling Vintage Cards | Investors and Collectors" with nearly 30,000 members accusing Anthony of "peddling counterfeit Vintage Cards at shows from the MidWest to California" located at https://www.facebook.com/groups/760929360750145/permalink/2632943983548664/. (Exhibit "E"). He later responded to questions related to his original post, in which he refers to Anthony as a "con man" and suggests the other user "YouTube him". (Exhibit "E cont.")

4.25 Selling Counterfeit goods is a crime.

4.26 [redacted]'s statements are false. Anthony has not sold counterfeit goods and is not a "Con Man".

4.27 Defendant [redacted] intentionally attributed criminal acts to Anthony, stating that Anthony sold counterfeit goods and is a "con man," and acted with actual malice.

4.28 A reasonable person, upon reading and hearing these false allegations, would have believed and relied upon Defendant [redacted]'s statements.

4.29 Individuals hearing of Defendant [redacted]'s false allegations did believe and rely upon Defendant's statements.

4.30 Anthony Curcio has been harmed and damaged in his reputation and his business by Defendant's statements.

4.31 Plaintiff is informed and believes and on that basis alleges that Defendant [redacted] published false and defamatory statements about Plaintiff Anthony Curcio.

4.32 The false and defamatory statements, by imputing serious and criminal conduct to Plaintiff Anthony, caused damage to his reputation and exposed him to public hatred, contempt, ridicule and financial injury.

4.33 Defendant [redacted]'s statements constituted slander, libel and defamation per se.

4.34 Plaintiff is informed and believes and on that basis alleges that Defendant [redacted] made these statements with actual malice and reckless disregard for the truth.

4.35 As a result of Defendant [redacted]'s false and defamatory statements, Plaintiff Anthony has suffered damages for which the Defendant is liable.

4.36 Plaintiff Anthony is entitled to punitive damages from Defendant [redacted] in order to penalize and deter the Defendant from repeating his conduct.

## V. PRAYER FOR RELIEF

WHEREFORE, having fully alleged its causes of action, Plaintiff prays for the following relief:

5.1 Award Plaintiffs their actual, general and specific, plus compensatory damages against Defendants in an amount to be determined at trial;

5.2 Award Plaintiff Anthony Curcio punitive damages against Defendant [redacted] in an amount to be determined at trial;

5.3 Enjoin Defendants from making false, disparaging, or misleading statements about the Plaintiffs;

5.4 Declare Defendant [redacted]s statement to be defamatory and false and enjoin Defendant to publicly retract all statements made about Plaintiff Anthony Curcio;

5.5 Ordering Defendants to print a full retraction in the Facebook group in which the known published statements were made, as well as all websites controlled by Defendants' stating that Plaintiff is not selling counterfeit or altered cards;

5.6 Ordering Defendant [redacted] personally contact all individuals and businesses to retract all statements made about Plaintiff, his moral character, quality of business transactions, and any other negative statements related to Plaintiff;

5.7 Reimburse Plaintiffs of reasonable attorneys' fees, costs, and expenses;

5.8 Award Plaintiffs pre-judgment and post-judgment interest at the legal rate on the damages, attorney's fees and costs of suit awarded; and,

5.9 Such other and further relief as this Court deems equitable and just.

DATED this 24th day of November, 2023.

**CURCIO MEDIA, INC.**

By: ______________________
Anthony Curcio

From: **PNW Sports Cards LLC** <pnwsportsllc@gmail.com>
Date: Mon, Sep 25, 2023 at 10:21 AM
To: [redacted]

Hey [redacted]

I'm wondering if u had a contract you use that covers basics regarding transaction, mostly than I'm sending to you my 3-4 most valuable cards and that you will be responsible for safe keeping while in possession, etc. Then agreement to return if not sold in upcoming auction?

Let me know, thanks!

**Agreement**

[redacted]
To: PNW Sports Cards LLC <pnwsportsllc@gmail.com>

UPDATE:

I received your Box today.

NOLAN RYAN 1968 TOPPS #177 PSA 9 ... Registry number 20932587
JOE MONTANA 1981 TOPPS #216 PSA 10 .... Registry number 25039430

1968 TOPPS # 330 Roger Maris
1968 TOPPS # 220 Harmon Killebrew
1968 TOPPS #80 ... Rod Carew
1968 TOPPS #500 ... Frank Robinson
1968 TOPPS #100 ... Bob Gibson
1968 TOPPS #490 ... Super Stars

The Six (6) cards are Raw and UN-Graded.

Please call me when you receive this email.

Ty [redacted]

[redacted]

---

**From:** PNW Sports Cards LLC <pnwsportsllc@gmail.com>
**Sent:** Monday, September 25, 2023 10:21 AM
**To:** [redacted]
**Subject:** Agreement

Hey [redacted]

I'm wondering if u had a contract you use that covers basics regarding transaction, mostly than I'm sending to you my 3-4 most valuable cards and that you will be responsible for safe keeping while in possession, etc. Then agreement to return if not sold in upcoming auction?
Let me know, thanks!

From [redacted]
Date: Thu, Sep 21, 2023 at 12:04 PM
Subject: Re: Ryan/Montana
To: PNW Sports Cards LLC <pnwsportsllc@gmail.com>

Anthony ...
I have negotiated a price based on them looping the card, the market and the age of the grade.
The Centering will definitely come into play as standards have changed.

I have serious investors looking into the Ryan and a local collector looking into the Elway.
If they Pass I have an Auction planned in the beginning of October with minimum bids for 12 to 15 cards. I would add your two card to the auction as they would not compete with the other cards. That will go out to over 27000 buyers so we will have lots of folks looking to bid.

All monies on cards over $10,000 are Bank Wired to me. Smaller items can be paid by PayPal Goods.

1. The Ryan ...
I quoted $65000 which is $5000 over the bottom of the Vin-Grid

2. The Elway ...
I quoted $6000 which is the standard going price. He doesn't know much about older grades so the beauty of the card will be the main factor.

LMK what you want me to do. Also, Do you have any other Vintage Cards with you?
I know you have the Jordan, Koufax and Rose I dealt to you. They would go great in the Auction as well as some others you have?

Thx [redacted]

[redacted]


Buying and Selling Vintage Cards | Investors and Collectors
Community home
Buying and Selling Vintage Cards | Investors and Collectors
Join group
Share
Discussion
Buy and Sell
Featured
People
Media
Questions
Events
Files
[redacted]
ALERT to our members of Buying and Selling Vintage Cards Investors and Collectors ..
The man is Anthony Curcio ( check him out on YouTube)
is peddling counterfeit Vintage Cards at shows from the MidWest to California. Most seem to be PSA SLABS where the Registry numbers begin at 20000000 to 29000000.
White Holo PSA in the Middle. He personally pawned off over 10 to me valued over $200,000.
Shown are a few. He lives in Washington State. Do Not do business with him. Notify security if you see him selling at your show. Law Enforcement is involved.
1957 TOPPS
BROOKS ROBINSON
#328
NM - MT
8
25349886
About
Hello there! We strongly urge you to only use PayPal goods and services for transactions within this group.
Please keep in mind that we focus ... See more
Public
Anyone can see who's in the group and what they post.
Visible
Anyone can find this group.
Learn more
Recent media
HANK AARON—RF
See all

[redacted]'s Post ×



5w Like Reply Share

[redacted] Author
[redacted] send me a better picture PM
UPCLOSE on the bottom half of the card.
I'll tell you if it's fake in 10 seconds.

5w Like Reply Share

[redacted] Author
[redacted] Both sides please

5w Like Reply Share

↳ View all 2 replies

[redacted] Author
[redacted] Josh
You DO NOT have one of his counterfeit cases.

5w Like Reply Share

Write a public reply...

[redacted]
Those are really good fake slabs. Other than the red color being too thick on the top.

5w Like Reply Share

[redacted] Author
[redacted] The Slabs are Counterfeit.
I can't comment on the exact reasons.
As the Owner of this Group, I don't want to see anyone burned by this con man.
YouTube him. Research for yourselves.

2

5w Like Reply Share

↳ View 1 reply

Write a public reply...

3:31 5G 30

Wallet Activity

Get live package tracking →

Search by name or email

Automatic Payment -$67.95

**Apple Services**
Oct 8

Automatic Payment -$13.20

[redacted]
Oct 4

Money sent -$200

"Fee reimbursement"

[redacted]
Oct 4

Money sent -$6,800

Home Finances Payments Deals Wallet

SUPERIOR COURT OF CALIFORNIA

Compiled References Courtesy Of The Legal Helpdesk @ SafeTek.com

# Service of Legal Process
## Laws, Regulations, Points & Authorities
## (State of California Jurisdictions)

## Legal Authority & Presumptions

"Service of Legal Process" or "Service of Legal Documents" by a registered Process Server or a California Licensed Private Investigator is legally authorized by the CA-B&P (California Business & Professions Code)[Section 22350(b)(4)]; a compliant process server has the same authority as a Deputy Sheriff or Marshal, and while making a lawful service of process may willfully enter any lands, uncultivated or under cultivation, unenclosed or enclosed by fence, regardless of any displayed signs forbidding trespass, that may belong to, or be occupied by, another, without the permission of the landowner, the owner's agent or of the person in lawful possession of the land (CA-CPP - California Code of Civil Procedure [Section 602.8(c)(3)]).

California Evidence Code section 604 states: "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate." Thus, it is presumed that service made by a registered process server in California was proper unless credible documentary proof is introduced as evidence that would support a finding that service was not proper.

California Evidence Code section 647 states: "The return of a process server registered pursuant to Chapter 16 (commencing with Section 22350) of Division 8 of the Business and Professions Code upon process or notice establishes a presumption, affecting the burden of producing evidence, of the facts stated in the return." The code creates a presumption of proper service of process if the documents were served by a registered process server.

## Evasion or Refusal of Service by Parties

Service of process on a party or individual evading service is specified by CA-CCP [Sections 415.10 and 415.20(b)] - There is NO requirement of service for a person touch or take physical possession of the legal documents; any acceptance or refusal of the documents is irrelevant. Personal service is completed by the simple act of advising the party that service is being attempted and leaving the documents in the presence or proximity ("easy speaking distance") of the party, regardless whether the party accepts the documents.

An individual's failure to respond may result in additional Court awarded costs against an evading or non-responding party for any or all of the following: (1) Costs by a licensed private investigator including research, records searches, surveillance, made in attempt to accomplish service. (2) Attempts of alternative service methods including service at places of employment or alternate addresses, substitute service (an ostensibly qualified adult present at the time), service by publication, or service by means of a court ordered break-in by a Sheriff. (3) Any other alternative legal means of service.

Service made on a person that refused to identify themselves is legal and valid. When an individual has refused to show their identification when asked by a server, and the server has notified the individual that they have legal documents for the named party, then the server may complete service by announcing the effected service and leaving those documents in the presence of that individual.

## "Substitute Service" of Parties

California Code of Civil Procedure (CA-CCP) sections 415.20(a),(b) pertain to service of process on a party via "Substitute Service" - In lieu of "Personal Delivery" the service of specified court documents may be accomplished via "Substitute Service"; if the court documents cannot with reasonable diligence be personally delivered to the person to be served accordingly (CCP Sections 416.10 thru 416.90), service is completed by the act of leaving copies at the party's usual place of business, mailing address (United States Postal Service Boxes exempted), dwelling house, or place of abode, in the presence or proximity ("easy speaking distance") of an appropriate person (who at that time at least 18 years of age and ostensibly in charge of the location, or a competent member of the household), and who shall be informed of the contents thereof, and by thereafter mailing copies of those documents to the person to be served (via prepaid first-class mail to the address where the document copies were left); acceptance or refusal of the documents is **not** relevant. Service in this manner is deemed complete on the 10th day after the mailing.

Substituted service at an "old" address has been deemed appropriate if the address is the one on-file with the DMV (CA Department of Motor Vehicles) [Vehicle Code 1808.21(c)], or the party uses the address as a mailing address [CA-CCP 415.20(b)].

Most common court documents can be served via "Substitute Service" – Documents that are often sub-served include the standard California "Summons", "Complaints", "Notices", and "Plaintiffs Claim and Order to go to Small Claims (SC-100)"; however there are some documents that may require "Personal Service" which may include "Restraining Orders", "Order for Examination", "Order to Show Cause (FL-300), and "Subpoenas" (for a Personal Appearance and or Production of Records and or Things),."

MAR 2 7 2013
ATTEST
By ________ Deputy

## Case Law – Service of Legal Process and the Evasion or Refusal of Service

*In re Ball* [(1934) 2 Cal App 2d 578, 579, 38 P 2d 411] – Service cannot be denied by simply moving away or not accepting the papers: "We take it that when men are within **easy speaking distance** of each other and facts occur that would convince a reasonable man that personal service of legal documents is being attempted, service cannot be avoided by denying service and moving away without consenting to take the documents in hand."

*Crescendo Corp. v. Shelted* [(1968) 267 Cal App 2d 209,212,72 Cal Rptr 776] – "Personal service usually contemplates actual delivery of the summons and Complaint to the person to be served. However, the person on whom service is sought to be made may not by merely declining to take the document or documents offered to him claim that personal service was not made on him because the documents were not actually delivered to him. Under such circumstances, where it would be obvious to a reasonable person that personal service was being attempted, the service may be made by merely depositing the process sought to be served in some appropriate place where it would most likely come to the attention of the person being served."

*Thomdyke v. Jenkins* [61 Cal App 2d 119] – "Service of a Summons on an evader was sustained when, after the Defendant had refused to take the papers, the process server tossed the folded papers over a wire fence and they landed at the feet of the Defendant as the server informed him that they were legal papers."

*Trujillo v. Trujillo* [71 Cal App 2d 257, 162 P 2d 640] – "Personal service of process is supported by evidence showing that the Defendant attempted to avoid service, and that the process server, after explaining the nature of the documents to the Defendant while the latter sat in his automobile, left copies in the Defendant's custody and control by placing them under the windshield wiper, where they were dislodged and lost when the defendant drove away.

*Khourie, Crew & Jaeger v. Sabek* [220 Cal.App.3d 1009, 269 Cal.Rptr. 687 (1990)] - It is established that a Defendant will not be permitted to defeat service by rendering service impossible." A party cannot attempt to avoid service of process by refusing to accept the documents; this includes refusing to open a secured door or refusing to identify themselves. If a person refuses to open the door after being notified regarding the nature of the documents, then the process server may compete service by simply 'posting' the papers on the door - More recent cases have affirmed this and also allow service by calling the defendant on a mobile phone while standing outside the party's door. The court found that defendant's argument that service failed because the process server did not somehow manage to get past the locked door and into the office is unpersuasive; "The evident purpose of CCP section 415.20 is to permit service to be completed upon a good faith attempt at physical service on a responsible person, plus actual notification of the action by mailing the summons and complaint to the appropriate party." *Additionally*, if an individual is concealed in a building or vessel, so as to prevent the service upon them, any Court officer may, upon proof by affidavit of the concealment, and of the materiality of the individual, make an order to serve accordingly, and for that purpose the Sheriff of the county may break into the building or vessel where the witness is concealed (CA-CCP [Section 1988]).

## Case Law - Service of Legal Process and "Substitute Service"

*Pasadena Medi-Center Associates v. Superior Court* [Supreme Court (1973) 9 Cal.3d 773, 108 Cal.Rptr. 828, 511 P.2d 1180] – Service is valid when made on a person with **ostensible** authority, when plaintiff relies on agent who represented his authority to receive process, and defendant is estopped from raising service objections because person served was not authorized to receive service.

*Stafford v. Mach* [64 CA4th 1174 (1st Dist. 1998)] – Service made on a person that refused to identify themselves is legal and valid. When an individual refuses to show their identification when asked by a server, and the server has notified the individual that they have legal documents for the named party, then the server may complete service by announcing the effected service and leaving those documents in the presence of that individual, and by thereafter mailing copies of those documents to the named party to be served to the address where the document copies were left. On the corresponding proof of service, the server should note that the person served was "John Doe", with an ostensible position or title (such as "co-occupant" or "receptionist"), and an approximate physical description (gender, ethnicity, age, height, weight, hair...). In this case the server reported that "an Asian male answered the door" and "began asking a lot of questions such as why the server was asking for the subject and who sent the server." The male said he had never heard of Mach before, refused to show identification, and threatened to call the cops. The server then "announced drop service" and left the papers in the presence of the male by literally dropping them in front of the male at his door. Stafford held that service in this manner is proper and valid.

*Ludka v. Memory Magnetics Int'l* [25 Cal.App.3d 316 (2nd Dist. 1972)] – Service made on a person sharing an office with the defendant, but not working for the same company, is legal and valid. After being informed that the party to be served was out and no one else was available, the documents were served by tossing them on a nearby table in the presence of a receptionist and informing her "You're served" Copies of the documents were then mailed to defendant party. The defendant unsuccessfully challenged the service arguing that service was invalid because the receptionist was not authorized to accept service and because a third party in the reception area threw the papers in the trash. The court rejected these arguments and held that service "amply complied" with code section 415.20 and that the gratuitous actions of third party did not render service ineffective. Based on these facts and circumstances at the time, the receptionist was determined to be "the person who was apparently in charge" of the office.

*Khourie v. Sabek* [(1990) 220Cal App 3d 1009] - The court ruled that substituted service upon a third-party non-employee, who was in custody and control of the office where service was being attempted was appropriate and complete (even though that party allowed the documents to be discarded after the service). A common application of this principle is the service upon a receptionist in a "virtual office" or "fegian suite" but who is not an employee of the entity being served.

SUPERIOR COURT OF CALIFORNIA

Compiled References Courtesy Of The Legal Helpdesk @ SafeTek.com

**Service of Legal Process**
**Laws, Regulations, Points & Authorities**
**(State of California Jurisdictions)**

## Due Diligence

The service rules differ when serving "entity" defendants" and "individuals"

- Due Diligence is NOT REQUIRED for service of non-individuals; the "reasonable diligence" requirement is not in place for substituted service on entity defendants; (entities such as businesses, corporations, etc.) [CA CCP § 415.20, sub(a)].
- Small Claims cases have NO "Due Diligence" or "Reasonable Diligence" requirements to effect Substitute Service – Small Claims documents can be sub-served on the first attempt, with no need for due diligence [CA-CCP §116.340(a)(3)]. Substitute service must be effectuated 25 days prior to the hearing date (15 days per normal service [CCP §116.340(b)], plus 10 days for mailing [CA-CCP §415.20(b)]).
- There is no "reasonable diligence" requirement in place for substituted service on CMRA "Agents" of individuals or entities; Due Diligence is NOT REQUIRED for service of at a CMRA; however, for a valid service the CMRA must follow through with their required compliance with B&P § 17538.5 (otherwise service may be quashed if CMRA's compliance is neglected). [CA Civil Code 415.20(c)]
- Substituted service cannot be made on individual defendants (persons) unless a good faith effort at personal service is attempted [CA CCP § 415.20, sub(b)]. Ordinarily, ... two or three attempts at personal service at a proper place should fully satisfy the requirement of "reasonable diligence" (Espindola v. Nunez (1988) 199 Cal.App.3d 1389, 1392 [245 Cal. Rptr. 596]), and allow substituted service to be made" (Bein, supra, 6 Cal.App.4th at pp. 1391-1392).

## Secured/Gated Communities or Facilities

California Code of Civil Procedure (CA-CCP) sections 415.21(a) pertains to service of process at a secured or gated community or complex - When performing lawful service of process or service of a subpoena, a process server must be granted access to a gated community or complex; if an individual controlling access (such as a guard or attendant) denies the server reasonable access then that individual may be sub-served as either a person in charge of the business or a competent member of the household.

CA-CCP Section 415.21.(a): Notwithstanding any other law, any person shall be granted access to a gated community or complex for a reasonable period of time for the sole purpose of performing lawful service of process or service of a subpoena upon displaying a current driver's license or other identification, and one of the following: (1) A badge or other confirmation that the individual is acting in his or her capacity as a representative of a county sheriff or marshal. (2) Evidence of current registration as a process server pursuant to Chapter 16 (commencing with Section 22350) of Division 8 of the Business and Professions Code or of licensure as a private investigator pursuant to Chapter 11.3 (commencing with Section 7512) of Division 3 of the Business and Professions Code. CA B&P Code 415.21(b): This section shall only apply to a gated community or complex which, at the time service of process is attempted, is staffed by personnel who controls access to the community or complex.

## Commercial Mail Receiving Agency (CMRA) / AKA "Private Mailboxes"

An eligible document may be sub-served at a CMRA (such as a UPS Store Box, Postal Annex, Mailboxes etc...) – CMRAs are required to act as agent for service of process for the mail receiving service customer, even two years after the mailbox has been closed (may be utilized to effectuate service on evasive parties).

CA Civil Code 415.20(a): "*In lieu of personal delivery of a copy of the summons and complaint to the person to be served as specified in Section 416.10, 416.20, 416.30, 416.40, or 416.50, a summons may be served by leaving a copy of the summons and complaint during usual office hours in his or her office or, if no physical address is known, at his or her usual mailing address, other than a United States Postal Service post office box, with the person who is apparently in charge thereof...*" NOTE: This code also exempts United States Postal Service Post Office Boxes from being able to receive service (there is no permissible way to serve a USPS PO Box or a Post Office with documents).

CA B&P Code 17538.5 (d)1 "*Every person receiving private mailbox receiving service from a CMRA in this state shall be required to sign an agreement, along with a USPS Form 1583, which authorizes the CMRA owner or operator to act as agent for service of process for the mail receiving service customer. Every CMRA owner or operator shall be required to accept service of process for and on behalf of any of their mail receiving service customers, and for two years after termination of any mail receiving service customer agreement. Upon receipt of any process for any mailbox service customer, the CMRA owner or operator shall (A) within 48 hours after receipt of any process, place a copy of the documents or a notice that the documents were received into the customer's mailbox or other place where the customer usually receives his or her mail, unless the mail receiving service for the customer was previously terminated, and (B) within five days after receipt, send all documents by first-class mail, to the last known home or personal address of the mail receiving service customer. The CMRA shall obtain a certificate of mailing in connection with the mailing of the documents. If the CMRA has complied with these requirements, the CMRA must provide any involved party a declaration under penalty of perjury of the mailing and attach a copy of the Certificate of Mailing, stamped by the USPS. Service of process upon the mail receiving service customer shall then be deemed perfected 10 days after the date of mailing.*"

The document to which this certificate is attached is a full, true and correct copy of the original on file and of record in my office. I further certify the said Letters are in force and effect and have not been revoked.
ATTEST MAR 2 7 2013
JOHN A. CLARKE, Executive Officer/Clerk of the Superior Court of California, County of Los Angeles.
By __________ Deputy

## Case Law - Service of Legal Process & Reasonable Diligence

*Espindola v. Nunez* [(1988) 199 Cal.App.3d 1389, 1392; 245 Cal. Rptr. 596] & *Bein Supra* [6 Cal.App.4th at pp. 1391-1392] - Ordinarily, ... two or three attempts at personal service of an individual defendant at a proper place should fully satisfy the requirement of "reasonable diligence", and allow substituted service to be made." The process server made three separate attempts to serve the Brechtels at their residence. Each time, the gate guard denied access. Substitute service was appropriate.

## Case Law - Service of Legal Process Guards & Secured Communities or Complexes

*Bein v. Brechtel-Jochim Group, Inc.*[6 Cal.App.4th 1387, 8 Cal.Rptr. 351 (1992)] – Substituted service on a guard of a gated community or complex who denies access may be sub-served as either a person in charge of the business or a competent member of the household when the defendant authorizes the guard to control access.

## Case Law - Service of Legal Process & Commercial Mail Receiving Agencies

*Ellard v. Conway,* [94 Cal.App.4th 540, 114 Cal.Rptr. 2d 399 (2001)] - Substituted service proper at a Commercial Mail Receiving Agency, and due diligence requirement was satisfied by ascertaining forwarding address from the US Postal Service.

## Case Law - Service of Legal Process Presumptions and Capacity

*Palm Properties Investments, LLC v. Yadegar, [194 Cal.App.4th 1419 (2011)]* - Court erred in not applying evidentiary presumption of a registered process server's proof of service under Evidence Code § 647. Summary – The California Court of Appeal ruled on the issue of the rebuttable presumption status of a proof of service signed by a registered process server under Evidence Code § 647. As a condition precedent to the unlawful detainer action, a three-day notice to pay rent was served on the tenants by a registered process server. Although the defendants admitted receiving the notice in a letter through counsel, they filed a motion claiming that the plaintiff had failed to establish a prima facie case, and had not strictly complied with the Unlawful Detainer Act. The court sustained the defendants' objection to the proffer of the proof of service of the notice as evidence, and ruled in favor of the defendants' contention that the plaintiff did not meet its burden in establishing that the notice was properly served. The appellate court reviewed the trial court's finding of fact to determine whether they were supported by the evidence. Because the conclusions of law were based on the evidence, the review was made de novo. Because the service was effectuated by a registered process server, the proof of service should have been admitted. Under Evidence Code § 647, a registered process server's proof of service established an evidentiary presumption, affecting the burden of producing evidence. Absent the defendants' rebuttal evidence, the trier of fact must find for the plaintiff in accordance with the presumption. Therefore, the trial court erred in not applying the presumption. The judgment for the defendant was reversed, and the matter was remanded to the trial court for retrial. This is the first appellate decision addressing Evidence Code § 647 since CAPPS sponsored this legislation over 25 years ago.

*Cory v. Crocker National Bank [123 Cal.App.3d 665, 177 Cal.Rptr. 150, (1981)]* – Capacity notice improperly marked on summons substantially complied with the statute because the corporation was the only named party and the proper person was served.

*MJS Enterprises, Inc. v. Superior Court, [153 Cal.App.3d 555, 200 Cal.Rptr. 286 (1984)]* – It is the capacity notice on the summons, not the process server's proof of service, which asserts judicial power.